# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JUAN ARMSTRONG, et al.,

     Plaintiffs,

v.

     No. 01 C 2963
     MDL No. 1417

AMSTED INDUSTRIES, INC., et al.,

     Judge James B. Moran

     Defendants.





DOCKETED
JAN 2 2 2004

## NOTICE OF FILING

To:    (See Attached Certificate of Service)

        PLEASE TAKE NOTICE that on the 21ˢᵗ day of January, 2004, the undersigned filed with the Clerk of the Court for the United States District Court, Northern District of Illinois, Eastern Division **LaSalle Bank's Motion for Summary Judgment and LaSalle Bank's Brief in Support of its Motion for Summary Judgment.**

                                   Attorney for Defendant LaSalle Bank, N.A.

Theodore M. Becker
Keith C. Hannigan
Scott C. Ryan
JENKENS & GILCHRIST, P.C.
225 W. Washington Street, Suite 2600
Chicago, Illinois  60606
(312) 425-3900
COUNSEL FOR DEFENDANT LASALLE BANK, N.A.

## CERTIFICATE OF SERVICE

I, Scott C. Ryan, an attorney, hereby certify that I caused a copy of **LaSalle Bank's Motion for Summary Judgment** and **LaSalle Bank's Brief in Support of its Motion for Summary Judgment,** to be served as indicated below upon:

*VIA FEDERAL EXPRESS*
Pamela B. Slate
Nicola A. Thompson
Slate Kennedy LLC
2001 Park Place North, Suite 450 (35203)
Post Office Box 370735
Birmingham, Alabama 35237-0735

*VIA MESSENGER*
Gary D. McCallister
Thomas A. Kelliher
Gary D. McCallister & Associates, Ltd.
29 South LaSalle Street, Suite 1210
Chicago, Illinois 60603

*VIA MESSENGER*
Richard H. Schnadig
Charis Runnels
Vedder, Price, Kaufman & Kammholz
222 North LaSalle Street, Suite 2600
Chicago, Illinois 60601

on this 21st day of January, 2004.

Scott C. Ryan

Theodore M. Becker
Keith C. Hannigan
Scott C. Ryan
JENKENS & GILCHRIST, P.C.
225 W. Washington Street, Suite 2600
Chicago, Illinois 60606
(312) 425-3900
COUNSEL FOR DEFENDANT LASALLE BANK, N.A.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUAN ARMSTRONG, et al.,

          Plaintiffs,

v.

AMSTED INDUSTRIES, INC., et al.,

          Defendants.

DOCKETED
JAN 2 2 2004

No. 01 C 2963
MDL No. 1417

Judge James B. Moran

FILED
JAN 2 1 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## LASALLE BANK'S MOTION FOR SUMMARY JUDGMENT

LaSalle Bank, N.A. ("LaSalle Bank"), by its attorneys, and pursuant to Rule 56 of

the Federal Rules of Civil Procedure and Local Rule 56.1, hereby files its Motion for Summary

Judgment. In support of its Motion, LaSalle Bank submits its Brief in Support of its Motion for

Summary Judgment and adopts the Defendants' Joint Statement of Undisputed Material Fact in

Support of Their Motion for Summary Judgment and Defendants' Joint Appendix.

WHEREFORE, Defendant, LaSalle Bank, N.A., respectfully requests that this Court

grant LaSalle Bank's Motion for Summary Judgment.

Respectfully submitted,

LASALLE BANK, N.A.,

By: _____

Attorney for Defendant

1

January 21, 2004

Keith C. Hannigan
Theodore M. Becker
Scott C. Ryan
Jenkens & Gilchrist, P.C.
225 West Washington Street, Suite 2600
Chicago, Illinois 60606-3418
(312) 425-3900

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JUAN ARMSTRONG, et al.,

     Plaintiffs,

v.

AMSTED INDUSTRIES, INC., et al.,

     Defendants.

**DOCKETED**

JAN 2 2 2004

No. 01 C 2963
MDL No. 1417

Judge James B. Moran

FILED

JAN 2 1 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

RECEIVED FOR DOCKETING 03 12

04 JAN 21 PM 4 41

CLERK
U.S. DISTRICT COURT

## LASALLE BANK'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

151

# TABLE OF CONTENTS

I.   BACKGROUND ............................................................................................. 2

II.  COUNT I – THE UNCONTROVERTED FACTS ESTABLISH THAT LASALLE IS NOT
     LIABLE FOR BREACH OF FIDUCIARY DUTY ...................................................... 3

     A.   Applicable Law .................................................................................... 4

          1.   Primary Fiduciary Duties ................................................................ 4

          2.   The Prudence Standard ................................................................... 5

     B.   LaSalle Is Not Liable For Failing To Prevent The Varlen Acquisition ................... 8

          1.   Since Plaintiffs' claim against Amsted for the Varlen acquisition fails, their
               claim against LaSalle must similarly fail .............................................. 8

          2.   LaSalle performed its duty regarding the Varlen Acquisition ...................... 8

               a.   LaSalle did not owe an ERISA fiduciary duty with respect to Varlen . 8

               b.   The Amsted Directors were independent and qualified ................. 10

               c.   LaSalle carefully reviewed procedures employed by Amsted .......... 11

     C.   The Uncontroverted Evidence Establishes That LaSalle Did Nothing Wrong With
          Respect To The Valuation ....................................................................... 15

          1.   LaSalle's trustee role with respect to the valuation ............................... 15

          2.   Duff & Phelp's $184 valuation was carefully considered
               and reasonable ........................................................................... 16

          3.   Amsted, Duff & Phelps and LaSalle all carefully and prudently considered the
               repurchase obligation .................................................................. 17

               a.   Amsted properly considered the repurchase obligation ................. 18

               b.   Duff & Phelps properly considered the repurchase obligation ........ 21

               c.   LaSalle properly considered the repurchase obligation ................. 22

               d.   Plaintiffs concede they have no evidence of causation with respect to
                    the repurchase allegations ............................................................ 23

          4.   The discount for lack of marketability was carefully considered as part of the
               valuation .................................................................................. 25

          5.   The Varlen transaction was appropriately considered in the valuation ......... 27

i

6.     Plaintiffs have no claim under the Uniform Standards of Professional Appraisal Practice ................................................................................ 28

7.     Even assuming some error in the valuation, LaSalle reasonably relied upon Duff & Phelps ................................................................................ 29

D.     LaSalle Cannot Be Liable For Amsted's Post-Valuation Conduct ......................... 31

III.     COUNT III – AS A MATTER OF LAW, LASALLE CANNOT BE LIABLE FOR UNLAWFUL PLAN AMENDMENT .................................................................. 31

IV.     CONCLUSION ................................................................................... 31

## TABLE OF AUTHORITIES

29 U.S.C. 1109 ................................................................................. 23

29 § U.S.C.A. 1109............................................................................ 23

Del.Gen.Corp.Law §141 ...................................................................... 9

Department of Labor Regulation §2510.3-101(a), (c) and (h)(3).................... 10

Proposed Department of Labor Regulation § 2510.3-18(b)-18(b)(3)(ii) ........... 29

ERISA §404(a)(1) .............................................................................. 5

ERISA §404(a)(2) .............................................................................. 5

ERISA, Title 1 .................................................................................. 5

ERISA §404(a)(1)(B)........................................................................... 5

*H.R. Rep. No. 1280*, 93d Cong. 2d Sess. 313, *reprinted* in 1974 U.S. Code Cong. & Admin. News 5038, 5093 ............................................................................... 6

I.R.C. §409(h) ................................................................................. 18

I.R.C. §409(h)(1)(B) .......................................................................... 18
................................................................................................ 18

I.R.C. §409(h)(2)(B) .......................................................................... 18

S. Rep. No. 127, 93rd Cong. 2d Sess., *reprinted* in 1974 U.S. Code Cong. & Admin. News 4838, 4865 ............................................................................... 6


*Anderson v. Mortell*, 722 F.Supp. 462, 473 (N.D. Ill. 1989) ...................... 23

*Brandt v. Grounds*, 787 F. 2d 895, 898 (7th Cir. 1982) ........................... 22

*DeBruyne v. Equitable Life Assurance Society*, 920 F.2d 457, INSERT (7th Cir. 1990) ................... 6

*Donovan v. Cunningham*, 716 F.2d 1455, 1466 (5th Cir. 1983)................... 6
................................................................................................ 10
................................................................................................ 33

*Ershick v. United Missouri Bank of Kansas City*, 948 F.2d 660, 666 (10th Cir. 1991)..................... 7
................................................................................................ 24

*Katsaros v. Cody*, 744 F.2d 270, 279 (2d. Cir. 1984)........................... 6

*Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995)............................................................. 7
........................................................................................................................................... 23

*LaLonde v. Textron, Inc.*, 270 F. Supp. 272, 278 (D. RI 2003) ............................................. 6
........................................................................................................................................... 10
........................................................................................................................................... 25

*Leigh v. Engle*, 727 F.2d 113, 137 (7th Cir. 1984) ............................................................... 23

*Martin v. Feilen*, 965 F.2d 660, 665 (8th Cir. 1992) ............................................................ 6
............................................................................................................................................. 9
........................................................................................................................................... 10

*Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir. 1997) ....................................................... 6

*Moench v. Robertson*, 62 F.3d 553, 571 (3rd Cir. 1995) ...................................................... 7
........................................................................................................................................... 24

*Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98, 104 (2nd Cir. 1998)........................ 23

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUAN ARMSTRONG, et al.,

        Plaintiffs,

v.

                         No. 01 C 2963
                         MDL No. 1417

AMSTED INDUSTRIES, INC., et al.,

                         Judge James B. Moran

        Defendants.

## LASALLE BANK'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiffs have brought this case against LaSalle Bank in an attempt to obtain an unprecedented result. Unlike virtually all other cases in which an ESOP trustee has been held liable for breach of fiduciary responsibility, there are no allegations in this case of disloyalty to the ESOP participants or of self-dealing on the part of the trustee. In fact, there is no hint of any conflict of interest that might have affected LaSalle's performance of its duties. Therefore, in order to fashion a claim, Plaintiffs are alleging that LaSalle essentially was the guarantor of the value of the Amsted shares that it held and that LaSalle should have intervened in the business affairs of Amsted and overturned decisions made by the officers and directors of the Company. In the 30 years since ERISA was enacted, no court has held that an ESOP trustee has obligations of the kind asserted here by Plaintiffs. The radical extension of the scope of an ESOP trustee's liability proposed by the Plaintiffs cannot be supported either by the facts of this case or the law. For the court to expand the breadth of ERISA in the manner requested by Plaintiffs would contravene both the plain language of the law and the policy

1

underlying the law.

## I.  BACKGROUND[1]

This action has been brought against LaSalle Bank by a class comprised of nonretired participants in the Amsted Industries, Inc. Employee Stock Ownership Plan (the "ESOP"). The sponsor of the ESOP is Amsted Industries, Inc., which also is a defendant in the case. LaSalle has been the trustee of the ESOP since 1986.

In August of 1999, Amsted purchased all of the outstanding shares of Varlen, Inc. for a price of $788 million.  In order to finance this purchase, Amsted entered into a $1 billion credit facility agreement with CitiBank.  As of September 30, 1999, the last day of Amsted's 1999 fiscal year, LaSalle's financial advisor, Duff & Phelps, LLC, determined the value of the stock of Amsted to be $184.41 per share.  In making this determination, Duff & Phelps assumed that the value of Varlen was equal to the price that Amsted had paid for it.

During Amsted's fiscal year that ended September 30, 2000, Amsted suffered from a severe downturn in all of the markets in which it conducted business operations.  Its profits declined substantially, and as of September 30, 2000, Duff & Phelps determined that the value of Amsted's stock had declined to $89.87 per share.  Also during fiscal year 2000, an unprecedented number of employees of Amsted left the company.  The benefit to which a terminated participant in the ESOP is entitled is equal to the value of the Amsted shares credited to his or her account.  Pursuant to the terms of the ESOP in effect at that time, retired employees were entitled to demand payment of their benefits under the ESOP immediately in one lump-sum payment. During fiscal year 2000, any employee of Amsted who retired and

---

[1] In the interest of sparing the Court undue repetition, LaSalle adopts, and will not unduly restate, the introductory facts and law contained in Amsted's Brief at pp. 1-7.

2

demanded payment of his or her benefits on or before June 30, 2000 was entitled to benefits calculated by reference to the September 30, 1999 valuation of the Amsted stock. The extraordinary number of retirements and associated benefit distributions during the period October 1, 1999 through June 30, 2000 resulted in a severe cash drain from Amsted.

In order to reduce the outflow of cash necessary to fund the payments of benefits under the ESOP, Amsted made important changes to the benefit payout provisions of its ESOP in the year 2000. First, in April of 2000, Amsted amended the ESOP to provide for benefits to be distributed in the form of shares of the Company's stock, instead of being distributed in the form of a lump-sum cash payment. The Company is obligated to repurchase the distributed shares, and the April 2000 amendment provides for the Company to pay for the distributed shares in installments over a period of four years. In July of 2000, Amsted further amended its ESOP to provide for the value of the Company shares to be redetermined on a quarterly basis, rather than on an annual basis, and for distributions to participants who terminate employment for any reason other than death, disability, or normal retirement to be deferred for a period of five years. These amendments to the Plan were successful in stemming the tide of employee voluntary terminations and reducing the cash demand on the business to repurchase shares from such terminated employees.

## II. COUNT I - THE UNCONTROVERTED FACTS ESTABLISH THAT LASALLE IS NOT LIABLE FOR BREACH OF FIDUCIARY DUTY.

Plaintiffs' theories of liability have been fluid but it appears that they have now settled on three separate allegations of breach of fiduciary duty with respect to LaSalle.[2] First,

---

[2] To the extent that Plaintiffs attempt to contrive new theories or attempt to revive ones which have been abandoned, LaSalle will address those claims on reply.

3

Plaintiffs allege that Amsted's acquisition of Varlen was a breach of Amsted's fiduciary duties and that LaSalle is liable for failing to prevent that acquisition. This allegation fails as a matter of law because the acquisition of Varlen was an entirely proper exercise of Amsted's business judgment. Moreover, assuming that Amsted's acquisition was somehow wrongful, LaSalle met its responsibilities as a prudent trustee to monitor Amsted's actions.

Second, Plaintiffs allege that the September 30, 1999 $184.41 valuation of Amsted's shares was so fundamentally flawed that it amounted to a breach of LaSalle's duty of prudence to accept the valuation from its well-qualified financial advisor, Duff & Phelps. The valuation claim fails as a matter of law because the uncontroverted facts demonstrate that the valuation was prepared in accordance with generally accepted valuation methodologies and was reasonable at the time it was made. Moreover, even if the Plaintiffs were able to create a triable issue of fact with respect to the adequacy of the valuation, they are singularly unable to proffer evidence that the alleged breach caused them any damage.

Third, Plaintiffs allege that LaSalle is liable for what they claim are the belated and insufficient steps taken by Amsted in 2000 to address the liquidity crises engendered by the unexpectedly high turnover of Amsted employees. LaSalle cannot be liable for the actions taken after the valuation (post-October 1999) unless, first, it is proven that Amsted violated its duties. Since Amsted prudently responded to the evolving and accelerating repurchase obligation, and LaSalle properly monitored those actions, LaSalle is not liable.

A. **Applicable Law**

1. **Primary Fiduciary Duties.**

The primary duties of a fiduciary of an employee benefit plan under ERISA are the following:

4

(1)    to act for the exclusive benefit of plan participants and their beneficiaries;

(2)    to act prudently;

(3)    to diversify the investment of the plan's assets; and

(4)    to act in accordance with the plan documents.

ERISA §404(a)(1).    In the case of an employee stock ownership plan, the diversification requirement and the prudence requirement (to the extent that it requires diversification) are not violated by the acquisition or holding of "qualifying employer securities."  ERISA §404(a)(2).

Plaintiffs have alleged generally that LaSalle violated its fiduciary duties under Title I of ERISA, which includes Section 404.  However, their specific allegations relate only to the prudence requirement.  They have not alleged any specific violations of the exclusive benefit or diversification requirements or of the requirement to act in accordance with the plan documents.  Therefore, this brief will focus on an analysis of whether there is any evidence that LaSalle, in its capacity as trustee of the ESOP, violated the prudence requirement.

## 2.    The Prudence Standard.

To satisfy the prudence requirement, a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  ERISA §404(a)(1)(B).  The prudence requirement should be interpreted in light of the policy underlying the laws regulating ESOPs.  Congress has stated that the intended purpose of an ESOP is "to build equity ownership of shares of the employer corporation for its employees."  *H.R. Rep. No. 1280*, 93d Cong. 2d Sess. 313, *reprinted in*

1974 U.S. Code Cong. & Admin. News 5038, 5093. "It is expected that courts will interpret the prudent man rule and other fiduciary standards, bearing in mind the special nature and purposes of employee benefit plans intended to be effectuated by [ERISA]." S. Rep. No. 127, 93rd Cong. 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin. News 4838, 4865.

Courts hearing claims brought against ESOP trustees for alleged breach of fiduciary responsibility must take into account the Congressional policy of fostering the formation of ESOPs. *See Donovan v. Cunningham*, 716 F.2d 1455, 1466 (5th Cir. 1983). *See also Martin v. Feilen*, 965 F.2d 660, 665 (8th Cir. 1992) ("the special statutory rules applicable to ESOPs inevitably affect the fiduciary's duties under § 1104"); and *LaLonde v. Textron, Inc.*, 270 F. Supp. 272, 278 (D. RI 2003) ("Any allegation of breach of fiduciary duty must be considered in light of the special nature of ESOPs"). This court should not broaden the responsibilities of ESOP trustees in the manner suggested by Plaintiffs, for to do so would discourage competent fiduciaries from serving as ESOP trustees and would undermine the Congressional policy of encouraging employee stock ownership.

Further, when evaluating an allegation that an ERISA fiduciary has breached its duty to act prudently, a court must examine the fiduciary's conduct "from the perspective of the time of the investment decision rather than from the vantage point of hindsight." *Katsaros v. Cody*, 744 F.2d 270, 279 (2d. Cir. 1984). *See also, Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir. 1997). ("Prudence is evaluated at the time of the investment without the benefit of hindsight.") As the Seventh Circuit has held, quoting Judge Bua's sensible observation, the "fiduciary duty of care requires prudence, not prescience." *DeBruyne v. Equitable Life Assurance Society*, 920 F.2d 457, 465 (7th Cir. 1990).

6

Where the trustee of an ESOP is independent and has substantial experience managing ESOPs, three federal courts of appeal have held that a court should not substitute its judgment for that of the trustee. *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995); *Moench v. Robertson*, 62 F.3d 553, 571 (3rd Cir. 1995); and *Ershick v. United Missouri Bank of Kansas City*, 948 F.2d 660, 666 (10th Cir. 1991). In *Eshrick*, the Tenth Circuit held that "[j]udicial review of fiduciary actions is highly deferential" and that the decisions of an independent fiduciary will be upheld by a court "unless they are arbitrary and capricious, not supported by substantial evidence or erroneous on a question of law." Id.

Similarly, the Third Circuit has held that an ESOP fiduciary who invests in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision and that a plaintiff may overcome that presumption only "by establishing that the fiduciary abused his discretion." *Moench v. Robertson*, 62 F.3d 553, 571 (3rd Cir. 1995). In *Kuper*, the Sixth Circuit expressed agreement with and adopted the Third Circuit's holding in *Moench* that "a proper balance between the purpose of ERISA and the nature of ESOPs requires that we review an ESOP fiduciary's decision to invest in employer securities for an abuse of discretion." *Kuper*, 66 F.3d at 1459.

Plaintiffs allege that LaSalle violated the prudence requirement by failing to adequately investigate the acquisition of Varlen before it was completed, by failing to adequately review the September 30, 1999 valuation report from its financial advisor, and by failing to assure that Amsted adequately planned for its repurchase liability. LaSalle can be liable for breach of fiduciary duty only if the Plaintiffs can adduce facts which demonstrate, without the benefit of hindsight, that LaSalle's acts or omissions with respect to these matters were imprudent at the

7

time. Plaintiffs cannot do this, and so judgment must be entered against them.

**B.    LaSalle Is Not Liable For Failing To Prevent The Varlen Acquisition.**

Plaintiffs cannot prevail on their claim that LaSalle is liable for Amsted's acquisition of Varlen because the uncontroverted evidence demonstrates that the Varlen acquisition was a reasonable exercise of Amsted's sound business judgment. Moreover, since the Varlen acquisition was a business transaction, LaSalle does not owe any ERISA duty with respect to it.

**1.    Since Plaintiffs' claim against Amsted for the Varlen acquisition fails, their claim against LaSalle must similarly fail.**

As discussed extensively in its brief in support of its motion for summary judgment, Amsted's acquisition of Varlen was a carefully considered, entirely reasonable exercise of business judgment by the officers and directors of Amsted. (Amsted Brief, pp. 12-19). LaSalle adopts the arguments of the Amsted Defendants on this point. The only conceivable source of liability for LaSalle is if the actions taken by the Amsted Defendants to authorize and implement the Varlen acquisition were such an obviously egregious breach of corporate law that LaSalle's failure to replace all of the company's Board of Directors and senior management (all of whom supported the acquisition) was, in and of itself, a breach of LaSalle's duties. Obviously, if there was no underlying breach by the Amsted Defendants, there was no duty by LaSalle to intervene. Since the actions of the Amsted Defendants were reasonable and well within the business judgment rule, LaSalle is not and cannot be liable.

**2.    LaSalle performed its duty regarding the Varlen acquisition.**

    **a.  LaSalle did not owe an ERISA fiduciary duty with respect to Varlen.**

The responsibility for determining whether to proceed with the Varlen acquisition

resided with the officers and directors of Amsted, not with LaSalle. Amsted is incorporated under the laws of the State of Delaware and under applicable provisions of the Delaware General Corporation Law, the determination whether a corporation should acquire another corporation is a matter of business judgment within the discretion of the officers and directors of the acquiring corporation. Del.Gen.Corp.Law § 141. No shareholder vote is required to authorize a corporate acquisition. Del.Gen.Corp.Law. This is true regardless of whether the stock of the corporation is owned by an ESOP or by other persons. The applicable provisions of the Delaware General Corporation Law apply without any distinctions based upon the identity of a corporation's shareholders. As LaSalle's fiduciary expert, Colin M. Henderson, an experienced ESOP trustee, noted in his report, this makes sense because ESOP trustees are not qualified to take primary responsibility for making decisions regarding whether or not the plan sponsor should engage in specific business transactions, and they do not have the resources to investigate proposed business transactions that are available to the plan sponsor's management. (Henderson Report, p. 13)

ERISA fiduciaries are not corporate fiduciaries, and it is not the responsibility of an ESOP trustee to "second guess" the business decisions of the plan sponsor's management. (Henderson Report, p. 13). The duties imposed upon fiduciaries of employee benefit plans by ERISA apply only to transactions that involve investing the assets of the plan or administration of the plan. *Martin v. Feilen*, 965 F.2d 660, 666 (8th Cir. 1992). The assets of Amsted's ESOP were the shares of Amsted. However, as made clear in the Department of Labor's regulations interpreting ERISA, the properties owned by Amsted are not plan assets and, therefore, the conduct and management of Amsted's business is not a matter of ERISA

9

fiduciary responsibility. Department of Labor Regulation §2510.3-101(a), (c) and (h)(3).

Plaintiffs are asking this court to expand the scope of ERISA and impose upon ESOP trustees the responsibility to independently investigate the business decisions made by the officers and directors of the plan sponsor. This would make ESOP fiduciaries virtual guarantors of the financial success of their plans. As the Eighth Circuit has stated, such broad liability cannot be reconciled "with the Congressional intent to encourage the use of ESOPs as a 'technique of corporate finance.'" *Martin v. Feilen*, 965 F.2d at 666. The broadening of the scope of fiduciary liability sought by Plaintiffs also is inconsistent with the Congressional intent to encourage employee ownership through the use of ESOPs, a policy which has been recognized by the courts. *Donovan v. Cunningham,* 716 F.2d 1455, 1466 (5th Cir. 1983); *Martin v. Feilen,* 965 F.2d 660, 665 (8th Cir. 1992); and *LaLonde v. Textron, Inc.*, 270 F. Supp. 272, 278 (D. RI 2003). To expand the scope of ERISA in the manner that would be required to allow a recovery for Plaintiffs in this case would completely undermine the Congressional policy of encouraging employee ownership. No independent bank or trust company would be willing to serve as an ESOP trustee if accepting a trusteeship would impose upon it the responsibility to second guess business decisions of the plan sponsor's management. For this reason, no court ever has held an independent ESOP trustee liable for failing to override a legitimate business decision made by officers or directors of the plan sponsor.

b. <u>The Amsted Directors were independent and qualified.</u>

To the extent that LaSalle deferred to the judgment of Amsted's management with respect to the Varlen transaction, it was reasonable for LaSalle to do so. The undisputed evidence in this case shows that the officers and directors of Amsted were highly qualified to manage the business affairs of Amsted and to fulfill their corporate fiduciary responsibilities.

Plaintiffs have made no allegations to the contrary. The majority of Amsted's directors were "outside" or "independent" directors, who were not employees of Amsted. (Facts ¶ 5). LaSalle was familiar with the experience and qualifications of the officers and directors of Amsted, and Plaintiffs have presented no evidence of any reason why LaSalle should have questioned their capabilities with respect to evaluating the Varlen transaction or to think that it could better evaluate the transaction. Moreover, there is no evidence or allegations that the officers and directors of Amsted were subject to any conflicts of interest that could affect their business judgment in evaluating the transaction.

### c.  LaSalle carefully reviewed the procedures employed by Amsted.

Although under the circumstances, it would have been reasonable for LaSalle to completely defer to the judgment of the officers and directors of Amsted with respect to the Varlen transaction, it did not merely rely on their judgment. Rather, in addition to verifying the independence and qualifications of the officers and directors of Amsted, the undisputed evidence shows that LaSalle also carefully reviewed the procedures undertaken by management in connection with the proposed transaction by taking into account the following information:

> (i)  the officers and directors of Amsted reviewed numerous public documents concerning Varlen, including filings by Varlen with the Securities & Exchange Commission (Facts ¶ 53);

> (ii)  management retained Salomon Smith Barney ("Salomon"), a leading national investment banking firm, to provide counseling in connection with the proposed acquisition (Facts ¶¶ 55, 57);

> (iii)  Salomon conducted a careful and thorough analysis of Varlen and presented detailed reports to the officers and directors of Amsted (Facts ¶¶ 56, 62, 63, 69, 71, 72);

> (iv)  the Board of Directors was kept fully informed of the considerations involved in determining whether to seek to acquire Varlen and on the progress of the acquisition negotiations at all times (Facts ¶¶ 58, 62);

(v) all of the directors of Amsted, including all of the independent directors, concluded that the acquisition of Varlen was in the best interests of the shareholders of Amsted and offered substantial opportunities for growth and synergies (Facts ¶¶ 58, 64, 67, 69);

(vi) Salomon recommended the proposed acquisition and provided detailed financial models and related analysis in support of its recommendation, all of which were reviewed by the officers and directors of Amsted (Facts ¶¶ 62, 69, 71, 72); and

(vii) prior to closing the acquisition, Amsted obtained from Salomon an opinion that the acquisition was fair to Amsted from a financial point of view (Facts ¶ 72).

At all times during the course of the planning by Amsted for and the negotiation of the Varlen acquisition, LaSalle kept itself informed regarding the proposed transaction. (Facts ¶¶ 60, 61). Among other things, Vaughn Gordy, the LaSalle trust officer with primary responsibility for the Amsted ESOP, attended a meeting of Amsted's officers, Salomon and Duff & Phelps in April of 1999, at which the proposed acquisition was discussed in detail (Facts ¶ 60); and Mr. Gordy reviewed the reports and fairness opinion from Salomon. (Facts ¶ 73). Mr. Gordy also discussed the proposed transaction on numerous occasions with Mr. Berg, Amsted's general counsel, reviewed publicly-available information about Varlen and the transaction, and generally monitored the progress of the transaction. (Facts ¶ 75). In addition, LaSalle consulted with its financial and legal advisors regarding the proposed transaction and requested its own independent financial advisor, Duff & Phelps, to review the information that LaSalle obtained regarding the proposed transaction, including financial projections relating to the proposed acquisition and the reports and opinion from Salomon. (Facts ¶ 61).

Plaintiffs fiduciary expert, Wilson Ellis, states that LaSalle was required to independently evaluate the acquisition of Varlen. (Ellis Report, p. 17.) However, he fails to state in his report what additional actions LaSalle should have taken. It is undisputed that the

proposed acquisition was not a matter subject to a shareholder vote. Therefore, even assuming that the Varlen acquisition was unwise for some reason, Plaintiffs cannot state a claim against LaSalle for failing to invoke any procedures to prevent the transaction that were available to it under the Delaware General Corporation Law. Moreover, LaSalle was not asked to buy or sell any assets and, therefore, cannot be faulted for any improper investment decision with respect to assets of the ESOP.

Ellis states that LaSalle could have taken the drastic step of changing Amsted's management or of bringing a shareholders' derivative suit against management. (Ellis Report, p. 20.) However, Plaintiffs have failed to allege any actions on the part of Amsted's officers or directors even approaching the level of misconduct that could possibly have justified such drastic action. Indeed, Ellis in his deposition was unwilling to say that LaSalle should have changed Amsted's management. (Ellis Deposition, p. 20.) It would have been reckless for LaSalle to take the kinds of action suggested by Ellis, for either a management change or a lawsuit would have presented great cost and risks to the Company. If LaSalle had made significant changes in the composition of the Board of Directors or officers of Amsted, there likely would have been a severe disruption in the management of the Company's business affairs. In light of the sustained growth and profitability of the Company over the preceding eight years, together with the steady increase in the value of the Company's stock, it would have been the height of irresponsibility and imprudence for LaSalle to have intervened in the management of the Company. Indeed, because the experienced officers and directors of the Company had concluded that the acquisition of Varlen was in the best interest of the shareholders, if LaSalle had somehow been able to prevent the Varlen acquisition, Plaintiffs

13

then would have complained that LaSalle had prevented the Company from taking advantage of an opportunity to expand and diversify and thereby enhance the value of its shares.

There is no dispute as to the facts relating to the conduct of LaSalle in connection with the Varlen acquisition. Plaintiffs assert that somehow LaSalle's actions were not sufficient, but there is no dispute as to the actions that were taken by LaSalle. Therefore, Plaintiffs' claims against LaSalle relating to the Varlen transaction are ripe for summary judgment. As discussed above, judicial review of the actions of independent ESOP trustees is highly deferential. LaSalle's conduct should not be second guessed by the court unless the court finds that LaSalle acted in an arbitrary and capricious manner. This would be contrary to the undisputed facts, which establish not only that it was reasonable and appropriate for LaSalle to rely upon the judgment of Amsted's management with respect to the Varlen transaction, but also that LaSalle both reviewed the procedures undertaken by management in evaluating the transaction and carefully and actively monitored management's actions and decisions in connection with the transaction. (Facts ¶ 75). As amply demonstrated by the Amsted Defendants in their summary judgment brief, the decision by Amsted's management to acquire Varlen was a good decision on the merits and was a decision that was based on careful consideration of all appropriate factors. Moreover, even if the decision to acquire Varlen was a mistake, that is not sufficient to state a claim of breach of fiduciary duty against LaSalle. Plaintiffs' vague allegations that LaSalle could have done something more, without specifying what LaSalle should have done or why the actions of LaSalle and of the Amsted Defendants were insufficient, are not enough to merit a trial.

### C.    The Uncontroverted Evidence Establishes That LaSalle Did Nothing Wrong With Respect To The Valuation.

Plaintiffs' current favored hypothesis is that the October 1999 valuation of Amsted's shares, performed by Duff & Phelps, was so wrong that it constituted a breach of fiduciary duty for LaSalle to accept that value.[3]   However, even with the benefit of hindsight, the Plaintiffs are unable to proffer any facts that the valuation was incorrect, much less that it was so obviously wrong that it was a breach of fiduciary duty for LaSalle to accept that valuation from the clearly qualified and unconflicted appraisal firm of Duff & Phelps.

### 1.    LaSalle's trustee role with respect to the valuation.

Under the terms of Amsted's ESOP plan document, it was the Trustee's responsibility to determine the fair market value of the Company's stock. (Facts ¶ 18).   Until amended in 2000, the Plan provided that the Company's stock was to be valued once a year, as of the last day of each fiscal year. (Facts ¶ 18).  For the fiscal year ending September 30, 1999, LaSalle retained Duff & Phelps LLC to assist it in determining the fair market value of Amsted's stock. (Facts ¶ 19).  In reaching its determination of the value of the outstanding shares of Amsted as of September 30, 1999, LaSalle relied upon the opinion that it obtained from Duff & Phelps, together with the underlying valuation report prepared by Duff & Phelps. (Facts ¶ 91).  As LaSalle's expert, Colin Henderson, stated in his report, knowledgeable independent institutional trustees with experience in ESOP transactions always retain their own independent financial advisors. (Henderson Report, p. 19.) Plaintiffs do not dispute that it was prudent and

---

[3] As a privately-held, 100 percent ESOP-owned company, Amsted's shares had no public market.  The value of the Amsted shares was set by an annual appraisal conducted by Duff & Phelps at the behest of LaSalle in its capacity as ESOP Trustee.  The details of this valuation process are set out more fully in the Statement of Undisputed Facts (Facts ¶¶ 18-33).

appropriate for LaSalle to retain its own financial advisor in connection with its service as trustee of Amsted's ESOP.

### 2. Duff & Phelp's $184 valuation was carefully considered and reasonable.

To begin with, Plaintiffs cannot proffer any factual evidence that Duff & Phelps' October 1999 valuation was incorrect as of the time it was rendered, much less that LaSalle, in the reasonable exercise of its duty, knew that it was. Rather, the facts establish that Duff & Phelps performed a careful and thorough analysis of Amsted and, based upon that analysis, derived a reasonable value for the shares.

In performing the valuation, Duff & Phelps delved deeply into the financial documents and operations of Amsted. (Facts ¶¶ 22, 23, 79). Duff & Phelps did not simply accept Amsted management's word, as expressed in the projections and operating plans provided to them. Rather, it is undisputed that Duff & Phelps reviewed and independently analyzed the detailed business plans of Amsted's individual business units and, based on that review and analysis, understood the aggregate business profile and forecasts as prepared by the Company. (Facts ¶¶ 22-27, 79).

In addition to understanding the internal view of Amsted's operations, Duff & Phelps' files and report establish that it also considered the general economic conditions that existed in each major industrial grouping represented by the Company and evaluated those observations in its analysis of Amsted. (Facts ¶¶ 27, 28). Going further, within each major sector, Duff & Phelps, LLC analyzed the trends of each Amsted component enterprise. (Facts ¶¶ 23, 27).

Having obtained a comprehensive understanding of the financial performance and prospects of Amsted, Duff & Phelps then identified a number of publicly-traded firms

operating in the various industries in which Amsted operates. The results of this industry-specific comparable analysis were weighted to represent Amsted's mix of business units. (Facts ¶ 27).

With these analyses complete, Duff & Phelps utilized both Comparable Company and Discounted Cash Flow approaches to value. (Facts ¶ 28). These methodologies were appropriately structured to express conclusions as to the value of the invested capital of Amsted as well as its equity. (Gross Report, p. 3).

Based on their review of this data, and given the proximity of the date of the transaction to the end of the plan year, Duff & Phelps, LLC made the determination that the actual transaction price paid for Varlen was the best evidence of fair market value of Varlen, the value of Varlen was added to the value of Amsted's invested capital, and the total was reduced by the cost of the consideration used to fund the purchase. (Facts ¶ 80). This process resulted in a net equity value of Amsted that was the same before and after the Varlen acquisition. The length and breadth of the undisputed record establishes that Duff & Phelps' work was thorough and professional.

### 3. Amsted, Duff & Phelps and LaSalle all carefully and prudently considered the repurchase obligation

Plaintiffs have devoted considerable effort to asserting that the Defendants did not adequately take into account Amsted's repurchase obligation in performing the valuation. However, despite Plaintiffs' best efforts, their argument is manifestly unsupported by the facts. Rather, the uncontroverted evidence establishes that Amsted, Duff & Phelps and LaSalle all considered the repurchase forecast fully and carefully. Moreover, even if Plaintiffs could prove that LaSalle somehow neglected its duties with respect to the repurchase forecast, there

is no contention, much less evidence, as to what the forecast should have been. Indeed, the Plaintiffs have been completely unable, or unwilling, to offer any evidence at all as to what the forecast should have been. Accordingly, as a matter of law, the Plaintiffs' claims based on alleged failures regarding the repurchase obligation fail.

### a. Amsted properly considered the repurchase obligation.

The law requires that an ESOP sponsored by a corporation whose shares are not readily tradable on a national securities exchange must provide that a participant who is entitled to receive a distribution from the plan may demand that his or her benefits be distributed in the form of stock of the employer and that the participant also be must be given a put option. I.R.C. §409(h). That is, the participants must have the right to require the employer (not the ESOP) to repurchase any employer stock distributed to them, using a "fair valuation formula." I.R.C. §409(h)(1)(B). This is generally referred to as an ESOP company's "repurchase liability" or "repurchase obligation." This liability or obligation is a liability or obligation of the company which sponsors the ESOP, not the ESOP trust. I.R.C. § 409(h)(1)(B). In the case of an S corporation, like Amsted, the plan sponsor can require the participants to take their benefits in the form of cash (as opposed to employer stock), with the amount of the benefits determined by reference to the value of the shares allocated to the participants' accounts. I.R.C. § 409(h)(2)(B).

It is an uncontroverted fact that Amsted performed repurchase liability forecasts as part of its annual budgeting and long-range financial planning processes. A five-year forecast of repurchase obligation was produced based on projections of share turnover in the plan, share price and compensation increases. (Facts ¶ 41). During Fiscal Year 1999, the long-term forecast used a turnover assumption (prior to extraordinary items) of nine percent of the

allocated shares. (Facts ¶ 33). Nine percent was an eminently reasonable assumption since actual turnover for 1997 through 1999 had been 9.0 percent, 9.4 percent and 9.0 percent respectively. (Facts ¶ 33).

Following on long-term financial planning forecast, Amsted then developed specific annual repurchase forecasts. (Facts ¶¶ 38-40). The Company collected information from each division containing its best estimate of the repurchase obligation arising within that division in the coming quarters. (Facts ¶ 39). These amounts were compared to the first year in the five year forecast, and any differences were investigated. (Facts ¶¶ 40, 41). In addition, any known events that would affect the repurchase obligation, such as the divestiture of a location, were also incorporated into the forecast. (Facts ¶ 41).

Subsequent to the development of the long-range and annual projections, the repurchase forecasts were reviewed at least quarterly. (Facts ¶ 41). Financial information from each division was updated, any significant deviation from the projections was investigated, and the forecasts were revised. (Facts ¶ 40).

Separately, Amsted acquired from Benefits Consultants, Inc., a leading, professional ESOP plan administrator, a software package, known as "PERLS" that was specifically designed for the purpose of forecasting ESOP repurchase obligations. (Facts ¶ 49). The PERLS software uses the actual account balance and demographic information of the plan and projects the repurchase obligation based on an input set of demographic and financial assumptions and the specific provisions of the plan. (Facts ¶ 50). The assumptions used for the PERLS forecasts were also developed based on the historical experience of the Plan. (Facts ¶ 50). Amsted ran many different PERLS reports and evaluated the results, ultimately

19

concluding that the PERLS output was so heavily predicated on its assumptions that it was useful only as a way to check the forecasts that the Company had already derived (Belger Report, p. 3) and as a way to run "what-if" scenarios.  (D02181).

In addition to forecasting and reconciling the repurchase obligation by year, by quarter, and by division, Amsted performed other analyses regarding its future repurchase obligation. (Facts ¶ 41).  Account balance totals were summarized by age, group, and division. (Facts ¶ 16).  The split of the current year's repurchase obligation between cash payout versus IRA roll-over was also monitored and compared to the expected rate. (Facts ¶ 41).  Diversification was broken down by division, by the percentage of shares eligible for diversification, and by shares that were first eligible for diversification versus those that had been eligible in the prior year.[4] (Facts ¶ 16).  The most important assumptions used in the forecasting were Company specific.  They were developed from historical experience as well as each division's best estimates of future events, and were developed and reviewed by senior officers of the Company. (Facts ¶ 39).

All of these procedures were in place prior to the Varlen transaction, and prior to the challenged September 30, 1999 year-end valuation.  The uncontroverted facts demonstrate that Amsted had a well-conceived process to forecast repurchase liability that was based on sound principles and that was monitored on an ongoing basis.  The forecasts generated by this process had an established history of being accurate and reliable. (Facts ¶¶ 33, 44, 50).  The process culminated in a repurchase obligation forecast for 2000 of $113 million. (Facts ¶

_____

[4] After an ESOP participant has attained a specified age and years of participation in the plan, he or she has the right to "diversify" a portion of the ESOP stock account into other investments in accordance with the provisions of the ESOP plan document.  (Belger Report, p. 2.)

104).[5]  Plaintiffs have not and cannot point to any evidence to dispute the extensive record of Amsted's diligence nor do they contend that $113 million was an amount that presented any challenge for Amsted to pay.  It is therefore an uncontroverted, inarguable fact that Amsted thoroughly considered its repurchase obligation on an ongoing basis.

### b.  Duff & Phelps properly considered the repurchase obligation.

Because the repurchase obligation was a contingent obligation for Amsted, Duff & Phelps properly considered it as one of many elements effecting the October 1999 share-price valuation.   The Discounted Cash Flow valuation methodology used by Duff & Phelps necessarily included management's forecast of repurchase obligation as part of the projected future cash flows.   Moreover, the record is replete with contemporaneous documentary evidence establishing that Duff & Phelps actively and specifically evaluated Amsted's repurchase obligation. (Facts ¶ 43).  For example, on October 16, 1999, Duff & Phelps obtained from Amsted documentation regarding the Company's obligation to buy back shares and how a change in the share value would impact Amsted's funding of its repurchase obligation. (Facts ¶ 43).  Duff & Phelps' internal work papers show that they considered this issue, noting that "Result of higher valuation reduces other contrib., so ESOP has less $. Amsted now has to buy back shares." (Facts ¶ 43).

Plaintiffs' only remaining allegation regarding the repurchase obligation is that Duff & Phelps did not specifically discuss the repurchase obligation in its valuation report.  However, that absence is unremarkable and irrelevant.  There are an almost infinite number of issues that

---

[5] D&P02775 is a schedule showing Amsted's cash flow forecast as of September 27, 1999.  The repurchase obligation forecast is comprised of the sum of the line-items for "ESOP Terminations" ($111 million for 2000) and "Diversification" ($1.7 million).

could be discussed in a valuation report and the absence of one factor, even one that proved significant in hindsight, does not render the report flawed, much less so flawed that it rises to the level of a breach of fiduciary duty. The truth is that the Plaintiffs cannot point to a single case that requires, or even suggests, that a valuation report must specifically discuss an ESOP's repurchase obligation. Accordingly, the uncontroverted facts establish that Duff & Phelps did reasonably consider the repurchase obligation.

### c. LaSalle properly considered the repurchase obligation.

Relying upon the analysis of Amsted and Duff & Phelps, LaSalle also properly considered the repurchase obligation and properly monitored Amsted's repurchase obligation. First, LaSalle knew that Amsted had an established track record of accurately forecasting its repurchase liability and thus reasonably relied upon the company's processes and proven competence. (Facts ¶ 44). Second, LaSalle was aware of Amsted's repurchase liability planning and its use of the PERLS program. (Facts ¶¶ 42, 44). Third, LaSalle periodically spoke directly with Amsted's general counsel, Thomas Berg, regarding the repurchase obligation. (Facts ¶ 42). Finally, LaSalle specifically queried Duff & Phelps regarding the repurchase obligation and the impact of the Varlen acquisition upon it.[6] (Facts ¶¶ 91, 92). In light of the uncontroverted facts that Amsted, Duff & Phelps and LaSalle all gave specific and detailed attention to forecasting the repurchase obligation, Plaintiffs' claims based upon the repurchase obligations fail as a matter of law.

---

[6] LaSalle's ESOP Committee minutes indicate that "Duff & Phelps believed that the Company's plan recordkeeper [sic], [BCI], had conducted a study on this issue." This may reflect an imprecise transcription since the uncontroverted facts are that Amsted was using the PERLS software, a BCI product, as part of its repurchase obligation forecasting process. (Facts ¶ 91). The significance of the query is that LaSalle was plainly taking an active role in monitoring the repurchase obligation.

d. <u>Plaintiffs concede they have no evidence of causation with respect to the repurchase allegations.</u>

Beyond all the evidence establishing that the repurchase obligation was properly considered by both Duff & Phelps and LaSalle, Plaintiffs' case suffers from another fatal flaw: they are unable to show that the alleged failure to consider the repurchase obligation caused any injury. Under ERISA, an action only exists to recover losses that "resulted" from the breach of fiduciary duty. 29 § U.S.C.A. 1109; *Brandt v. Grounds*, 787 F.2d 895, 898 (7th Cir. 1982) ("29 U.S.C. 1109 clearly indicates that a causal connection is required between the breach of fiduciary duty and the losses incurred by the plan.")

The burden is on the plaintiff to prove that any losses to the plan were proximately caused by the breach of fiduciary duty. *Brandt v. Grounds*, 787 F.2d 895, 898 (7th Cir. 1982). *Leigh v. Engle*, 727 F.2d 113, 137 (7th Cir. 1984); see also, *Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98, 104 (2nd Cir. 1998) (holding that 29 U.S.C. § 1109(a) "requires a plaintiff to demonstrate . . . that the plan's losses `result[ed] from'" the breach by proving "some causal link" between the breach and the plaintiff's loss) (citations omitted) (alteration in original); *Kuper v. Iovenko*, 66 F.3d 1447, 1459-60 (6th Cir. 1995) (stating that the "plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan"); *Anderson v. Mortell*, 722 F.Supp. 462, 473 (N.D.Ill. 1989) (plaintiff must prove, rather than speculate, amount of damages caused by breach).

The reason Plaintiffs cannot proffer evidence of causation is because it does not exist. The great weakness of the Plaintiffs' case is that even if Defendants had done everything Plaintiffs now say should have been done, it would not have produced a materially different forecast. The simple truth is that no one knows, and there is no evidence as to, why the

23

turnover of Amsted employees increased so dramatically in 2000. Even with the benefit of years of hindsight and countless hours of lawyer and expert time, Plaintiffs cannot offer any evidence as to why so many Amsted employees unexpectedly left the company in 2000. Obviously, if Plaintiffs cannot establish what happened, with the benefit of after the fact perception, it would have been impossible for Defendants to predict in 1999 what was coming.

This point is driven home by the uncontroverted testimony of Mr. Joseph Belger, an expert in repurchase obligation studies. Having considered the record available in 1999, Mr. Belger has concluded that no repurchase forecaster could have predicted the turnover Amsted suffered in 2000. (Belger Report, p. 6). Moreover, Mr. Belger has further opined that, having considered the evidence regarding the employees who did leave in 2000 (in other words, considering the evidence with the admitted benefit of hindsight), there is no pattern as to who left that explains the extraordinary turnover. (Belger Report, p. 6). Accordingly, the uncontroverted evidence establishes that Plaintiffs cannot offer sufficient evidence with respect to causation to sustain their burden and judgment should therefore be entered against them.

Plaintiffs' inability to establish any causal connection between the acts and omissions of LaSalle about which they complain, on the one hand, and the decline in the value of the shares of Amsted held by the ESOP, on the other hand, shows that the gist of Plaintiff's complaint really reduces to the fact that there has been a decline in the value of Amsted's stock. It is well established that a mere showing of a decline in the value of shares of a plan sponsor held by an ESOP is insufficient to show imprudence on the part of the ESOP trustee. *Ershick v. United Missouri Bank of Kansas City*, 948 F.2d 660, 668 (10th Cir. 1991). As recently stated by the federal court for the District of Rhode Island, "ESOPs are not intended to guarantee

retirement funds, and they place employee retirement assets at a greater risk than the typical ERISA-regulated plan." *LaLonde v. Textron,* 270 F. Supp. 272, 278 (2003). Similarly, the Eighth Circuit has noted that "ESOPs, unlike pension funds, are not intended to guarantee retirement benefits." *Moench v. Robertson,* 62 F.3d 553 (3rd Cir. 1995).

### 4. The discount for lack of marketability was carefully considered as part of the valuation.

Plaintiffs have also criticized the absence of a discount for lack of marketability from Duff & Phelps' September 30, 1999 valuation. A marketability discount is applied in valuing an asset when there is no established market. Whether a marketability discount should be applied to the valuation of a particular company obviously depends upon the circumstances of the company and the likelihood that it will default. Duff & Phelps applied a 0% marketability discount to the October 1999 Amsted valuation. (Facts ¶ 97). Plaintiffs concede that determination of a marketability discount is essentially a subjective determination. (Clawson Deposition, p. 12). Even further, Plaintiffs agree that a 0% marketability discount is appropriate in certain circumstances and concede that a 0% marketability discount was correct with respect to Amsted in July 1999. (Clawson Report, p. 64). The whole of the Plaintiffs' criticism is that, because of the Varlen acquisition, Duff & Phelps should have increased the marketability discount in October 1999. This argument is nothing more than hindsight and cannot withstand summary judgment.

Moreover, the undisputed facts establish not only that it was reasonable for Duff & Phelps to value Amsted's stock without a discount for lack of marketability but that, in fact, Duff & Phelps was <u>required</u> to value Amsted's stock without this kind of a discount. Amsted's by-laws specifically provide that the shares of the Company are to be valued as if they were

publicly traded. (Facts ¶ 97). By definition, shares which are publicly traded are readily marketable and, therefore, are valued without a discount for lack of marketability. For the Plaintiffs to argue that Duff & Phelps should have applied a discount for lack of marketability in valuing Amsted's shares and that LaSalle should not have accepted a valuation without this kind of a discount is to argue that Duff & Phelps and LaSalle should have violated a legally-binding contractual obligation.

The valuation of the Amsted shares on a marketable basis was appropriate for several additional reasons. First, unlike most ESOPs, the Amsted ESOP allowed terminated employees to receive their benefits almost immediately upon the termination of their employment. (Facts ¶ 13). Most ESOPs impose a waiting period of up to five years for the payment of benefits in the case of a termination by a participant for any reason other than death, disability, or normal retirement. Moreover, throughout the fourteen-year history of Amsted's ESOP, the Company had paid the benefits due to all terminated participants in full and on a timely basis. (Facts ¶ 13). In other words, there was a market for the participants' Amsted stock.

Finally, for Duff & Phelps to apply a discount for lack of marketability in the 1999 valuation would have been inconsistent with past practice and would have defeated the reasonable expectations of the participants in the plan who had relied upon the well-established valuation procedure. Based on these undisputed facts, there is no basis for a finding that it was a mistake for Duff & Phelps not to apply a discount for lack of marketability in its 1999 valuation of the ESOP shares or for LaSalle to accept the Duff & Phelps 1999 valuation report.

### 5. The Varlen transaction was appropriately considered in the valuation.

The Amsted acquisition of Varlen closed on August 16, 1999 (Facts ¶ 74). Duff & Phelps' valuation of Amsted was due some two months later in October 1999. (Facts ¶ 79). In its valuation, Duff & Phelps properly assumed that, since the acquisition had taken place some two months earlier at arm's-length and after competitive bidding, the price paid for Varlen was equal to the value received by Amsted.[7] (Gross Report, pp. 4-5; Henderson Report, p. 23). As the Ninth Circuit has held:

> When there has been a fair, arms-length transaction the purchaser's stated reasons for paying the price he did are irrelevant in assigning a value to an asset. Evidence of other appraised values is also irrelevant, because the sale price is a better indicator of the asset's value than any estimate of value given prior to the sale. The bankruptcy court properly found that, under the facts of this case, the value was conclusively determined by the sale price.

*In Re: The Two "S" Corporation v. Sun National* Bank, 875 F.2d 240, 244 (9th Cir. 1989) (emphasis added). This was a rational approach for Duff & Phelps to take, based as it was upon the best possible contemporaneous data for establishing the market value for Varlen – arms-length negotiations between unrelated parties.

In considering the Varlen acquisition, Duff & Phelps had access to a substantial amount of data regarding the transaction from the Amsted point of view. This included presentation materials and reports to the Amsted Board of Directors prepared by Amsted's investment banker, Salomon Smith Barney, a copy of Salomon's financial fairness opinion to Amsted, detailed analyses of Varlen, as well as publicly-available data regarding Varlen. (Facts ¶¶ 59, 73). Among other things, the analysis prepared by Salomon highlighted (1) the strategic

---

[7] To acquire Varlen, Amsted paid $42/share. (Facts ¶ 69). The closest contestant bid $41.50/share. (Facts ¶ 70).

advantages of the acquisition, (2) Salomon's recommended pricing range for the acquisition, and (3) Salomon's view that the transaction stood a good chance of being accretive to the value of Amsted. (Facts ¶ 62).

By way of contrast, Plaintiffs have offered no evidence that Duff & Phelps' treatment of the Varlen acquisition was wrong. Plaintiffs have not even proffered expert opinion that the price paid for Varlen was too high. Indeed, Plaintiffs' expert reports are conspicuously silent as to the price paid for Varlen. Similarly, because the Plaintiffs have no evidence as to what the actual value of Varlen was (if not the auction price paid by Amsted), they have no evidence regarding what value Duff & Phelps should have assigned to the Varlen assets as part of the Amsted valuation. All Plaintiffs have been able to muster is a weak assertion that Duff & Phelps' treatment of Varlen was incorrect, without any actual evidence as to how it was wrong, to what degree it was wrong or how the Plaintiffs were supposedly damaged by the alleged error. Accordingly, Plaintiffs' arguments regarding the treatment of Varlen in the Duff & Phelps valuation fail as a matter of law.

**6.      Plaintiffs have no claim under the Uniform Standards of Professional Appraisal Practice.**

Plaintiffs have halfheartedly raised an argument that Duff & Phelps' conduct violates the Uniform Standards of Professional Appraisal Practice (USPAP) and that LaSalle is somehow liable for that breach. (Clawson Report, pp. 24-26). Even assuming that appraisal standards are binding upon LaSalle, this argument is insubstantial and easily disposed of.

As to the allegations regarding USPAP Rule 9, Plaintiffs concede that there are no allegations of conduct under that rule that are not addressed elsewhere in their various allegations. (Clawson Deposition, pp. 214-215). Accordingly, USPAP Rule 9 does not create

any independent duties and cannot be the basis for any liability against LaSalle.

USPAP Rule 10 requires that an appraisal report contain a signed certification by the appraiser. Plaintiffs contend that Duff & Phelps' valuation report does not contain any such certification and that LaSalle has therefore committed a breach of fiduciary duty. This sets a new standard for irrelevant minutiae. It is undisputed that the valuation opinion letter, which actually transmitted the value, was signed by Duff & Phelps. (Facts ¶ 93). Moreover, the valuation report, which is the source of Plaintiffs' grievance, identifies Duff & Phelps as the author on the footer of almost every page. (Facts ¶ 93). Finally, as if the foregoing were not more than sufficient to dispose of this claim, Plaintiffs concede that they are unaware of any consequence from the absence of an ink-signature on the valuation report, much less a consequence that caused them any damage. Accordingly, the Plaintiffs' USPAP claims should be rejected out-of-hand.

### 7. Even assuming some error in the valuation, LaSalle reasonably relied upon Duff & Phelps.

Even if Plaintiffs could somehow establish that Duff & Phelps' 1999 valuation report was flawed in some way, this would not be sufficient to establish a breach of fiduciary responsibility on the part of LaSalle. It is not only reasonable for an ESOP trustee to rely on a valuation report from a qualified business appraiser, but in fact ESOP trustees are required to rely on independent appraisers (unless the trustee is a qualified appraiser himself or herself or, in the case of an institutional trustee, has qualified appraisers on staff). Proposed Department of Labor Regulation §2510.3-18(b)-18(b)(3)(ii).

Of course, an ESOP trustee cannot shield itself from responsibility by relying upon a report from an unqualified appraiser or from an appraiser who is not independent or by relying

upon a valuation report that is seriously flawed in an obvious way. However, none of those circumstances exist here. There is no dispute as to the independence or competence of Duff & Phelps. Plaintiffs acknowledge that Duff & Phelps is an independent and qualified ESOP valuation firm. In fact, Plaintiffs' fiduciary expert, Wilson Ellis, testified that he often has retained Duff & Phelps in the past himself. Ellis Deposition, pp. 34-35. LaSalle's selection of Duff & Phelps to serve as its financial advisor is therefore evidence of the exercise of a high degree of care by LaSalle in connection with the performance of its services as the trustee of the Amsted ESOP.

As to whether Duff & Phelps' 1999 valuation report was flawed, there is no dispute as to the facts upon which the report is based. For the reasons stated above, this court should find as a matter of law that the report was properly prepared. Moreover, even if the Duff & Phelps report was flawed, there is no basis in the undisputed facts for concluding that it was unreasonable for LaSalle to accept the valuation report. The undisputed evidence shows that LaSalle carefully reviewed the 1999 business valuation report prepared by Duff & Phelps. LaSalle's internal fiduciary committee discussed the report with Ms. Bluth, of Duff & Phelps, at a meeting held on October 25, 1999 (Facts ¶ 81). Prior to that meeting, copies of the report were distributed to members of the fiduciary committee. (Facts ¶ 81). Plaintiffs do not dispute that the members of LaSalle's internal fiduciary committee were experienced in ESOP transactions and in reviewing business valuation reports and were capable of understanding the methodologies employed by Duff & Phelps in reaching its valuation conclusion.

To rule that LaSalle could not rely on the Duff & Phelps' 1999 valuation report would require ESOP trustees to become experts in the valuation of closely-held corporations, which

would be contrary to the statutory framework, which clearly contemplates that ESOP fiduciaries not only should be able to rely upon independent valuation experts but that they should in fact do so.

**D.    LaSalle Cannot Be Liable For Amsted's Post-valuation Conduct.**

In addition to complaining about the Varlen acquisition and the October 1999 valuation, Plaintiffs have also found fault with the Defendants' conduct in late 1999 and early 2000 as Amsted's employee turnover exceeded projections, thereby driving the repurchase obligation over forecast. The Amsted Defendants have addressed these allegations in detail and disposed of them. LaSalle adopts those arguments. As with the allegations regarding the acquisition of Varlen, LaSalle cannot be liable for the actions taken after the valuation (post-October 1999) unless Plaintiffs first prove that the Amsted Defendants violated their duties. Since the actions of the Amsted Defendants were prudent with respect to the response to the evolving repurchase obligation, then obviously, LaSalle is not liable.

The undisputed evidence also shows that LaSalle was aware of the actions being taken by the Company to address the liquidity crisis and assured itself that the Company was taking appropriate action to address the matter. (Facts ¶ 139). Therefore, there can be no basis for imposing liability upon LaSalle for breach of fiduciary responsibility.

**III.    COUNT III - AS A MATTER OF LAW, LASALLE CANNOT BE LIABLE FOR UNLAWFUL PLAN AMENDMENT.**

In their Amended Complaint, Plaintiffs alleged that the amendments made by Amsted to its ESOP Plan and Trust were unlawful and that the illegality was so apparent that it rose to a breach of fiduciary duty for LaSalle to allow the amendments to go forward, even though LaSalle had no authority over those amendments. (Non-Retirees First Amended Consolidated

Class Action Complaint 64, 175-178). Now, in a remarkable display of intellectual inconsistency, Plaintiffs allege that it was a breach of fiduciary duty for Amsted not to make the identical amendments earlier than they did. (Clawson Report, pp. 8-9, 66-67; Clawson Deposition, pp. 182-183). Moreover, Plaintiffs claim that it was so obvious the amendments were mandatory and essential that it constituted a breach of LaSalle's fiduciary duty for it to not compel Amsted to make them sooner, even though, again, LaSalle had no authority over those amendments. (Clawson Report, pp. 8-9, 66-67; Clawson Deposition, pp. 182-183).

Putting aside the Plaintiffs' patent inconsistency, Count III, even as presently constituted, fails. First, as a matter of law, the amendments were not unlawful. Amsted had every right to amend the Plan. There is no evidence that the amendments were unlawful nor are there any disputed facts relevant to the plan amendments.

Additionally, there is no evidence that the amendments caused any harm or that there were any damages as a result of the amendment. Indeed, all of Plaintiffs' damage evidence is premised on the allegation that the amendments were made too late, not that the amendments were made. (Clawson Report, pp. 9-11, 66-67; Clawson Deposition, pp. 182-183).

Finally, even if the amendments were unlawful, and there was evidence that the amendments caused injury and damages, there is no evidence that LaSalle is liable for the amendments. LaSalle is a directed trustee. It is well-settled law that amending an ERISA plan is a settlor, not a fiduciary function. *Hughes Aircraft Company v. Jacobson*, 525 US 432, 119 S.Ct. 755 (1999). Accordingly, LaSalle had no authority over amendments to the plan, and Plaintiffs have presented no evidence or authority for the theory that LaSalle can somehow nonetheless be held liable for the amendments. The single amendment to the trust cannot

sustain a claim because (i) the trust already allowed Amsted to have quarterly valuations, and (ii) it is inconceivable that it was LaSalle's duty to prevent an amendment that required more frequent valuations. Accordingly, as a matter of law, judgment must be entered in LaSalle's favor on Count III.

## IV. CONCLUSION

Plaintiffs' allegations must be considered in light of the special nature of ESOPs. A court's task in interpreting ERISA in connection with a claim of breach of fiduciary responsibility is to balance the competing policies of fostering the formation of ESOPs, on the one hand, and safeguarding the interests of participants in these plans, on the other hand, "so that competent fiduciaries will not be afraid to serve, but without giving unscrupulous ones a license to steal." *Donovan v. Cunningham*, 716 F.2d 1455, 1466 (5th Cir. 1983). To hold that Plaintiffs' claims in this case are sufficient to merit a trial would be to fail to draw the proper balance referred to by the court in *Cunningham*. It would have the result that competent fiduciaries would be afraid to serve as ESOP trustees out of concerns that they will, in effect, become viewed as guarantors of the success of the plan sponsor's business operations, that they will be required to second guess all important business decisions made by the plan sponsor's management, and that they will be subject to costly and burdensome litigation. If Plaintiffs' claims are sufficient to merit a trial, then competent fiduciaries will agree to serve as ESOP trustees, if at all, only where they can charge fees far in excess of what most ESOP companies can afford to pay. To discourage competent fiduciaries from serving as ESOP trustees would severely undermine the Congressional policy of encouraging employee stock ownership.

Since the enactment of ERISA 30 years ago, no court has held that claims such as those

33

being brought by Plaintiffs against LaSalle are sufficient to impose liability upon an independent and experienced ESOP trustee. This is not the occasion for a radical expansion of the scope of the responsibilities of an ESOP trustee. Rather, this court should recognize the long-standing Congressional policy of promoting employee stock ownership and dismiss Plaintiffs' claims against LaSalle.

Respectfully submitted,

LASALLE BANK, N.A.,

By: _____
Attorney for Defendant

January 21, 2004

Keith C. Hannigan
Theodore M. Becker
Scott C. Ryan
Jenkens & Gilchrist, P.C.
225 West Washington Street, Suite 2600
Chicago, Illinois 60606-3418
(312) 425-3900