

FILED

JAN 2 1 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUAN ARMSTRONG, et al.,

    Plaintiffs,

v.

Amsted INDUSTRIES, INC., et al.,

    Defendants.

No. 01 C 2963

Judge: James B. Moran

DOCKETED

JAN 2 2 2004

## DEFENDANTS' JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT

Defendants Amsted Industries, Incorporated ("Amsted"), Amsted Industries, Incorporated Employees' Stock Ownership Plan ("ESOP" or "Plan"), Arthur W. Goetschel, Raymond A. Jean, David B. Whitehurst, Lewis Collens, John E. Jones, W. Robert Reum, Richard E. Terry, Gordon R. Lohman, Thomas C. Berg, O.J. Sopranos, Robert A. Chiappetta, and Matthew J. Hower (collectively the "Amsted Defendants"), and LaSalle National Bank, N.A. ("LaSalle"), by their attorneys and pursuant to Rule 56.1(a)(3) of the General Rules of the United States District Court for the Northern District of Illinois, submit the following Statement of Undisputed Material Facts in support of their motions for summary judgment. In addition to this Statement, Amsted Defendants and LaSalle each separately submit motions for summary judgment and memoranda in support thereof and submit a joint appendix.

### THE PARTIES

1.    Plaintiffs in *Armstrong* consist of a class of active and former employees who are non-retiree participants in Amsted's Employee Stock Ownership Plan ("ESOP"). The class

153

excludes individual Defendants and participants whose ESOP benefits were calculated at $184.41 per share (12/13/02 Court Order, Docket #108).

2.    Defendant AMSTED Industries, Incorporated ("Amsted") is a Chicago-based diversified manufacturer of industrial products primarily producing railroad car wheels and related rail products, heavy-duty truck parts and construction materials through separate manufacturing divisions.   Amsted was a profitable, conservatively managed company with modest debt (Ellis Rpt. 5).[1]

3.    In 1998, Amsted had sales of $1.25 billion and net income of $84 million.   In 1999, Amsted had sales of almost $1.34 billion and net income of $156 million. (Hower Aff. ¶8, Ex. A).

4.    In 1999, there were approximately 6,000 salaried, non-union employees at Amsted's domestic facilities who were ESOP participants (Hower Aff. ¶7).

5.    The currently remaining[2] individual Defendants and their positions during the relevant period (1998-2000) only are set forth below:[3]

---

[1]  All affidavits, declarations, depositions and exhibits, documents, and expert reports and depositions can be found in the Joint Appendix in Support of Defendants' Motions for Summary Judgment and Defendants Thomas C. Berg, OJ Sopranos, and Robert Chiappetta's Motion for Summary Judgment (Volumes I-VI), filed contemporaneously herewith.

[2]  The originally named Defendants no longer listed below have been dismissed by Plaintiffs (or by Stipulation).   Additionally, individual Defendants Tom Berg, Robert Chiappetta, and O.J. Sopranos have contemporaneously filed a separate motion for summary judgment on the grounds that they are not ERISA fiduciaries and, thus, not proper Defendants.

[3]  Dates are provided only to the extent an individual did not maintain the position listed throughout 1998, 1999 and 2000.

| | |
|---|---|
| Richard E. Terry | Independent Director and Chairman and Chief Executive Officer of Peoples Energy Corporation. Member of ESOP Committee, March - December 2000. (Terry Dep. 5-6, 31) |
| Lewis Collens | Independent Director and President of Illinois Institute of Technology. Member of ESOP Committee, 1998 - March 2000; Chair, April 1999 – March 2000. (Collens Dep. 4-5, 12, 82-83, 94, 108) |
| John E. Jones | Independent Director and Former Chairman, President and Chief Executive Officer of CBI Industries. Member of ESOP Committee mid –1998 – 2000; Chair, April – December 2000. (Jones Dep. 5-7) |
| Robert Reum | Independent Director and Member of ESOP Committee. ESOP Committee Chair, April 1998 – March 1999. Chairman, President and Chief Executive Officer of The Interlake Corporation, 1998 – 1999. (Reum Dep. 5-8) |
| Gordon R. Lohman | Chairman and Chief Executive Officer of Amsted, 1998 - June 1999; Independent Director, Retired Chairman and CEO of Amsted, June 1999 - June 2000. Member of ESOP Committee, 1998-March 2000. (Lohman Dep. 8-10, 19, 90) |
| Arthur W. Goetschel | Director and Corporate Vice President of Amsted 1998 – 1999; Director, President and Chief Operating Officer of Amsted, 1999 – June 2000; Director and President, Chairman and CEO of Amsted, June 2000 – March 2001. Member of ESOP Committee. (Goetschel Dep. 6, 74-75) |
| Raymond Jean | Chairman and CEO of Varlen Industries Inc., January – August 1999; Corporate Vice-President of Amsted, August 1999 - 2000; Director, January 2000 – February 2001. Member of ESOP Committee March - December 2000. (Jean Dep. 5, 49, 88) |
| David B. Whitehurst | Director and Corporate Vice President of Amsted. Member of ESOP Committee. (Whitehurst Dep. 8, 11) |
| Matthew Hower | Non-director. Controller, Griffin Wheel Company, January - September 1999 (Hower Dep. 7); Treasurer of Amsted and ESOP Plan Administrator, September 1999 – December 2000. (Hower Dep. 4, 9) |

CHICAGO/#1135401.9

| Robert Chiappetta | Non-director. Controller of Griffin Pipe Products Company, January – September 1998; Treasurer of Amsted and ESOP Plan Administrator, September 1998 –September 1999; Corporate Vice President and Chief Financial Officer of Amsted, September 1999 – Spring 2000. (Chiappetta Dep. 8) |
| O.J. Sopranos | Non-director. Amsted Corporate Vice President, 1998 – October 1999. (Sopranos Dep. 9) |
| Thomas C. Berg | Non-director. Vice President, General Counsel and Secretary of Amsted. (Berg Dep. 5, 172) |

(Collens Dep. 34, 42, 116, 126, Exs. 5 (Bates Nos. D03365-70), 7 (Bates Nos. 3401-07), 29 (Bates Nos. D0857-60); Chiappetta Dep. 63, 192, 197-98, 238-39, Exs. 2 (Bates Nos. D0846-47), 31 (Bates Nos. D0848-49), 33 (Bates Nos. D0910-18), 43 (Bates Nos. D0850-51); Jean Dep. 94, 96-97, Exs. 19, 20 (Bates Nos. D0861-63, D03178-80); Dixon Dep. 16-17, Ex. 1 (D0864-70)).

6.      Most independent directors have served on various Board committees for at least ten years (Collens Dep. 4-5, 10; Terry Dep. 5-9, 24-25; Jones Dep. 5-6, 36; Reum Dep. 8-11, 51) and most management directors had been employed by Amsted for decades (Goetschel Dep. 5-7; Lohman Dep. 8-9; Whitehurst Dep. 5-8).

7.      Defendant LaSalle National Bank, N.A. ("LaSalle") is Trustee of Amsted's ESOP and has been since the ESOP's establishment in 1986 (Bluth Dep. 13; Gordy Dep. 13).

## AMSTED'S ESOP

8.      Amsted is wholly-employee owned through a "leveraged" ESOP established in 1986 (Ellis Rpt. 3; Berg Dep. 75-76). Previously, the Company was a publicly-traded New York Stock Exchange company (Ellis Rpt. 3; Berg Dep. 76).

9. The ESOP was created by Amsted bank borrowings, the proceeds of which were lent to the ESOP which allowed it to purchase most of Amsted's outstanding shares[4] (Ellis Rpt. 3; Newman Dep. 67). The named fiduciary of the ESOP is Amsted's "ESOP Committee" (ESOP Plan eff. 10/01/95, §9.1 (Bates Nos. D00253-55); ESOP Plan eff. 10/01/99, §9.1 (Bates Nos. D00367-68)).

10. During the relevant period (1998-2000), Amsted's ESOP Committee was chaired by an independent outside director and composed equally of three independent and three management directors (*supra* Facts ¶5).

11. Annually until July, 2000, Amsted contributed to the ESOP 25% of eligible employees' "considered compensation" although the Plan document never required a particular contribution amount (Berg Dep. 90; Hower Dep. 36-37; ESOP Plan eff. 10/01/95, Art. 3, "Contributions by Employers" (Bates Nos. D00184-85)). These Company contributions, in turn, were used to repay the ESOP's debt to Amsted and the balance, if any, was used to repurchase terminating participants' shares. If the contributions are insufficient to cover the ESOP loan payment and stock repurchases, either a Company cash dividend is issued or the Company purchases the shares. (Newman Dep. 44-45, 55-56; Ellis Rpt. 3).

12. Until the 2000 Amendments, eligible ESOP participants upon termination were entitled to receive an ESOP distribution for vested shares either in the form of an annuity (seldom used) or a lump-sum cash payment (ESOP Plan eff. 10/01/95, §§7.1-7.5 (Bates Nos. D00216-23)). In either case, the value of the shares was determined on the basis of a valuation

---

[4] Certain managers also purchased shares at the time but these were redeemed by Amsted in 1998 when Amsted became a sub-chapter S corporation and are now held as treasury shares (Berg Dep. 46-47).

mpleted as of the end of Amsted's October 1 to September 30 fiscal year (ESOP Plan eff.

)/01/95, §§1.4, 7.6 (Bates Nos. D00181, D00223)).

13. Unlike most ESOPs, the Amsted plan allowed departing employees to be paid in

ull almost immediately upon termination (Ellis Dep. 119). In the 14 years from the ESOP's

inception to the 2000 Amendments, the Company had a history of paying terminating employees

(Bates No. D02039) and was always able to meet its repurchase obligation (Clawson Dep. 88-

89).

14. A terminating Participant obtained his distribution by completing and submitting

a distribution request form sometime during the fiscal quarter in which the participant intended

to terminate; payment was made after the end of that fiscal quarter either in cash or by purchase

of an annuity depending on the option selected (Feliksik Dep. 13; ESOP Plan eff. 10/01/95,

§§1.4, 7.6-7.7(c) (Bates Nos. D00181, D00223-24).

15. The share value for a terminating participant who submitted a distribution form in

the first three quarters of Amsted's fiscal year was based on the value at the end of the preceding

fiscal year, *i.e.*, September 30. If a participant submitted a distribution form on or after July 1

(the start of the Company's 4th fiscal quarter) but before September 30, he or she received a

distribution based on the share valuation determined as of the end of that fiscal year. For

example, for forms submitted between July 1, 2000 and September 2000, the applicable

valuation date was September 30, 2000. (ESOP Plan eff. 10/01/95, §§1.4, 7.6 (Bates Nos.

D00181, D00223); Chiappetta Dep. 201-202).

16. Participant account balance totals were summarized by age group and by division

(Newman Dep. 82-83, Ex. 8 (Bates Nos. D02422-24)). Diversification was broken down by

division, by the percentage of shares eligible for diversification, and by shares that were first eligible for diversification versus those that had been eligible in the prior year (D02719).

17. After an ESOP participant has attained a specified age and years of participation in the Plan, he or she has the right to diversify a portion of the ESOP stock account into other investments in accordance with the provisions of the ESOP Plan document (Belger Rpt. 2).

## VALUATION OF AMSTED'S SHARES GENERALLY

18. Under the terms of the Amsted's ESOP plan document, it was the Trustee's responsibility to determine the fair market value of the Company's stock which was to be valued once a year as of the last day of each fiscal year (Gordy Dep. 40-42, 71, Ex. 1 (Bates Nos. L000567-614)).

19. Annual share value was determined by an independent investment banking firm employed by LaSalle. From 1987 through 1997, the firm was William Blair & Company, a Chicago-based investment banking firm with recognized expertise, among other things, in valuing privately-held corporations (Schiedemeyer Dep. 18). From 1998 through 2001, the annual (and, subsequent to September 30, 2000, quarterly) valuations were performed by Duff & Phelps, one of the premier ESOP valuation firms in the United States (Bluth Dep 11, 83, Ex. 14 (Bates Nos. D&P4827-4913); Berg Dep. 92-93; Ellis Dep. 35).

20. The following chart shows the value of Amsted's shares determined by these respective valuers from the beginning of the ESOP through fiscal year 2001:

| AS OF: | SHARE PRICE | % CHANGE |
|--------|-------------|----------|
| 03/08/86 | $30.73 | |
| 09/30/86 | 31.58 | 2.8% |
| 09/30/87 | 37.40 | 18.4 |
| 09/30/88 | 49.40 | 32.1 |
| 09/30/89 | 53.40 | 8.1 |
| 09/30/90 | 47.14 | -11.7 |

| 09/30/91 | 47.62 | 1.0 |
|---|---|---|
| 09/30/92 | 53.46 | 12.3 |
| 09/30/93 | 63.41 | 18.6 |
| 09/30/94 | 78.82 | 24.3 |
| 09/30/95 | 85.70 | 8.7 |
| 09/30/96 | 100.00 | 16.7 |
| 09/30/97 | 121.26 | 21.3 |
| 09/30/98 | 139.78 | 15.3 |
| 09/30/99 | 184.41 | 31.9 |
| 09/30/00 | 89.87 | -51.3 |
| 12/31/00 | 84.42 | -6.1 |
| 03/31/01 | 55.74 | -34.0 |
| 06/30/01 | 68.70 | 23.0 |
| 09/30/01 | 44.24 | -35.6 |

(Montgomery Dep. 50-54, Ex. 5 (Bates Nos. BC0066-70); Schiedemeyer Dep. 158, 169-70, 172, 175, 179, Exs. 31 (Bates No. D&P06352), 38 (Bates Nos. L002903-04), 39 (Bates Nos. L002905-06), 41 (Bates Nos. L002907-08), 43 (Bates Nos. L002909-10)).

21.    Duff & Phelps prepared its 1998 through 2000 valuations following essentially the same format followed by William Blair & Company and the same procedures that Duff & Phelps used in valuing other companies for other clients (Bluth Dep. 11-12, 18-19, 89-90, 154; Schiedemeyer Dep. 64-65; Henderson Rpt. 22).

22.    In 1998 after initial orientation to Amsted, and again in 1999, the responsible Duff & Phelps' personnel (principally Elyse Bluth, a Managing Director, and Jeffrey Schiedemeyer, then an Associate) conducted a due diligence review of Amsted. They obtained interim quarterly and year-end financial data from Amsted's Chief Financial Officer and his staff, independently analyzed it and then conferred with appropriate Amsted financial employees with respect to any questions or anomalies that may have emerged from their own review (Bluth Dep. 18-20, 25, 45-47, 89-91, 109-110, 113-114; Schiedemeyer Dep. 64-65, 69-70, 73, 117-120).

23.     Separate meetings were also held by Bluth and other Duff & Phelps personnel with those Amsted business executives responsible for its key operating divisions. Their purpose was to independently verify Amsted's current financial reporting and to review in detail divisional business plans based on internal and external forecasting for Amsted's most important business components. (Bluth Dep. 18-19, 22-23, 33, 45-49, 89-91, 113-115, 117; Schiedemeyer Dep. 64-65, 73, 85-86, 88, 90, 117-119).

24.     Duff & Phelps also reviewed cash flow projections, capital expenditures and financial forecasts which in its judgment bore on Amsted's current fiscal condition, growth and stability. The forecasts included repurchase obligation estimates for the next fiscal year. (Bluth Dep. 18, 25, 33, 89-90, 109-110, 113-114, 116-117; Schiedemeyer Dep. 64-65, 93-96, 117-119).

25.     Although aware that some of Amsted's businesses were cyclical, Amsted executives believed and told Duff & Phelps in 1998 that these cycles were "nearly impossible to predict" with any certainty (Bluth Dep. 48). Various Amsted executives and Board members, in fact, held different views regarding where Amsted's product lines were in terms of cyclical "peaks" (Spiece Dep. 19; Collens Dep. 124-125; Terry Dep. 14-15; Jean Dep. 14-17; Reum Dep. 77-78).

26.     Duff & Phelps considered Amsted's business in relation to all current and existing developments as elicited in their interviews and review of both Company financials and external data (Bluth Dep. 113-117).

27.     Duff & Phelps also considered price-earnings ratios, EBITDA multiples and other financial data for publicly-traded companies in industries comparable to Amsted's (Bluth Dep. 18, 48, 53-54, 89-90, 116; Schiedemeyer Dep. 91, 117-119). Such publicly-traded companies are recognized as relevant points of comparison in valuation studies (Bluth Dep. 48, 53-54;

Gross Rpt. 7). The results of this industry-specific comparable analysis were weighted to represent Amsted's mix of business units (Bluth Dep. 48, 53-54).

28. After completing these analyses, Duff & Phelps utilized both Comparable Company and Discounted Case Flow approaches to value Amsted stock (Gordy Dep. 147, Ex. 11 (Bates No. L000718-822 at L00723); Bluth Dep. 54).

29. After all the above factors were considered, a preliminary valuation estimate was often disclosed to Amsted management a week or so before the final valuation was formally presented to LaSalle as Trustee and, if approved by it, to Amsted's ESOP Committee and directors. These presentations reviewed much of the same data discussed above (*supra* Facts ¶¶ 22-28). Duff & Phelps then provided LaSalle with a formal opinion letter with the new share valuation. (Berg Dep. 92-94; Bluth Dep. 59-60, 84-85, 88, 123-124, 130-131, Exs. 14 (Bates Nos. D&P4827-913), 15 (Bates Nos. D&P1913-38), 16 (Bates Nos. D&P5267-68), 26 (L02399-400), 27 (Bates Nos. D&P0001-30); Schiedemeyer Dep. 99-105, 128, 133-134, 137-138, Exs. 1 (Bates Nos. L002397-98), 15 (Bates Nos. D03288-364), 22 (Bates Nos. D01339-432), 23 (Bates Nos. D&P03594-622), 25 (Bates Nos. D&P06373-75)).

30. Under the Plan and Trust Agreement terms, the ESOP Committee neither approved nor disapproved of a valuation; rather, it only received a presentation by Duff & Phelps with the share valuation as approved by LaSalle (Berg. Dep. 92-93; Goetschel Dep. 74; ESOP Trust eff. 10/01/99, §5.8 (Bates Nos. D0506-07); ESOP Plan eff. 10/01/99, §10.3 (Bates No. D00374-75)).

31. Similarly, Amsted neither approved nor disapproved of a valuation, but rather purchased vested shares at the valuation share price approved by LaSalle (*supra* Facts ¶30; Berg Dep. 39-41).

-10-

32.     The share value determined as of September 30, 1998 of $139.78 was the highest share value in Amsted's ESOP's history to date, a 15% increase over the prior year's value ($121.26) and a compound increase of 77% from September 1994 (*supra* Facts ¶20).

33.     Employee turnover, measured by the number of vested shares held by departing employees that were cashed out divided by the total number of such available shares, remained relatively constant, as shown below:

| Year Ending 9/30 | Share Price | Turnover As % of Prior Year Released Shares |
|---|---|---|
| '85-95 11 year total | $30.73 - $85.70 | Avg. 7.8% |
| 1996 | $100.00 | 10.9% |
| 1997 | $121.26 | 9.0% |
| 1998 | $139.78 | 9.4% |
| 1999 | $184.41 | 10.1% (9.0% excluding MacWhyte)[5] |

(Newman Dep. 64, 69-71, 76-77, Ex. 7 (Bates Nos. D02056-67 at D02067); Bates No. D02039-41).

## AMSTED'S AWARENESS AND REVIEW OF ITS REPURCHASE OBLIGATION

34.     The requirement that Amsted pay participants their ESOP account balances creates what, in ESOP parlance, is known as a "repurchase obligation" (Ellis Dep. 101-02; Ellis Rpt. 8).  Generally, the amount of the repurchase obligation depends on a number factors, principally the value of ESOP shares, turnover, and plan provisions relating the timing of redemptions (Bluth Dep. 51; Newman Dep. 55, 57; Ellis Dep. 102-03, 151-52; Clawson Dep. 18; Belger Rpt. 2).

---

[5] *See infra* Facts ¶¶98-101.

CHICAGO/#1135401.9

35.     Employee turnover is one of the most important variables in repurchase obligation assessment (Ellis Dep. 152).

36.     The estimate of projected turnover is a subjective determination based essentially on management's opinion of what employees will do (Clawson Dep. 19-20).

37.     Company management has recognized from the Plan's inception that a significant and unexpected increase in employee turnover could precipitate a cash drain (Berg Dep. 145).

38.     Amsted's yearly repurchase obligation – the product of share value times the number of shares of departing vested employees – was forecast by the Company's Treasurer and refined by the Controller using up-to-date compensation, turnover and demographic information (Montgomery Dep. 20-23; Newman Dep. 57-70; Berg Dep. 136-37; Belger Rpt. 3).

39.     These forecasts incorporated company specific assumptions that were developed from historical experiences as well as each division's best estimate of future behavior, and were developed and reviewed by senior officers of the company (Newman Dep. 65, 142-145).

40.     Every year and quarterly within a year Amsted's financial staff internally reviewed the amount of its annual anticipated repurchase obligation.  It did so by examining financial information and employee turnover percentages on a divisional and company-wide basis (i) during each fiscal quarter, (ii) again at year-end and (iii) by making historical comparisons and future projections.  Any significant deviation from the projections was investigated and the forecasts were revised (Newman Dep. 183-84, Ex. 23 (Bates Nos. D02400-06)).  Amsted's Controller during the relevant period, Joseph Newman, testified at length about Amsted's annual and interim accounting practices with respect to its repurchase obligation as the following transcript excerpt illustrates:

*     *     *

CHICAGO/#1135401.9

Q:    Was there a methodology that was employed by the company in '98 and '99 where it attempted to predict what shares would be redeemed through the ESOP plan on some interval, whether it be weekly, monthly, quarterly, annually?

A:    Yes.

Q:    What was that called?

A:    As part of the financial – as part of the financial planning process and the forecasting process where the controller's office consolidated the divisions by plans and generated consolidated financial projections, one of the pertinent projections that had to be made in order to generate consolidated financial statements for Amsted on a projected basis was projections of – of distributions of – of the repurchases of the ESOP shares on a periodic basis.

Q:    What would have been the interval for the periodic prediction?

A:    Forecasts are prepared on a – on a rolling quarterly basis, which means that a projection is made of the next four quarters, and that projection is updated each quarter, and then long-range plan process was updated annually and typically went out three to five years.

Q:    Did that forecasting change at any time between January 1 of '98 and the time of your departure in March of 2001?

Mr. Schnadig:  Do you mean the forecasting methodology?

Mr. McCallister:  Methodology, correct.

By the Witness:

A:    No.

\*    \*    \*

Newman Dep. 57-58.  (*See also* Newman Dep. 69-70, Exs. 7 (Bates No. D02056-67 at D02067), 9 (Bates No. D02116-17); Montgomery Dep. 20-23; Berg Dep. 41-42, 134-35).

41.    In the rolling quarterly forecasts, Amsted created a 5 year forecast of repurchase obligations based on projections of share turnover in the plan, share price and compensation increases (Bates No. D01800; Newman Dep. 57-58, 65-70, Ex. 7 (Bates Nos. D02056-67); Gross Dep. 80, 85-89, Ex. 4 (Bates No. D02067)).  In addition to forecasting and reconciling the repurchase obligation by year, by quarter and by division, Amsted performed other analysis

regarding its future repurchase obligation (Bates No. D02120). The annual repurchase forecasts incorporated any known events, such as the divestiture of a business component, into any revisions to Amsted's 5 year forecast (Bates No. D02413). Also, the split of the current year's repurchase obligation between cash payout versus IRA roll-over was also monitored and compared to the expected rate (Berg Dep. 39-40, Ex. 4 (Bates Nos. D03529-31)). The forecasts generated by this process has an established track record of being accurate and reliable (Berg Dep. 41).

42. LaSalle spoke directly with Amsted's general counsel, Thomas Berg, regarding Amsted's repurchase obligation (Berg Dep. 133).

43. Financial forecasting data including Amsted's repurchase obligation was provided to Duff & Phelps as part of its valuation process (Bluth Dep. 77-78, 118-119, 121-122, Ex. 25 (Bates Nos. D&P006183-6191); Batse Nos. D&P006192-6193); Schiedemeyer Dep. 67-80, Ex. 7 (Bates Nos. D&P05511-28 at D&P5513)). Duff & Phelps internal work papers show that Duff & Phelps considered the Amsted's repurchase obligation (Bluth Dep. 121-122, Ex. 25 (Bates Nos. D&P006183-91 at D&P006183); Gross Dep. 85-93, Ex. 6 (Bates Nos. D&P00620-21); Bates Nos. D&P006301-06, D&P006315-18).

44. LaSalle was aware of Amsted's accurate forecasting of its repurchase obligation (Gordy Dep. 170).

45. Forecasting of a company's repurchase obligation is expressly endorsed by those ESOP authorities cited by Plaintiffs' own expert witness. For example, Kace Clawson, in his report, included references to the National Center for Employee Ownership (NCEO), which recommends the following:

> Due to the cash demands it creates, the repurchase obligation is a major issue for many companies.

-14-

* * *

A closely held employee stock ownership plan company's ability to turn participants' 'put' shares into cash gives life and credibility to the ESOP. Without it, all that has come before has little meaning.

* * *

Because repurchase obligations impact cash flow, a projection of the obligation should become a part of the ESOP company's annual budget process.

* * *

(Clawson Rpt. 53-55).

46.     Repurchase obligation studies are not required by ERISA but are prudent (Ellis Dep. 143-44). Amsted's internal repurchase obligation studies were prudent (Ellis Dep. 238-43).

47.     Until fiscal year 2000, regularly predicted and actual turnover rates were quite close. The repurchase obligation was satisfied from the Company's normal cash flow, some of which was used in the Company contribution to the ESOP (Berg Dep. 39-42).

48.     Amsted management periodically considered, but did not yet implement, possible modifications to the ESOP design and administration, including deferring payments to terminating employees and changing the percentage of Company contributions (Berg Dep. 28-29, 70-92, 95-96, Exs. 5 (Bates No. D03547), 6 (Bates No. D03549), 7 (Bates Nos. D03552-54), 8 (Bates Nos. D03550-51); Montgomery Dep. 68-76, Ex. 10 (Bates No. D03546)). Amsted management also believed that a public offering might provide a viable source of funding the repurchase obligation if the need arose (Berg Dep. 84-87, Ex. 7 (Bates Nos. D03552-54)).

49.     In addition to up-to-date and historic examination of turnover rates, accounting estimates as to cash needs and periodic consideration of Plan changes, Amsted, beginning in approximately 1997, purchased and began using a software program called PERLS, one of two

-15-

recognized programs generally available that were marketed to attempt to accurately predict an ESOP's repurchase obligation using a variety of demographic assumptions (Clawson Dep. 68-69, 94-95; Hower Dep. 21-22, Ex. 2 (Bates Nos. D01998-2012)); Montgomery Dep. 23-25; Belger Rpt. 3).

50.     PERLS predictions of the repurchase obligation, based on employee demographics and financial assumptions, tended to confirm Amsted's historical repurchase analysis (Belger Rpt. 3).

51.     In the ESOP's early years, Amsted had employed either Wyatt & Company or Hewitt (major actuarial consulting firms) to forecast the repurchase obligation (Berg Dep. 47-50; Montgomery Dep. 28).

## THE 1999 VARLEN ACQUISITION

52.     In February or March, 1999, Arthur W. Goetschel, then Amsted's President and soon to be its next CEO and Chairman, began seriously considering the possibility of acquiring Varlen Corporation, a publicly-traded company well known to Amsted executives because its product line was compatible with Amsted's (Goetschel Dep. 6, 17-19; Sopranos Dep. 9-11).

53.     Goetschel and Corporate Vice President O.J. Sopranos initially obtained and reviewed available public documents concerning Varlen, including SEC filings and annual reports. They preliminarily concluded that Varlen was a good strategic fit. Its stock also was widely held, a circumstance permitting an offer to go forward without a single or small group of stockholders obstructing the transaction. (Goetschel Dep. 19-20; Sopranos Dep. 9-11, 17).

54.     Accordingly, Goetschel recommended to Chairman Lohman that an acquisition of Varlen be considered by Amsted management and directors; Lohman agreed (Goetschel Dep. 19-20, 22).

55. Shortly thereafter, on March 24, 1999, Goetschel and other Amsted managers met with the investment banking firm of Salomon Smith Barney ("SSB") to seek advice and guidance on the merits of the Varlen acquisition. Amsted had worked with SSB over the years on prior divestitures, and it is a well known and established Wall Street firm. (Goetschel Dep. 19-21; Sopranos Dep. 12-13; Kurtz Dep. 11-12).

56. Then or immediately afterwards, SSB presented Amsted with a "Preliminary Situation Analysis" which described Varlen's business, its key personnel and financial data, including its stock performance (Varlen had been trading between $20-$26 per share). It also reviewed favorable trends in Varlen's businesses and financial multiples in comparably traded public companies. General pro forma financial projections or models based on a combination of the two companies also were prepared together with possible acquisition strategies.[6] No conclusion or recommendation was made, although even at this early stage, SSB made purchase price projections based on an assumed Varlen value of $36 per share. (Kurtz Dep. 8-9, 11-12, 22-25, Ex. 1 (Bates Nos. D1292-23)).

57. At a regularly scheduled meeting held April 20, 1999, Amsted directors were informed of the possibility of the acquisition and the reasons for it. The directors unanimously agreed to explore the transaction and to use SSB as Amsted's financial advisor. (Goetschel Dep. 22-26, Ex. 2 (Bates Nos. D00874-78)).

58. Each independent and management director who attended that April meeting and the three subsequent ones (*infra* Facts ¶¶62, 67, 69) that culminated in the acquisition believed that Varlen was an excellent fit with Amsted and that a merger of the two companies would allow for substantial long-term enhancement of shareholder value through operating synergies

---

[6] Amsted data was provided by its CFO, Gary Montgomery, and his staff (Montgomery Dep. 83-85; Newman 133-34).

(Lohman Dep. 45; Whitehurst Dep. 31-32; Terry Dep. 11, 15; Reum Dep. 43; Collens Dep. 59-60; Jones Dep. 7-8, 41-42; Goetschel Dep. 17, 31-32).

59. During the week following the April 20, 1999 directors' meeting, Duff & Phelps' Managing Director, Elyse Bluth, was made aware of the potential acquisition and was provided SSB's financial and acquisition related analyses (Bluth Dep. 6, 92-93, Ex. 17 (Bates No. D&P03667); Berg Dep. 105).

60. During April 1999, Vaughn Gordy attended a meeting of Amsted officers at which Salomon Smith Barney made a presentation regarding the Varlen acquisition (Gordy Dep. 134-35).

61. After this April 1999 meeting, LaSalle consulted with its financial and legal advisors regarding the Varlen acquisition (Gordy Dep. 220-23, Ex. 24 (Bates Nos. L000170-71)).

62. On May 3, 1999, a special directors' meeting was held to consider the Varlen acquisition (now code named "Project Victor"). At it, SSB made another presentation which included commentary as to why Varlen was an "attractive acquisition candidate." (Goetschel Dep. 27-31, Ex. 3 (Bates Nos. D06548-94 at D06556)). The points made included the following:

- A second chance to acquire Brenco business [which Amsted had looked at previously (Goetschel Dep. 28-31)];

- Over 90% of Varlen's business portfolio fit with Amsted;

- Varlen was one or two in every market it sold to;

- No overlap or associated anti-trust problems;

- Varlen was, with Amsted, a leading supplier to the railway supply industry;

- Automotive/heavy truck segments complement Amsted's strategic plan;

- Varlen had decentralized style and strong unit-level management;

CHICAGO/#1135401.9

- Amsted can acquire Varlen and finance it successfully;

- Builds Amsted shareholder value;

- Lowers cyclical risk without significantly increasing financial risk.

(Goetschel Dep. Ex. 3 (Bates No. D06556)). SSB concluded also that "the transaction can be financed without putting the company at unreasonable financial risk" (Goetschel Dep. Ex. 3 (Bates Nos. D06568-69)).

63. Supporting financial models, again using an assumed purchase price of $36 per share and applying different revenue, income, EBITDA and other assumptions typically used in such pro forma presentations, also were prepared and considered (Goetschel Dep. 32, Ex. 4 (Bates Nos. D01324-38); Levine Rpt. 18). Even under the worst case (or "doomsday") scenario, profits were projected with a positive cash flow (Goetschel Dep. 32, Ex. 4 (Bates Nos. D01324-38 at D01337)). Still other materials stressed that Varlen's shares were undervalued by the stock market because of current buyer disinterest in smaller capitalization companies (Goetschel Dep. 27, Ex. 3 (Bates Nos. D06548-94 at D06559-60)). SSB lastly reviewed alternate acquisition strategies depending on whether Varlen was receptive or hostile to an offer (Goetschel Dep. 27, Ex. 3 (Bates Nos. D06548-94 at Bates Nos. D06573-87).

64. On May 4, 1999, following the directors' unanimous authorization to proceed with a non-hostile purchase of Varlen, Goetschel wrote to Varlen's Chairman, Raymond Jean, and offered to buy Varlen at "a price of at least $33 per share." (Goetschel Dep. 32-33, Ex. 5 (Bates Nos. D01766-67); Chiappetta Dep. 87-88, Ex. 9 (Bates Nos. D00879-84)).

65. Shortly thereafter, Varlen retained Morgan Stanley & Company as its investment advisor (Jean Dep. 23; Goetschel Dep. 37-38, Ex. 9 (Bates No. D03965-68)).

66.     Receiving no response from Varlen, Goetschel on May 10, 1999, wrote Jean (and this time all Varlen directors) again proposing a minimum purchase price of $33 per share (Goetschel Dep. 32-34, Ex. 6 (Bates Nos. D01764-65)).

67.     On May 17, 1999, when Amsted's friendly overtures were rebuffed by Varlen, Goetschel, again with unanimous approval of Amsted directors, agreed to "commence a tender offer" directly to Varlen's shareholders "for all shares of Varlen at a price of $35 per share." The offer was to expire on July 6, 1999 (Goetschel Dep. 35-37, 44-45, Exs. 7 (Bates Nos. D01760-63), 8 (Bates Nos. D00885-87)).

68.     On July 6, 1999, Amsted extended its $35 per share tender offer until July 21, 1999. On July 8, 1999, Amsted agreed to a "standstill" agreement with Varlen in order to have access to Varlen internal financial data and to participate in a Varlen-declared auction of its shares to the highest bidder (Goetschel Dep. 43-46, Ex. 10 (Bates Nos. D01784-92)).

69.     Ultimately, after another special meeting of Amsted's directors on July 29, 1999, with still further financial models presented by SSB based on a purchase price of $42.50 per share, Amsted offered $42 (Goetschel Dep. 52-54, Exs. 13 (Bates Nos. D00893-96), 14 (Bates Nos. D00763-82), 15 (Bates Nos. D02477-78)).[7]  SSB continued to view the transaction as including a "compelling strategic rationale" with "manageable financial risk" (Goetschel Dep. 48-50, Ex. 12 (Bates Nos. D01259-67 at D01267)).  That price (which totaled $787.8 million, excluding fees) was approved by Varlen's directors (Goetschel Dep. 51-53; Kurtz Dep. 45-46, 90, Ex. 6 (Bates Nos. D&P00398-460 at 402)).

70.     Amsted out-bid the rejected bidder in the auction process, Duchoissois Industries, by $0.50 per share (Jean Dep. 40-41, 52-53).

---

[7] SSB's valuation methodologies supported a purchase price for Varlen in the range of $34 to $58 per share (Kurtz Dep. 45-46, Ex. 6 (Bates Nos. D&P398-460 at D&P0440); Levine Rpt. 9).

71.     Throughout the process, Amsted management, SSB and the lenders performed numerous analyses and created numerous financial models to "stress test" the business case supporting the Varlen acquisition; these included various "downside" scenarios (Kurtz Dep. 9-11, 16, 29, 39, 47; Newman Dep. 116-17; Chiappetta Dep. 42-43). These financial models included analysis of the repurchase obligation, which was identified as a risk factor (Kurtz Dep. 33-34, 36-37, Ex. 4 (Bates Nos. SSB0000111-41 at SSB0000128); Chiappetta Dep. 23-24, 50-51). These analyses established a high likelihood that Amsted would be able to satisfy all of its obligations after the acquisition (Kurtz Dep. 33, Ex. 4 (Bates Nos. SSB0000111-41 at SSB0000126-35; Levine Rpt. 13, 16-18).

72.     On August 1, 1999, SSB issued its fairness opinion (Kurtz Dep. 43, 45-46, Ex. 5 (Bates Nos. D00756-58), Ex. 6 (Bates Nos. D&P0398-460)). After reciting the facts and assumptions upon which it was based and disclosing, inter alia, that it "will receive a fee for [its] services, a significant portion of which is contingent upon consummation of the Transaction" (Kurtz Dep. Ex. 5 (Bates No. D00757)), SSB concluded:

> Based upon and subject to the foregoing, our experience as investment bankers, our work as described above and other factors we deemed relevant, we are of the opinion that, as of the date hereof, the Cash Consideration to be paid in the Transaction by Amsted to the holders of Varlen Common Stock (other than Amsted and its affiliates) is fair, from a financial point of view, to Amsted.

(Kurtz Dep. Ex. 5 (Bates No. D00758)). Plaintiffs do not dispute that the price paid for Varlen was fair market value (Clawson Dep. 78, 80, 129; *see also* Gross Dep. 206 (statement of Plaintiffs' counsel, Gary McCallister)).

73.     Both LaSalle and Duff & Phelps were given copies of SSB's fairness opinion (Bates Nos. L000270-341; Kurtz Dep. 90, Ex. 6 (Bates Nos. D&P0398-460)).

74.     Although the Varlen transaction closed on August 16, 1999 (Goetschel Dep. 56-57, Ex. 16 (Bates Nos. D00897-99); Berg Dep. 126), before closing Amsted undertook a further

due diligence examination of the transaction using data and information hitherto unavailable because of the hostile nature of the purchase. The due diligence review included an assessment of the acquisition's impact on Amsted's repurchase obligation. Management was satisfied that the information was consistent with assumptions used by SSB. (Newman Dep. 124-25, 127; Montgomery Dep. 64-68, 97-98).

75. From commencement of negotiations to their conclusion, LaSalle's representative, Vaughn Gordy, was made aware of the substance of the transaction and Amsted's reasoning behind it (Berg Dep. 102, 106, Ex. 13 (Bates Nos. L0170-71); Bluth Dep. 101-02, Ex. 19 (Bates No. D&P02145); (Gordy Dep. 133-36).

76. Varlen's acquisition was financed through the negotiation of a $1 billion unsecured loan with Citibank as lead syndicator (Kurtz Dep. 93). Amsted's debt was given an investment grade rating (Kurtz Dep. 33, Ex. 4 (Bates Nos. SSB0000111-41 at SSB0000128)).

77. After the acquisition of Varlen was complete, Amsted had an unused line of credit of approximately $200 million (Clawson Dep. 89-90; Kurtz Dep. 45-46, 93, Ex. 6 (Bates Nos. D&P0398-460 at D&P0402)).

## DUFF & PHELPS' 1999 VALUATION AFTER THE VARLEN ACQUISITION

78. Throughout 1999, LaSalle had repeated contact with Duff & Phelps to monitor Duff & Phelps' efforts with respect to the Amsted valuation (Gordy Dep. 71, 85-90, 103, 133-134).

79. Within slightly more than a month after the Varlen purchase closed, Duff & Phelps, following essentially the same valuation procedures it had used a year earlier (*supra* Facts ¶¶22-29), determined Amsted stock to be valued at $184.41 per share (Bluth Dep. 132, Ex. 27 (Bates Nos. D02996-D03020)).

80.     This value took into account the price paid for Varlen but offset the amount paid by the sum borrowed to buy it. In other words, Duff & Phelps treated Amsted's enterprise value as being the same with or without Varlen. (Bluth Dep. 106-111, 112-113; Schiedemeyer Dep. 120-125; Gross Rpt. 4-5; Henderson Rpt. 23). Based on the review of the data it received regarding Varlen, and given the proximity of the date of the transaction to the end of the year, Duff & Phelps made the determination that the actual transaction price for Varlen was the best evidence of fair market value of Varlen, the value of Varlen was added to the value of Amsted's invested capital, and the total was reduced by the cost of the consideration used to fund the purchase (Gordy Dep. 147, Ex. 11 (Bates Nos. L000718-822)).

81.     Duff & Phelps submitted the October 1999 Amsted valuation to LaSalle's ESOP Fiduciary Committee for consideration and approval. Prior to this meeting, the valuation was distributed to the members of the Committee (Gordy Dep. 118-120). Minutes of LaSalle's ESOP Committee meeting of October 25, 1999, state:

> Ms. Bluth began with an overview of the fiscal year for the Company. Overall, it was a great year for the Company's businesses as it completed an $825 million acquisition of the Varlen Corporation ("Varlen") in August. Duff & Phelps' valuation assumes the Company paid fair market value for the acquisition. The Company's traditional business segments were valued with Varlen's business added in and the acquisition debt subtracted out of final value. Valuation summaries were provided both including and excluding Varlen from the equation and the same $184.41 price per share of the Company's common stock was reached (App. 1-2). The increase in enterprise value from last fiscal year is due to better EBITDA ($176 million) and from improvements the Company has made to its business (App. 1-5). The stock price has increased by 32% due to a $150 million value appreciation, a decrease in debt and an increase in cash as a result of S-Corp conversion (App. 106).

Furthermore, at this meeting, the Committee discussed the valuation in detail with Duff & Phelps, and LaSalle asked substantive questions and delayed approving the report until Duff & Phelps was able to supply supplemental information (Bluth Dep. 123-24, Ex. 26 (Bates Nos. L002399-400)).

-23-

82.     Duff & Phelps was not asked, nor did it independently determine, whether Amsted paid fair market value for Varlen (Bluth Dep. 103-04, 110-111; Schiedemeyer Dep. 110). Duff & Phelps' engagement and role was to determine the valuation as of specified dates of the common stock of Amsted (Bluth Dep. 61).

83.     Ms. Bluth wrote to LaSalle on September 30, 1999 stating:

> This letter will confirm our discussions regarding how Duff & Phelps, LLC will treat Varlen Corporation, acquired by Amsted, Incorporated in August 1999, in the annual ESOP valuation of Amsted's common stock. For purposes of the valuation, we will assume Varlen's value is its purchase price of approximately $788 million (before considering fees). This assumption will also be stated in our report and opinion letter.
>
> Nonetheless, should anything in our due diligence or analysis cause us to question this assumption, we will inform you and Amsted management.
>
> Please let me know if you have any questions about this approach.

(Bluth Dep. 105-06, Ex. 20 (Bates No. L000454)). LaSalle considered this treatment of the Varlen acquisition with respect to the valuation and concluded it was reasonable (Gordy Dep. 87; Gordy Dep. 133, Ex. 9 (Bates No. L000454)).

84.     Duff & Phelps did not receive any specific information about what effect, if any, the purchase of Varlen had on Amsted's repurchase obligation (Bluth Dep. 100), although it had been given historical repurchase data in 1998 and updated related financial information in 1999 (Bluth Dep. 75-76, 118-121).

85.     Varlen employees who were now covered by the Amsted ESOP were not given credit for their prior service at Varlen; consequently, none would become vested in the ESOP at all for three years and would not become fully vested until they had attained seven years of service (Berg Dep. 61; ESOP Plan eff. 10/01/99, §6.6 (Bates No. D00329)). Thus, there was no

immediate effect on Amsted's repurchase obligation for several years after Varlen closed (Berg Dep. 61; Kurtz Dep. 33, Ex. 4 (SSB0000111-41 at SSB0000128); Levine Rpt. 13).

86.    Amsted's annual 25% ESOP contribution expense was anticipated to increase by that portion of "considered compensation" attributable to the Varlen employees (Berg Dep. 109; Levine Rpt. 13).

87.    Additionally, Varlen operations were predicted to add cash flow to the combined operation (Kurtz Dep. 45-46, Ex. 6 (Bates Nos. D&P0398-460 at D&P0411, 414, 416, 437); Lohman Dep. 77; Jones Dep. 105).

88.    Nothing in Duff & Phelps' valuation took into account projected synergies resulting from the Varlen transaction, which both SSB and Amsted management anticipated would occur and, indeed, formed a large part of the rationale for the acquisition (Montgomery Dep. 145-146; Whitehurst Dep. 31-32; Jones Dep. 100, Ex. 6 (Bates Nos. D00048-77); Kurtz Dep. 33, Ex. 4 (Bates Nos. SSB0000111-41 at SSB0000124, SSB0000128); Clawson Dep. 82-83).

89.    Nor did the valuation allow for the substantial federal tax savings that would accrue to Varlen's earnings (as part of Amsted) because the latter was a sub-chapter S corporation and as such received favorable tax treatment (Chiappetta Dep. 83-84; Reum Dep. 20-21; Newman Dep. 46-47; Gross Rpt. 5).

90.    In the opinion of LaSalle's expert witnesses, treating both the above factors as "neutral" in the valuation process, was a conservative valuation decision by Duff & Phelps (Gross Rpt. 4-5; Henderson Rpt. 23).

91.    LaSalle's ESOP Committee minutes also reflect that "[c]oncerns regarding the Company's repurchase liability were raised" and that "Duff & Phelps believed that the

company's plan recordkeeper, Benefit Consultants, Inc. ["BCI"], had conducted a study on this issue [and that] Duff & Phelps will follow-up with BCI to allow LaSalle's review of this study" (Bluth Dep. 126-27, Ex. 26 (Bates Nos. L002399-400); Gordy Dep. 157-158, Ex. 12 (Bates Nos. L002399-404).

92.     Neither Bluth nor Vaughn Gordy, LaSalle's representative, recalled specifics of that discussion (Bluth Dep. 126-27; Gordy Dep. 157-58).  Gordy, however, did call BCI about BCI's work on PERLS and discovered that Amsted was, in fact, working with BCI regarding modifications BCI was then making to its PERLS software to tailor it to a company with an S-Corporation status like Amsted's (Gordy Dep. 62-63, 159-160).

93.     The valuation opinion letter was signed by Duff & Phelps (Gordy Dep. 143-144, Ex. 10 (Bates Nos. L000716-717)).  Also, nearly every footer of the valuation report identifies Duff & Phelps as the author (Gordy Dep. 147, Ex. 11 (Bates Nos. L000718-822)).

94.     In October 1999, LaSalle approved the Duff & Phelps' fiscal 1999 valuation of Amsted's share price of $184.41/share (Gordy Dep. 161).  LaSalle relied on this opinion as well as Duff & Phelps' underlying valuation report (Gordy Dep. 25, 43, 161, Exs. 10 (Bates Nos. L000716-17), 11 (Bates Nos. L000718-822)).

95.     Amsted's ESOP Committee was then advised of Duff & Phelps' $184.41 valuation through a presentation by Duff & Phelps at the Company's ESOP Committee's October 1999 meeting, and relied entirely upon the professional competence of the valuation firm that the trustee was using (Goetschel Dep. 74, Ex. 18 (Bates Nos. D00048-77)).

96.     When asked at his deposition whether he was surprised at the amount of share value increase from 1998, Mr. Goetschel answered as follows:

> A.     Well, I don't remember that I was.  You know, when you
> put yourself back in that time frame and understanding at least

what we felt was the charge of the valuation firm, to provide to the trustee a number that was representative of what Amsted stock would sell at if it were traded as a public company, if it were traded in the public market.

* * *

And you go back to the time frame of 1998 to 1999, and there have been, you know, significant increases in all market in all market indicators. And so with that in mind, I think that it wasn't -- wasn't difficult to look at 184 at that moment in time when it was presented and say, well, yeah, all right.[8] (Goetschel Dep. 82).

97. In none of Duff & Phelps valuations was a discount for lack of marketability applied. The reasons were threefold. First, a participant could "put" his shares to the Company and be paid in cash; second, Amsted by-laws provided that its shares were to be treated as if publicly traded, and, third, no such discount had been applied in previous valuations. (Bluth Dep. 64-65, 68-69; Schiedemeyer Dep. 132).[9] In 2000, when participant shares were no longer redeemed in cash, the issue was revisited. But again, no discount was used for similar reasons. (Bluth Dep. 143, 146-151).

**AMSTED'S 1999 DIVESTITURES OF MACWHYTE AND CCT**

98. At its March 8, 1999 Board of Directors meeting, the Directors authorized Amsted's sale or other disposition of its wire rope business subsidiary, MacWhyte Company

---

[8] Indeed, as the Duff & Phelps valuation report notes, although Amsted stock increased in value by 31.9% from 1998, the Dow Jones average was up 31.8% and the Standard & Poor 500 was up 26.1% for the same period (Bluth Dep. 132-134, Ex. 27 (Bates No. D03018)).

[9] A leading authority, cited in Plaintiffs' expert report, stated: "The repurchase liability arising from the terms of the ESOP is normally not considered to significantly affect the discount for lack of marketability unless the ability to repurchase the stock is impaired or the employer corporation's ability to honor the put option is in question." (Clawson Rpt. 56). In 1998-99, there was no indication of any such impairment or question with respect to Amsted's repurchase obligation. Nonetheless, Plaintiffs' valuation expert, Clawson, testified that he would have applied a marketability discount in 1999 and thereafter, based on the Varlen transaction. He testified that it is a subjective determination and he applies such a discount in about half the cases he works on (Clawson Dep. 12).

-27-

("MacWhyte") (Chiappetta Dep. 62-63, Ex. 1 (Bates Nos. D00871-73)), which occurred later in 1999 (Newman Dep. 77-78; Reum Dep. 60; Goetschel Dep. 101).

99.     At the July 20, 1999 Board of Directors meeting, the Directors authorized Amsted's sale or other disposition of its field erected cooling tower business, Ceramic Cooling Tower Company ("CCT"), a division of Baltimore Aircoil (Goetschel Dep. 47, Ex. 11 (Bates Nos. D00888-92); Newman Dep. 166).  And that, too, occurred later in 1999 (Newman Dep. 165-66; Goetschel Dep. 47, 101; Hower Dep. 54-55).

100.    Employees terminated as a result of MacWhyte and CCT division divestitures had the option of immediately submitting distribution forms to request distributions or waiting to submit request forms at a later date of their choosing (Chiappetta Dep. 148-49).

101.    In forecasting its repurchase obligation, Amsted had to make assumptions as to when these former employees were likely to request distributions (Chiappetta Dep. 148-149, 200-201).

## AMSTED'S FISCAL YEAR 2000 LIQUIDITY CRISIS AND THE COMPANY'S RESPONSE TO IT

102.    Amsted's actual fiscal year 1999 repurchase obligation calculated on an accrual basis (*i.e.*, for distribution requests *received* from October 1, 1998 through September 30, 1999) was $110 million (Hower Aff. ¶9).

103.    The actual fiscal year 1999 repurchase obligation calculated on a cash basis (*i.e.*, cash distributions actually *paid out* between October 1, 1998 and September 30, 1999) was $81.7 million (Hower Aff. ¶10).

104.    The repurchase obligation initially built into Amsted's fiscal year 2000 business plan, which estimated repurchase obligations on a cash basis, was $113 million, including $2

-28-

million in diversifications, based on a projected share valuation of $153.76 (Hower Aff. ¶11; Belger Rpt. 4).

105.    Once the new share value of $184.41 as of September 30, 1999 was approved by LaSalle, Amsted adjusted its projected fiscal year 2000 repurchase obligation accordingly to $135 million (Hower Aff. ¶12; Belger Rpt. 4).

106.    The $135 million included a forecast of $54 million to be paid out in the first fiscal quarter alone, which reflected the projected impact of the MacWhyte division divestiture, and then subsequent payouts of $35 million, $26 million, and $18 million for each of the next three fiscal quarters (Hower Aff. ¶12; Belger Rpt. 5).

107.    Actual payouts in the first fiscal quarter amounted to $55 million, or $1 million more than the forecast (Newman Dep. 173-75, Ex. 22 (Bates Nos. D02384-96 at D02396); Hower Aff. ¶12, 13; Belger Rpt. 5).

108.    The repurchase obligation forecast was adjusted in December 1999 to a revised annual projection of $142 million (Hower Aff. ¶14; Belger Rpt. 5).

109.    The $55 million paid out in the first fiscal quarter represented 5.2% of the shares allocated at the start of the fiscal year (Hower Aff. ¶15, Ex. B).  1.3% of this amount was due solely to MacWhyte and the remaining 3.8% was only 0.5% higher than the percentage of shares redeemed during the same quarter of the prior fiscal year (Hower Aff. ¶15, Ex. B).

110.    In the eight fiscal quarters immediately prior to the quarter ending September 30, 1999, the turnover rates were as follows:

| Quarter Ending | % of Shares at the Start of the Fiscal Year |
|---|---|
| September 30, 1997 | 2.6% |
| December 31, 1997 | 2.7% |
| March 31, 1998 | 2.4% |

| June 39, 1998 | 1.7% |
|---|---|
| September 30, 1998 | 3.3% |
| December 31, 1998 | 3.1% |
| March 31, 1999 | 1.7% |
| June 30, 1999 | 1.9% (0.9% excluding MacWhyte) |

(Hower Aff. ¶15, Ex. B).

111.    Many of the ESOP distribution forms submitted for the October 1 - December 31, 1999 fiscal quarter were received towards the end of that quarter (Chiappetta Dep. 202).

112.    In early or mid-January 2000, it became apparent to Amsted management that ESOP redemptions were substantially exceeding the prior estimate of $35 million for the quarter ending December 31, 1999 (Goetschel Dep. 91; *supra* Facts ¶106).

113.    The accrued repurchase obligation for the quarter ending December 31, 1999 was preliminarily estimated on January 7, 2000 to be approximately $66 million (Belger Rpt. 5; Hower Aff. ¶6).

114.    This estimate resulted in a further increase in the fiscal year projection to a range of $169 to $178 million (Belger Rpt. 5; Hower Aff. ¶17).

115.    The dollar amount of the actual share redemptions paid in February 2000 (for the quarter ending December 31, 1999) was approximately $64 million, representing 6.2% of the shares allocated at the start of the fiscal year (Newman Dep. 173-75, Ex. 22 (Bates Nos. D02384-96 at D02396); Belger Rpt. 5; Hower Aff. ¶¶15, 18, Ex. B). This amount included repurchases of almost $14 million, or 1.3% of shares, caused by the dispositions of MacWhyte and CCT (Newman Dep. 173-75, Ex. 22 (Bates Nos. D02384-96 at D02396); Belger Rpt. 5; Hower Aff. ¶16, Ex. B).

-30-

116.     In light of these redemptions to date and revised projections for the third and fourth fiscal quarters, the fiscal year forecast was again updated to a projected annual total of approximately $179 million (Newman Dep. 173-75, Ex. 22 (Bates Nos. D02384-96 at D02396); Hower Aff. ¶19; Belger Rpt. 5).

117.     The $68 million difference (excluding diversifications) between this updated forecast and the initial forecast built into Amsted's fiscal year 2000 business plan (*see* Facts ¶¶104, 116) was reported to the Company's directors at a meeting on January 27, 2000 with the Chairman's recommendation that the Company begin considering financial and legal alternatives to protect the Company's deteriorating cash position. The options discussed included an initial public offering of Company shares ("IPO"), a curtailment of capital expenditures and amending the ESOP to defer redemptions. (Goetschel Dep. 90-100, Ex. 21 (Bates Nos. D01880-88); Berg Dep. 144; Chiappetta Dep. 199, 208-15).

118.     Each of these and other alternatives were explored thereafter:

- Expenditures for the expansion of the Griffin Wheel Tulsa manufacturing plant already underway were decreased (Goetschel Dep. 100).

- SSB again was retained, this time to consider the possibility of an IPO as well as other market and financial possibilities (Goetschel Dep. 94-100, 118-19, Exs. 22 (Bates Nos. D01433-42 at D01433-37, 1442), 23 (Bates No. BC0044-57 at BC0044-45); Berg Dep. 178-79, Ex. 21 (Bates No. D01755); Chiappetta Dep. 47).

- Amsted, through its General Counsel, Thomas Berg, retained the services of well-known and established ESOP consulting firm, Houlihan Lokey Howard & Zukin, which together with SSB and the Company's ESOP legal counsel, McDermott, Will & Emery,[10] were directed to review all possible alternatives to curtail the amount of ESOP repurchases and the negative impact on the Company's cash position (Berg Dep. 148-49, 153-

---

[10] The responsible McDermott Will partner, Jared Kaplan, was Amsted's legal counsel and secretary to the ESOP Committee (Kaplan Dep. 6, 7, 9; Berg Dep. 206). According to Plaintiffs' expert, Wilson Ellis, Kaplan is "one of the leading ESOP lawyers in the country" who is well known to Ellis and who Ellis believes renders sound legal advice with regard to ERISA and ESOP matters (Ellis Dep. 55-56, 217-18).

-31-

55, Ex. 16 (Bates Nos. D01754); Newman Dep. 167-170, Ex. 22 (Bates Nos. D02384-96)).

119.    Even as they met, however, redemptions continued to escalate (Berg Dep. 151-152, 167-169). Estimates for redemptions to be paid out in May 2000 for the quarter ending March 31, 2000 were $28.1 million on February 2 (Hower Aff. ¶21, Ex. C; Belger Rpt. 5) and $38 million on March 1 (Hower Aff. ¶21, Ex. D; Belger Rpt. 5).

120.    On March 14, 2000, McDermott Will & Emery presented Berg with a memorandum (revised on March 22) outlining various strategies for amending and modifying the ESOP's structure to stop or scale down the amount and timing of redemptions (Berg Dep. 172-73, 175, Exs. 18 (Bates Nos. D2720-27), 19 (Bates Nos. BC0001-13)). Among the alternatives suggested were (i) replacing annual share valuations with quarterly ones (ii) imposing limitations on a participant's rights to immediate cash distributions and (iii) deferring payments through tightened entitlement standards (Berg Dep. 172-73, 175, Exs. 18 (Bates Nos. D2720-27), 19 (Bates Nos. BC0001-13)).

121.    By early April 2000, the cash drain had accelerated. Payments scheduled to be made during the third quarter amounted to approximately $61.5 million, a turnover rate of approximately 6.0% of the shares existing at the start of the fiscal year (Hower Aff. ¶22). This raised the fiscal year total for the first three quarters to over $180 million, a turnover rate of 17.4% (Hower Aff. ¶22).

122.    The magnitude of the redemption escalation was extraordinary (Ellis Dep. 246).

123.    Amsted's forecasted total fiscal year 2000 repurchase liability was adjusted in April 2000 to approximately $240 million (Berg Dep. 183-187, Ex. 23 (Bates No. D01756); Chiappetta Dep. Exs. 29 & 36 (Bates Nos. D01949-66)).

124.    At the same time, SSB advised that a public offering no longer was a viable alternative for raising cash because capital markets had become much less receptive (Berg Dep. 178-179).

125.    In April 2000, Amsted retained Willamette Management Associates to provide Amsted with an estimate, but not a complete valuation, of the current value of Amsted's shares and to see if there was a better way to estimate Amsted's repurchase obligation (Berg Dep. 222-223, Ex. 31 (Bates Nos. D01444-48); Hower Dep. 102-109, Exs. 27 (D01992-97), 28 (Bates No. D02013), 29 (Bates No. 2125)).

126.    By April 18, 2000, the date of a regularly scheduled Amsted directors meeting (Goetschel Dep. 119-20, Ex. 31 (D00919-920)), it was apparent that the Company was in a liquidity crisis.  Year end repurchases had recently been estimated at $240 million, there was potential for repurchases to approach as much as $300 million (Goetschel Dep. 120-123, 128, Ex. 33 (Bates No. D01890-91); Berg Dep. 208-211), and Amsted's loan covenants were imperiled (Goetschel Dep. 128).

127.    Consequently, at the directors meeting Chairman and CEO Goetschel recommended that there be a special director's meeting to consider structural changes to the ESOP (Goetschel Dep. 123-125, Ex. 33 (Bates Nos. D01890-91)).

128.    That meeting was subsequently held on April 25, 2000, and the independent directors considered and unanimously voted to adopt two prospective amendments to the ESOP effective at midnight that day (Goetschel Dep. 133-35, Ex. 35 (Bates Nos. D0923-28)).

129.    The first eliminated the right of a terminating participant to receive a lump sum cash payment.  Instead, he would be paid his account value in Company shares which would then be required immediately to be resold (or "put") to the Company in exchange for a four-year

installment promissory note (bearing interest at a reasonable rate)[11] of like amount secured by Company shares (Berg Dep. 216; Goetschel Dep. 133-35, Ex. 35 (Bates Nos. D00926-27); ESOP Plan eff. 10/01/99, §§7.4, 7.5(c), 7.16(d) (Bates Nos. D00337-42, D00348-53)).

130.   The second amendment eliminated the joint and survivor annuity option (Goetschel Dep. 133-35, Ex. 35 (Bates No. D00926); ESOP Plan eff. 10/01/99, §§7.2(d) (Bates Nos. D00333-34)).

131.   A majority of the independent directors also voted to reject management recommendations that Amsted's stock be revalued as of June 2000 so that the new share price would apply to ESOP distribution requests received after the meeting date and that there be quarterly instead of annual valuations, concluding that those steps either were unnecessary then, unfair to at least some participants, or ran the risk of adverse impact on employee morale (Goetschel Dep. 133-35; Berg Dep. 217-221; Terry Dep. 18-19; Lohman Dep. 94-95).

132.   The amendments were promptly communicated to participants (Goetschel Dep. 137-39, Ex. 36 (D02533-36)).

133.   Any employee who had prepared and submitted a completed distribution form before the amendments' effective date was permitted to exercise his or her election unaffected by the April Amendments (Gunn Dep. 88, Ex. 4).

134.   The redemption requests submitted during the third quarter of fiscal year 2000 totaled approximately $150 million and, had the April Amendments not been made, this entire amount would have had to be paid out during the fourth quarter (Hower Aff. ¶23; Belger Rpt. 5) for a repurchase obligation for the first three quarters alone of fiscal year 2000 of approximately $276 million (Hower Aff. ¶23).

---

[11] The interest rate paid on notes issued in 2000 was 6.33% (Frieburg Dep. 76; Bradley Dep. 47-49; Major Dep. 47).

CHICAGO/#1135401.9

135.    The turnover experienced during fiscal 2000 was an aberration that greatly exceeded prior experience or expectations (Belger Rpt. 6; Levine Rpt. 13-16).

136.    On July 18, 2000, Amsted's Board of Directors and its ESOP Committee held a regularly scheduled joint meeting (Goetschel Dep. 150-51, Ex. 42 (Bates Nos. D00929-38)). As a result of the continued increase in redemption requests, and once again following the recommendations of McDermott, Will & Emery, the Board and its ESOP Committee considered further amending the ESOP and making other administrative changes (Berg Dep. 225, Ex. 33 (Bates Nos. L01262F-J)).

137.    The independent directors on the ESOP Committee voted unanimously on July 18, 2000 to amend the ESOP and make other administrative changes as follows:

- Beginning with fiscal 2001, share valuations would be quarterly instead of annual.[12]

- To be immediately eligible for any ESOP distribution, participants must (a) retire at normal retirement date (age 65), (b) be 55 years old with 30 years service, or (c) be permanently disabled.

- If not so eligible, a participant became eligible five years after employment terminated or when the ESOP loan was repaid, whichever occurred last.

- The Company contribution to participant accounts was reduced from 25% to 10% of considered compensation.

(Goetschel Dep. 150-51, Ex. 42 (Bates Nos. D00929-38); Berg Dep. 216-217, 226; Collens Dep. 116, Ex. 29 (Bates Nos. D00857-60); ESOP Plan eff. 10/01/99, §§1.4, 3.1, 7.6, 7.7 (Bates Nos. D00308, D00310, D00339-42)).

138.    At the same meeting, changes to the Citibank loan agreement, including securing it, were approved (Berg Dep. 226, Ex. 35 (Bates Nos. D00929-38)).

---

[12] No immediate change in valuation dates was required because, as noted (*supra* Facts ¶15), participants terminating after June 30 were governed by the September 30, 2000 valuation.

CHICAGO/#1135401.9

139.    In response to the liquidity crisis, LaSalle regularly communicated with Amsted, in late 1999 and early 2000, regarding the increase in the repurchase obligation (Gordy Dep. 183-85): in December 1999, LaSalle confirmed with Amsted that the Company was reviewing its repurchase obligation (Berg Dep. 133); on September 8, 2000, LaSalle engaged Duff & Phelps to conduct quarterly valuations of Amsted's stock (Gordy Dep. 186, Ex. 16 (Bates Nos. L001372-78)); in October 2000, LaSalle communicated with Amsted regarding Amsted's retention of Boston Consulting Group and Goldman Sachs to review Amsted's portfolio and spin off business units that did not fit with Amsted (Gordy Dep. 194-195, Ex. 17 (Bates Nos. L001682-815)); and in October 2000, LaSalle analyzed the applicability of using a lack of marketability discount in subsequent valuations (Gordy Dep. 199-201).

140.    Duff & Phelps' September 30, 2000 valuation was $89.87 per share.  The firm again followed the same valuation techniques and assumptions as previously (Bluth Dep. 143, 149, Ex. 30 (Bates Nos. D0140-256); Schiedemeyer Dep. 139, 157-158).  It supplemented its report approximately six months after the valuation date at LaSalle's request to explain, among other things, why it did not use a discount for lack of marketability (Berg. 269-271, Bluth Dep. 149, 152-157, Ex. 32 (Bates Nos. D&P0257-95); Schiedemeyer Dep. 160-163).

141.    The total repurchase obligation that accrued during fiscal year 2000, which includes the amount of repurchases for the fourth quarter that were calculated using the new September 30, 2000 valuation share price, was approximately $278 million (Hower Aff. ¶24; Levine Rpt. 14).

142.    Moreover, for the trailing four quarters (July 1, 1999 through June 30, 2000), the accrued repurchase obligation for participants redeeming shares at the $184.41 share valuation amounted to over $330 million (Hower Aff. ¶25).

CHICAGO/#1135401.9

143.    The April 2000 and July 2000 ESOP amendments were prudent and necessary and an appropriate response to the crisis Amsted faced (Ellis Dep. 253; Clawson Dep. 182-83).

| | |
|---|---|
| Respectfully submitted, | Respectfully submitted, |
| AMSTED INDUSTRIES, INC., AMSTED INDUSTRIES, INC. EMPLOYEES STOCK OWNERSHIP PLAN, ARTHUR W. GOETSCHEL, RAYMOND A. JEAN, DAVID B. WHITEHURST, ROBERT CHIAPPETTA, O.J. SOPRANOS, LEWIS COLLENS, JOHN E. JONES, W. ROBERT REUM, RICHARD E. TERRY, GORDON R. LOHMAN, THOMAS C. BERG, AND MATTHEW J. HOWER | LaSALLE NATIONAL BANK, N.A. |

By: _Charis A. Runnels_
        One of Their Attorneys

By: _Keith C. Hannigan /sm_
        One of Its Attorneys

Richard H. Schnadig
Charles B. Wolf
Michael G. Cleveland
Charis A. Runnels
Alison J. Maki
Vedder, Price, Kaufman & Kammholz, P.C.
222 North LaSalle Street, Suite 2600
Chicago, IL  60601-1003
(312) 609-7500

Keith C. Hannigan
David Ackerman
Theodore M. Becker
Jenkens & Gilchrist
225 W. Washington Street, Suite 2600
Chicago, Illinois  60606-3418
(312) 425-3900

Dated: January 21, 2004