

FILED

JAN 3 1 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUAN ARMSTRONG, et al.,

    Plaintiffs,

v.

AMSTED INDUSTRIES, INC., et al.,

    Defendants.

No. 01 C 2963
MDL No. 1417

Judge James B. Moran

DOCKETED

JAN 2 2 2004

## AMSTED DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Amsted Industries, Incorporated ("Amsted"), Amsted Industries, Incorporated Employees' Stock Ownership Plan ("ESOP" or "Plan"), Arthur W. Goetschel, Raymond A. Jean, David B. Whitehurst, Lewis Collens, John E. Jones, W. Robert Reum, Richard E. Terry, Gordon R. Lohman, Thomas C. Berg, O.J. Sopranos, Robert A. Chiappetta, and Matthew J. Hower (collectively the "Amsted Defendants"), by their attorneys and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1 of the General Rules of the United States District Court for the Northern District of Illinois, hereby move this Court for entry of an Order granting them summary judgment against Plaintiffs.

In support of their Motion, the Amsted Defendants submit the following:

- Brief in Support of Amsted Defendants' Motion for Summary Judgment;

- Defendants' Joint Statement of Undisputed Material Facts In Support of Their Motions for Summary Judgment;

154

- Joint Appendix In Support Of Defendants' Motions For Summary Judgment And Defendants Thomas C. Berg, OJ Sopranos, And Robert Chiappetta's Motion For Summary Judgment (Volumes I through VI).[1]

WHEREFORE, for all of the foregoing reasons, the Amsted Defendants respectfully request the Court to grant summary judgment in its favor against Plaintiffs on their Amended Complaint and such other and further relief in its favor as the Court deems appropriate under the circumstances.

Respectfully submitted,

AMSTED INDUSTRIES, INC., AMSTED INDUSTRIES, INC. EMPLOYEES STOCK OWNERSHIP PLAN, ARTHUR W. GOETSCHEL, RAYMOND A. JEAN, DAVID B. WHITEHURST, LEWIS COLLENS, JOHN E. JONES, W. ROBERT REUM, RICHARD E. TERRY, GORDON R. LOHMAN, THOMAS C. BERG, O.J. SOPRANOS, ROBERT A. CIAPPETTA AND MATTHEW J. HOWER

By: _Charis A. Runnels_
One of Their Attorneys

Richard H. Schnadig
Charles B. Wolf
Michael G. Cleveland
Charis A. Runnels
Alison J. Maki
Vedder, Price, Kaufman & Kammholz, P.C.
222 North LaSalle Street, Suite 2600
Chicago, IL 60601-1003
Telephone: (312) 609-7500
Facsimile: (312) 609-5005
Dated: January 21, 2004

---

[1] Defendants Berg, Sopranos and Chiappetta move separately for summary judgment on the grounds that they are not fiduciaries and, therefore, not proper defendants. To avoid unnecessary duplication, all documents supporting this motion have been included within Defendants' Joint Appendix.

## CERTIFICATE OF SERVICE

The undersigned certifies that true and correct copies of the foregoing were served on

nuary 21, 2004:

- **Amsted Defendants' Motion for Summary Judgment;**

- **Brief in Support of Amsted Defendants' Motion for Summary Judgment;**

- **Defendants' Joint Statement of Undisputed Material Facts in Support of Their Motions for Summary Judgment; and**

- **Joint Appendix in Support of Defendants' Motions for Summary Judgment and Defendants Thomas C. Berg, OJ Sopranos, and Robert Chiappetta's Motion for Summary Judgment.**

to the following parties:

Edgar C. Gentle, III
J. Paul Zimmerman
Gentle Pickens Eliason & Turner
Two North Twentieth Building
2 North 20th Street, Suite 1200
Birmingham, Alabama 35203
**VIA FEDERAL EXPRESS**

Mark D. DeBofsky
Daley DeBofsky & Bryant
1 North LaSalle Street, Suite 3800
Chicago, Illinois 60602
**VIA MESSENGER DELIVERY**

Pamela B. Slate
Joel DiLorenzo
Slate Kennedy LLC
2001 Park Place North, Suite 450
Birmingham, Alabama 35203
**VIA FEDERAL EXPRESS**

Gary D. McCallister
Thomas A. Kelliher
Gary D. McCallister & Associates, Ltd.
29 South LaSalle Street, Suite 1210
Chicago, Illinois 60603
**VIA MESSENGER DELIVERY**

Robert M. Foote
Peter J. Flowers
Foote, Meyers, Mielke & Flowers, LLC
416 South Second Street
Geneva, Illinois 60134
**VIA FEDERAL EXPRESS**

David Ackerman
Theodore M. Becker
Keith C. Hannigan
Jenkens & Gilchrist
225 W. Washington Street, Suite 2600
Chicago, Illinois 60606-3418
**VIA MESSENGER DELIVERY**

Charis A. Runnels

Charis A. Runnels

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

JAN 2 1 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| JUAN ARMSTRONG, et al., | |
| Plaintiffs, | |
| v. | No. 01 C 2963<br>MDL No. 1417 |
| AMSTED INDUSTRIES, INC., et al., | Judge James B. Moran |
| Defendants. | |

DOCKETED

JAN 2 2 2004

## BRIEF IN SUPPORT OF AMSTED DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Richard H. Schnadig
Charles B. Wolf
Michael G. Cleveland
Charis A. Runnels
Alison J. Maki
Vedder, Price, Kaufman & Kammholz, P.C.
222 North LaSalle Street, Suite 2600
Chicago, IL 60601-1003
Telephone:    (312) 609-7500
Facsimile:    (312) 609-5005

Dated: January 21, 2004

154

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................... 1

II.    PLAINTIFFS' CLAIMS ................................................................. 2

III.   SUMMARY OF KEY UNDISPUTED FACTS ............................. 3

IV.   SUMMARY OF ARGUMENT ..................................................... 6

V.     PLAINTIFFS' CLAIMS IGNORE WELL ESTABLISHED LEGAL
STANDARDS ................................................................................. 6

     A.    The Applicable Standard Under Rule 56 ................................ 6

     B.    The General Standards Under ERISA for Identifying Fiduciaries And
Evaluating Their Conduct ..................................................... 7

     C.    The Prudent Person Standard Must Be Applied Without the Benefit of
Hindsight ............................................................................... 10

     D.    Plaintiffs Must Prove That The Amsted Defendants' Fiduciary Breach
Caused Harm To The ESOP .................................................. 11

VI.   PLAINTIFFS CANNOT MAINTAIN FIDUCIARY BREACH CLAIMS WITH
RESPECT TO THE VARLEN ACQUISITION OR AMSTED'S REPURCHASE
OBLIGATION PLANNING ......................................................... 12

     A.    Controlling Law Establishes that the Challenged Actions Were Not
Undertaken by Defendants as Plan Fiduciaries ..................... 12

     B.    The Amsted Defendants' Actions Satisfy Either Standard ...... 14

         1.    The Varlen Acquisition ................................................... 15

         2.    The Repurchase Obligation ............................................ 19

VII.   THE AMSTED DEFENDANTS CANNOT BE LIABLE UNDER ERISA WITH
RESPECT TO THE 1999 SHARE VALUATION ....................... 28

     A.    The Amsted Defendants Were Not Fiduciaries With Respect to the 1999
Share Valuation .................................................................... 28

     B.    The Amsted Defendants Cannot Be Liable As Co-Fiduciaries With
Respect to the 1999 Share Valuation ..................................... 28

**TABLE OF CONTENTS**
**(continued)**

Page

C.  Even If The 1999 Share Value Was Erroneously High, There Was No
    Loss To The Plan ................................................................................................. 31

VIII.  AMSTED DEFENDANTS CANNOT BE HELD LIABLE WITH RESPECT TO
       THE PLAN AMENDMENTS ADOPTED IN APRIL 2000 AND/OR JULY 2000....... 31

IX.  PLAINTIFFS' REMAINING THEORIES ALSO APPEAR TO HAVE BEEN
     ABANDONED AND, IN ANY EVENT, ARE MERITLESS........................................ 32

X.  PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIMS MUST BE
    DISMISSED BECAUSE THE AMSTED DEFENDANTS ACTED IN GOOD
    FAITH RELIANCE ON EXPERT ADVICE ................................................................. 33

XI.  CONCLUSION.......................................................................................................... 34

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUAN ARMSTRONG, et al.,

        Plaintiffs,

v.

AMSTED INDUSTRIES, INC., et al.,

        Defendants.

No. 01 C 2963
MDL No. 1417

Judge James B. Moran

## BRIEF IN SUPPORT OF AMSTED DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

**I.**    **INTRODUCTION**

The instant case arises from the following series of key and undisputed events:

1.    In August 1999, Amsted Industries, Inc. ("Amsted" or the "Company"), a company which was wholly owned by the Amsted Industries, Inc. Employees' Stock Ownership Plan ("ESOP"), acquired Varlen Corporation, a publicly traded company, for $788 million ($42 per share). To finance the acquisition and to obtain working capital, Amsted obtained a $1 billion unsecured loan from Citibank, acting as lead syndicator.

2.    In October, 1999, Defendant LaSalle Bank ("LaSalle"), the ESOP Trustee, on advice of its expert valuation firm, Duff & Phelps, determined the value of Amsted's stock as of September 30, 1999 (the end of Amsted's fiscal year) to be $184.41 per share, the highest value in the Company's history. Under the terms of the ESOP, that value became the basis for calculating benefits payable to participants who terminated employment and submitted distribution forms from July 1, 1999 through June 30, 2000. Those terminating thereafter were governed by succeeding valuations.

3.     Beginning at approximately the time of the 1999 valuation but not initially discernable, an unprecedented exodus of Amsted employees occurred; and they sought immediate lump sum cash distributions from the ESOP for their vested shares.  By the end of the fiscal year ending September 30, 2000, the accrued repurchase obligation for employees entitled to redeem their shares at $184.41 per share amounted to over $330 million, approximately 4 times the prior year's figure (Facts ¶¶ 103, 142).  This circumstance, coupled with the beginning of an economic downturn which affected Amsted and the entire United States economy, created a liquidity crisis for Amsted.  To save the Company and its ESOP, Amsted's ESOP Committee amended the ESOP in April 2000 and again in July 2000, to eliminate employees' right to a cash lump sum distribution, to defer eligibility for distributions and to make other changes to the plan.

This ERISA lawsuit followed.  In it, a certified class of active and terminated participants who did not receive the $184.41 share valuation sued Amsted, the ESOP, various officers and directors of Amsted and LaSalle.  The discovery record is voluminous, including over 24,500 pages of documents, 30 depositions taken by Plaintiffs, 13 depositions taken by defendants and seven expert witness reports and depositions.  Amsted, the ESOP and the Amsted officers and directors ("Amsted Defendants") have now moved for summary judgment.

## II.     PLAINTIFFS' CLAIMS

Even after the extensive discovery taken in this case, Plaintiffs' legal theories are murky; but at this point, Plaintiffs appear to be advancing the following theories of liability against the Amsted Defendants:

1.     Amsted Defendants breached their fiduciary duties to Plan participants by imprudently failing to take adequate steps, during fiscal 1999 or in early fiscal 2000, to correctly estimate the Company's repurchase obligation, that is, the amount that would have to be paid to redeem vested shares held by terminating employees, for fiscal year 2000.  Plaintiffs appear to

- 2 -

assert that, if adequate steps had been taken, the Company either would have foregone the Varlen acquisition or would have amended the ESOP to restrict distributions even before April 2000.

    2.     Amsted Defendants breached their fiduciary duties to Plan participants by imprudently allowing Amsted to incur significant debt to acquire Varlen. Plaintiffs do not challenge the price paid for Varlen, but instead argue that the ESOP was harmed by the debt incurred to acquire it.

    3.     Amsted Defendants breached their fiduciary duties by imprudently redeeming participants' shares at the $184.41 share valuation which Plaintiffs claim is excessive.

    4.     Amsted Defendants breached their fiduciary duties during fiscal 2000, as the liquidity crisis was developing, by imprudently failing to act more quickly or more aggressively than they did to amend the ESOP to restrict rights of terminating participants requesting distributions or to take other unspecified action.

    The numerous remaining theories advanced in Plaintiffs' Amended Complaint appear to have been abandoned, notably including the theory that the 2000 ESOP amendments themselves violated the ESOP and/or ERISA (Amend. Compl. Ct. III, ¶¶ 175-178). Indeed, Plaintiffs' experts have now testified that the amendments when made were prudent, necessary and appropriate. To the extent Plaintiffs may press any of their apparently abandoned theories in their response brief, Amsted Defendants will address and refute them in their reply.

## III.    <u>SUMMARY OF KEY UNDISPUTED FACTS</u>

    Quite apart from the substantial legal issues addressed below, Plaintiffs cannot adduce evidence to support any of their theories. Most significantly, there are no facts which could have caused a prudent fiduciary, in 1999, to foresee the exodus of Amsted employees and the liquidity crisis which subsequently ensued. Nor are there any facts which would have caused a prudent

- 3 -

fiduciary to conclude, in 1999, that the $184.41 valuation was flawed (if it was) and had to be rejected.

In the spring and summer of 1999, at or near the height of the recent stock market boom, Amsted, a company in excellent financial condition, was presented with an opportunity to acquire Varlen, a publicly-traded company which was complementary and compatible with its own businesses. Relying on the advice and counsel of Salomon Smith Barney ("SSB"), a highly regarded investment banker with which Amsted had previously worked, Varlen was purchased following first a friendly and then a hostile take-over attempt culminating in an auction with another seriously bidding company. Amsted proceeded in a careful, deliberate manner, based on extensive research, analysis and financial modeling. Amsted directors (the majority of whom were independent) unanimously supported the acquisition at every stage, and SSB issued a fairness opinion concluding that the purchase price was fair and reasonable. To finance the acquisition and to provide working capital, Citibank loaned Amsted $1 billion dollars on an unsecured basis. If Amsted's liquidity and ability to pay its obligations (including the repurchase obligation) when due had been a concern, a loan of this magnitude obviously would not have been obtained on this basis.

Duff & Phelps' 1999 valuation of Amsted shares at $184.41 was determined using widely-accepted ESOP valuation techniques and was consistent with prior ESOP share valuation methodologies for Amsted shares. Although the dollar amount was the highest it had been and represented a significant percentage increase over the 1998 value of $139.79, the 1998 valuation was itself the highest to date and did not result in abnormal redemptions.[1] The stock market, too,

---

[1] Indeed, the share price reached a record high for the prior four years with share turnover remaining at approximately 9-10% (Facts ¶¶ 20, 33).

- 4 -

peaked at about this time. Thus, while the $184.41 valuation represented a 31.9% increase over 1998, the Dow Jones average was up 31.8% for the same period. There are no facts which were known in October 1999, the only relevant time, which would have caused LaSalle (the ESOP fiduciary responsible for valuing the shares) to reject Duff & Phelps' recommended valuation and certainly none which would have caused the Amsted Defendants to object in their essentially passive role as recipient of that valuation.

No historic turnover pattern or software program forecast the large scale departure of employees and the concurrent redemption of shares which followed. Nor did the extent of employee turnover and the resultant cash impact begin to appear until early 2000. However, as soon as it became apparent that there might be a significant acceleration in redemptions, Amsted management began examining capital restructuring, ESOP amendments intended to defer payments to terminating employees and other alternatives to avoid a liquidity crisis and a violation of the Citibank credit terms. Several options were presented at a special April 25, 2000 Board of Directors' meeting but only one major change -- eliminating the lump-sum cash-out option and replacing it with a note payable in five installments over four years -- was prospectively adopted effective that date. A majority of independent directors concluded that other proposed amendments either were unnecessary then, unfair to at least some participants or ran the risk of adverse impact on employee morale.

Still, redemptions continued to accelerate at a high rate, further imperiling Amsted's loan covenants and its ongoing viability as a business enterprise while at the same time general business conditions deteriorated. As it became clear beyond doubt that more draconian measures were required to save Amsted and the ESOP, loan covenants were renegotiated and further amendments to the Plan were adopted by the Board of Directors on July 18, 2000. These

- 5 -

included imposing a new deferral before shares could be redeemed and quarterly valuations of Amsted stock. These amendments, along with a reduced share valuation of $89.87 per share as of September 30, 2000, finally proved sufficient to halt the exodus of employees.

## IV. SUMMARY OF ARGUMENT

Traumatic as these events were for both Amsted and its shareholders, there is not so much as a hint of ethical wrongdoing, self-dealing or unjust enrichment. Varlen was purchased in an arm's-length transaction in the open market and at fair market value. The sole purpose was to enhance shareholder value. If the $184.41 share price was too high, and there is no evidence it was, the departing employees benefited, not the Defendants. The ensuing liquidity crisis caused principally by the exodus of employees was unforeseeable to anyone in 1999.

Although the impact of ESOP amendments on participants was substantial, the amendments and the concomitant renegotiation of the Citibank loan saved the Company from probable bankruptcy and thus protected the long-term interests of the Plan participants, precisely what plan fiduciaries are required to do. There is no evidence – merely speculation – that share price caused that crisis or that prudent individuals could have anticipated it. Only Plaintiffs with 20-20 hindsight look at these events differently. But the law is not built on such second-guessing. No violation of the law occurred, and Amsted Defendants should be granted summary judgment.

## V. PLAINTIFFS' CLAIMS IGNORE WELL ESTABLISHED LEGAL STANDARDS

### A. The Applicable Standard Under Rule 56

The applicable standard for deciding a motion for summary judgment is well known to this Court and deserves only brief mention. In *Balzanto v. Nicholas Cuda Ltd. Profit Sharing*

- 6 -

*Plan,* 27 EB Cases (BNA) 2071, 2073 (N.D. Ill. 2002),[2] an ERISA case, Judge Kocoras summarized the standard as follows:

> Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law [citations omitted]. In seeking a grant of summary judgment the moving party must identify 'those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any which it believes demonstrate the absence of a genuine issue of material fact.' [citations omitted]. This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out 'an absence of evidence to support the non-moving party's case.' [citations omitted]. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but 'must set forth specific facts showing that there is a genuine issue for trial.' A 'genuine issue' in the context of a motion for summary judgment is not simply a 'metaphysical doubt' as to the material facts; rather a genuine issue exists when the evidence is such that a reasonable jury could find for the non-movant. [citations omitted] When reviewing the record, the court must draw all reasonable inferences in favor of the non-movant; however the court is 'not required to draw every conceivable inference from the record—only those inferences that are reasonable.'

## B. The General Standards Under ERISA for Identifying Fiduciaries And Evaluating Their Conduct

As the Supreme Court stated over twenty years ago and as the lower courts have repeatedly observed, ERISA is a "comprehensive and reticulated statute." *Nachman Corp. v. PBGC,* 446 U.S. 359, 361, 100 S.Ct. 1723, 1726 (1980). It requires that employee benefit plans, like the Amsted ESOP, be administered by "fiduciaries" who are held to high standards of loyalty and prudence in the performance of their fiduciary duties. See ERISA §§402-404, 29 U.S.C. §§1102-1104.

---

[2] A copy of this case is attached, along with copies of all unpublished cases cited herein, at Tab A.

ERISA provides that a person is a plan fiduciary "to the extent" that he is performing certain statutorily defined functions regarding plan administration or management or investment of plan assets. 29 U.S.C. § 1002(21)(A).[3] Further, ERISA specifically authorizes a person to act in a fiduciary capacity for some purposes but in a non-fiduciary capacity, e.g. as an officer, director or employee of a plan sponsor, for other purposes. ERISA §408(c)(3), 29 U.S.C. §1108(c)(3). Moreover, the statute provides that a plan may allocate various fiduciary responsibilities among two or more fiduciaries and, in such circumstances, one fiduciary will not be liable for the breaches of a co-fiduciary unless, inter alia, he had actual knowledge of the breach. See ERISA §405, 29 U.S.C. §1105; *Donovan v. Cunningham,* 716 F.2d 1455, 1475 (5th Cir. 1983).

Thus, "a person may be an ERISA fiduciary for some purposes, but not for others. In assessing whether a person can be liable for a breach of fiduciary duty, a court must ask whether that person is a fiduciary with respect to the particular activity at issue." *Plumb v. Fluid Pump Serv., Inc.*, 124 F. 3d 849, 854 (7th Cir. 1997) (citations and quotations omitted); *Klosterman v. Western Gen. Mgt., Inc.*, 32 F. 3d 1119, 1122 (7th Cir. 1994); *Johnson v. Georgia-Pacific Corp.*, 19 F. 3d 1184, 1188 (7th Cir. 1994); *Brandt v. Grounds*, 687 F.2d 895, 897 (7th Cir. 1982).

Two Supreme Court decisions establish that an employer does not act as a fiduciary by amending a benefit plan or making business decisions affecting a plan. *Lockheed Corp. v. Spink,*

---

[3] Specifically, 29 U.S.C. § 1002(21)(A) provides that:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

517 U.S. 882, 890-91, 116 S.Ct. 1783, 1789-90 (1996), held that plan administrators who adopted a benefit plan amendment to allow previously ineligible participants to prospectively accrue pension benefits in exchange for releases of ADEA and ERISA claims were not acting as fiduciaries under ERISA's "prohibited transaction" rules. Quoting the Second Circuit's decision in *Siskind v. Sperling Retirement Program*, 47 F.3d 498, 505 (1995), the Supreme Court said:

> Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries. As we said with respect to the amendment of welfare benefit plans in *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995), "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans... As the Second Circuit has observed, "only when fulfilling certain defined functions, including the exercise of discretionary authority or control over plan management or administration, does a person become a fiduciary under ERISA § 3(21)(A), 29 USC § 1002(21)(A)."

*Lockheed Corp.*, 517 U.S. at 890. Accord: *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443, 119 S.Ct. 755, 763 (1999) (amending pension plan to provide enhanced early retirement benefits but subsequently eliminating contributions of new participants not a fiduciary but a "settlor" function).

As further discussed below, a fundamental flaw in Plaintiffs' theory of this case is their failure to differentiate between actions which were taken in a fiduciary capacity and actions which were not. Similarly, they fail to differentiate between the fiduciary duties of Amsted Defendants, on the one hand, and LaSalle on the other.[4]

---

[4] They also persist in asserting claims against Amsted Defendants Berg, Chiappeta and Sopranos who were officers of Amsted but were not ERISA fiduciaries. A separate motion for summary judgment is being filed on behalf of those Defendants with respect to that issue. To the extent that motion might be denied, they join the arguments made here.

C.     **The Prudent Person Standard Must Be Applied Without the Benefit of Hindsight**

Even where Plaintiffs have correctly identified a fiduciary acting within the scope of his fiduciary duties and who is, therefore, held to a high standard of loyalty and prudence in the performance of those duties, Plaintiffs have improperly attempted to evaluate the defendants' conduct in light of subsequent events, contrary to the repeated admonitions of the federal courts.

It is well settled that the standard of prudence in ERISA Section 404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B), is an objective standard. *Keach v. U.S. Trust Co., N.A.,* 240 F.Supp.2d 840, 845 (C.D. Ill. 2002). Many courts have articulated the test of prudence as a procedural one. *Employee Benefits Law (2d Ed., BNA, 2000)* at 667. In the leading case of *Donovan v. Mazzola,* 716 F.2d 1226, 1232 (9th Cir. 1983), the Court stated that the test is whether the fiduciaries "at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." Applying this principle, the Seventh Circuit has emphasized that "the ultimate outcome of an investment is not proof of imprudence...The fiduciary duty of care...requires prudence, not prescience." *DeBruyne v. Equitable Life Assurance Society of the U.S.,* 920 F.2d 457,465 (7th Cir. 1990). See also, *Katsaros v. Cody,* 744 F.2d 270, 279 (2d Cir.), *cert denied,* 469 U.S. 1072 (1984) (prudent person standard is not concerned with results; it examines the fiduciary's conduct "from the perspective of the time of the investment decision rather than from the vantage point of hindsight."); *Metzler v. Graham,* 112 F.3d 207, 209 (5th Cir. 1997) ("prudence is evaluated at the time of the investment without the benefit of hindsight.").

Plaintiffs' claims are directly contrary to the rule irrefutably established in these cases, as discussed in detail below.

- 10 -

**D.**   **Plaintiffs Must Prove That The Amsted Defendants' Fiduciary Breach Caused Harm To The ESOP**

Assuming, arguendo, that some of Plaintiffs' theories in this case can otherwise withstand this motion because this Court believes that Plaintiffs have correctly identified an ERISA fiduciary who at least arguably breached his duty under ERISA with respect to the Varlen acquisition, the repurchase obligation, the 1999 share valuation and/or some other aspect of their case, Plaintiffs' claims still cannot withstand this motion because, as discussed in detail below, they have not and cannot satisfy their burden to establish that any breach of fiduciary duty by the Amsted defendants *caused* harm to the Plan. In this regard, Plaintiffs' burden was discussed in *Kuper v. Iovenko,* 66 F.3d 1447, 1459-60 (6th Cir. 1995), where the Court stated:

> [A] fiduciary's failure to investigate an investment decision alone is not sufficient to show that the decision was not reasonable. Instead, to show that an investment decision breached a fiduciary's duty to act reasonably in an effort to hold the fiduciary liable for a loss attributable to this investment decision, a plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan. (citing *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 279 (2d Cir.1992) ( "[P]roof of a causal connection ... is required between a breach of fiduciary duty and the loss alleged.").
>
> "In order to establish this causal link, a plaintiff must demonstrate that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." (citing *Fink v. National Savings and Trust Co.,* 772 F.2d 951, 962 (D.C.Cir.1985) (Scalia, J., concurring in part and dissenting in part).

Accord:  *Brandt v. Grounds,* 687 F.2d 895, 898 (7th Cir. 1982);  *Steinman v. Hicks,* 252 F.Supp.2d 746, 758-60 (C.D. Ill. 2003), aff'd, __ F.3d __, 2003 WL 22930603 (7th Cir. Dec. 10, 2003).

- 11 -

## VI.    PLAINTIFFS CANNOT MAINTAIN FIDUCIARY BREACH CLAIMS WITH RESPECT TO THE VARLEN ACQUISITION OR AMSTED'S REPURCHASE OBLIGATION PLANNING

### A.    Controlling Law Establishes that the Challenged Actions Were Not Undertaken by Defendants as Plan Fiduciaries

Applying the general principles discussed above and directly apposite here is the district court's decision in *Canale v. Yegan,* 782 F.Supp. 963 (D.N.J. 1992). There ESOP participants sued company officers and directors who were also acting as plan administrators asserting that they breached their fiduciary duties by, among other things, mismanaging the companies which sponsored the ESOP. In granting summary judgment to defendants on those complaint allegations which attacked the administrators' action respecting the financial health of the investment, the district court said:

> These [fiduciary] duties apply equally to plan administrators who are also the officers of sponsoring corporations. However, such officers "assume fiduciary status 'only when and to the extent' that they function in their capacity as plan administrators, not when they conduct business that is not regulated by ERISA." [citations omitted]. A claim that alleges nothing more than mismanagement of entities in which the administrator serves as an officer or director is therefore not actionable under ERISA, even if the plan has an interest in the entity.

*Id.* at 967.

Citing and following *Canale*, the Eighth Circuit in *Martin v. Feilen*, 965 F.2d 660 (8th Cir. 1992), ruled that a careful distinction must be made between conduct by fiduciaries that invokes ERISA's duty of care standard and actions which represent ordinary business judgments, saying:

> Virtually all of an employer's significant business decisions affect the value of its stock, and therefore the benefits that ESOP plan participants will ultimately receive. However, ERISA's fiduciary duties under § 1104 attach only to transactions that involve investing the ESOP's assets or administering the plan... A broader rule would make ESOP fiduciaries virtual guarantors of the financial success of the plan (which is indeed the result the Secretary seeks in this case). We cannot reconcile such broad liability with the congressional intent to encourage the use of ESOPs as a "technique of corporate finance."

- 12 -

*Id.* at 666.

For the same reasons, no fiduciary standard applies to the Amsted Defendants' decisions with respect to the purchase of Varlen Corporation and its forecasting and provisioning for Amsted's repurchase obligation over the years, particularly in 1999 and 2000. It is obvious that Amsted directors' and managers' action in pursuing and ultimately acquiring Varlen was a straightforward business decision typical of those that are made every day by privately held and publicly traded companies. The fact that the acquisition may have had an indirect impact on the ESOP does not transform the decision into a fiduciary one.[5] The Amsted Defendants' treatment of the repurchase obligation also is at bottom a business decision, although that obligation is integral to the ESOP and its design. The quantitative planning for it on an annual basis is simply a cash management matter. It is no different than budgeting for capital expenditures or any other cash outlays that have an impact on a company's financial condition. As such, it is part and parcel of business planning.

Because with respect to Varlen's acquisition and repurchase planning, Amsted Defendants were making business decisions, not acting as Plan fiduciaries, they were never subject to ERISA's fiduciary duty of prudence. Though couched as a violation of ERISA, Plaintiffs' challenge to the Varlen purchase and their attack on the Amsted Defendants' handling of the ESOP repurchase obligation (Amend. Compl.¶¶ 47-50, 127-161) are more akin to

---

[5] Department of Labor Regulation §2510.3-101(a) and (c) makes clear that, in a case involving an "operating company" (such as Amsted), although the Amsted shares owned by the ESOP are regarded as plan assets which must be managed by plan fiduciaries, the underlying assets of Amsted are not plan assets and, thus, the operation of the business itself is not a fiduciary function.

- 13 -

allegations made in a shareholder derivative action against officers and directors acting as fiduciaries toward their shareholders. See *Martin*, 965 F.3d at 667.[6]

Under Delaware corporate law, controlling here because Amsted is a Delaware corporation, a shareholders' suit cannot prevail unless a shareholder plaintiff carries "the burden of providing evidence that directors breached any one of the triads of their fiduciary duty-good faith, loyalty or due care." *Cede & Co. et al. v. Technicolor, Inc. et al.*, 634 A.2d 345, 361 (Del. 1993). If this threshold burden is not met, the business judgment rule attaches to protect the directors from being judicially second-guessed about their judgments. *Id.*; see also *Grobow et al. v. Perot et al.*, 539 A.2d 180 (Del. 1988); *Uni-Marts, Inc. v. Stein*, 1996 WL 466961 (Del. Ch. Aug. 12, 1996). Plaintiffs here, of course, have not even alleged or attempted to establish a violation of the business judgment rule.

### B. The Amsted Defendants' Actions Satisfy Either Standard

Whether this Court applies ERISA's "prudence" standard applicable to plan fiduciaries or the more appropriate business judgment rule, the conclusion reached should be the same: the Amsted defendants acted disinterestedly, carefully and thoroughly with respect to their decisions to purchase Varlen, in forecasting the repurchase obligation and in sensibly protecting against unexpectedly high share redemptions once they became apparent. That the Varlen acquisition did not result in immediate financial benefit to plan participants, or that the defendants did not correctly anticipate a 400% increase in share redemptions in fiscal 2000, is not material. What is material and controlling is the diligence and fairness of Defendants' assessments when these

---

[6] In *Martin*, the Court noted that an ESOP fiduciary may have a duty under ERISA to bring a shareholder derivative action against the company's board of directors. The court stated: "To recover under this theory, the Secretary must prove both a breach of the ESOP fiduciaries' duties and that the derivative suit against the corporate insiders would have prevailed." (emphasis in original) *Id.* at 667.

- 14 -

decisions were made, not some hindsight and second-guessing about them. Measured by this, the only relevant test, defendants are blameless.

### 1.     The Varlen Acquisition

Undisputed record facts here show that the Amsted Defendants' decision to acquire Varlen at a price of $42 per share was fair and reasonable and did not breach any duty of care or judgment. Varlen was selected as a possible acquisition candidate in April 1999 because its businesses and management were known to Amsted and were complementary and compatible with the Company's own key businesses. Even before initiating steps toward purchase, Amsted executives conducted their own independent due diligence by engaging in a thoroughgoing review of publicly available financial and other documents relating to Varlen. That review convinced Amsted's CEO designate, Arthur W. Goetschel, that buying Varlen would benefit Amsted's shareholders. Goetschel, in turn, was joined in this opinion by Amsted's then Chairman and its independent and management directors.

Amsted then selected Salomon Smith Barney ("SSB") as its financial and tactical advisor. Amsted and SSB had a long-standing relationship and SBB is a well-known, established Wall Street investment banker. As set forth in detail in Defendants' Joint Statement of Undisputed Material Facts and the report of Amsted's expert, Lawrence Levine, SSB undertook its own due diligence concerning the desirability of Amsted acquiring Varlen. SSB promptly reviewed Varlen's and Amsted's financial documents, business plans and their relative competitive positions in the industries they serve. SSB's salient conclusions, which remained constant throughout the transactional process, were that (1) the acquisition was synergistic because the companies' product lines were complementary without being competitive; (2) both companies were leaders in their respective markets; (3) an acquisition would enable the combined entity to better sell and service the recently consolidating rail and truck businesses;

- 15 -

and (4) long-term shareholder value would increase based on the projected synergies and other factors (Facts ¶¶ 62-63, 69, 71-72). SSB also presented various models based on Amsted's and Varlen's financial statements and projections and industry comparables; it analyzed them using a wide variety of valuation techniques and assumptions. These valuation methods led SSB to estimate Varlen's value in a range from $34 to $58 per share (Facts ¶69, fn.7).

Based on their own and SSB's conclusions, Amsted's independent and disinterested directors voted unanimously with its management directors to authorize a friendly takeover. However, its May 1999 offer of "at least" $33 per share was ignored by Varlen's Chairman and its directors. Amsted, again with unanimous director approval, then offered $35 per share directly to Varlen shareholders. At that point, Varlen retained Morgan Stanley & Company as its investment banker and, following its advice, started a public auction. At $42 per share, Amsted ended up as the successful bidder in August 1999, outbidding Duchoissois Industries by a mere 50¢ per share.[7]

The tender offer, the auction process and SSB's own modeling show that $42 per share was a fair market price in an arm's length market-based transaction. Moreover, Citibank, one of the largest and most sophisticated lending institutions in the United States, lent Amsted $1 billion to consummate the transaction on an unsecured basis. SSB's "fairness opinion" stated that the transaction was a fair one from the financial standpoint. Significantly, Plaintiffs do not contend that the $42 price was not fair market value (Clawson Dep. 78, 80-82, 129; Gross Dep. 206). Nor do they claim that the strategic reasons for acquiring Varlen were not sound.

---

[7]  Duchoissois was and is a large, privately held, diversified company with interests in the consumer products, transportation, defense and entertainment industries. It sold its railroad car unit (Thrall) to Trinity Industries in 2001 (www.hoovers.com).

CHICAGO/#1179788.8

In sum, Amsted Defendants, with the advice and counsel of a reputable investment advisor, acted prudently, disinterestedly and reasonably in selecting Varlen as a merger partner, in pursuing Varlen and ultimately in closing the transaction at a purchase price of $788 million. Nothing in the record suggests that at the time the Varlen acquisition was a bad decision, let alone a reckless one.

If Amsted were not owned by an ESOP, the fair price paid for Varlen would be the end of the story because, under the corporate law business judgment rule, disgruntled shareholders could not conceivably attack this decision. Plaintiffs here seek a different result by arguing that the unique circumstance of ESOP ownership, with its resulting need for sufficient levels of liquidity to redeem Amsted shares, made the Varlen acquisition both reviewable under ERISA law and inappropriate despite the fair price and the opportunity to enhance shareholder value. This argument fails for three fundamental reasons. First, as discussed above, it improperly blurs the legal distinction between settlor functions and duties to shareholders on the one hand (identical whether the shareholder is an ESOP or not) and the fiduciary duties under ERISA to plan participants on the other. No case ever has held that an otherwise lawful corporate acquisition was improper based on the purchaser's special status and needs as an ESOP-owned entity.

Second, there is no evidence whatsoever that the debt incurred in 1999 was excessive based on the facts known or knowable at that time. Although Plaintiff's valuation expert Clawson claims that the incurring of debt was the key reason why the Varlen acquisition should have been questioned, he admits that debt can be a good thing for a company in order to maximize its ability to grow, and he does not offer any objective basis for determining when debt may become excessive. (Clawson Dep. 137). He does not consider the fact that Varlen produced

- 17 -

positive cash flow to pay the debt and the repurchase obligation. And he admits that he does not know what Amsted's leverage ratio (the ratio of debt to EBITDA) was and does not know what an investment grade leverage ratio would be (Clawson Dep. 137, 160-61). Here, it is undisputed that Amsted's debt was given an investment grade rating and that Amsted's liquidity was deemed sufficient to support Citibank's $1 billion loan on an unsecured basis (Facts ¶ 76).

Third, Plaintiffs' argument fails because, as further discussed below, there is simply no evidence in the record to indicate that the liquidity crisis which occurred in fiscal 2000 was foreseeable as early as August 1999 or was caused by the Varlen transaction or the Citibank loan. Although Plaintiffs will make the conclusory argument that "a proper repurchase obligation study" (i.e. one which was somehow better than the repurchase obligation estimates which Amsted actually made) would have somehow revealed a problem, they cannot identify any specific methodological flaw or any information which was known or knowable in August 1999, to support their fatuous premise. Moreover, Plaintiffs' expert concedes that, if the Amsted Defendants had considered the Varlen transaction in the manner which he believes a prudent fiduciary should have, they still might have gone forward and done the deal (Clawson Dep. 131).[8] Thus, Plaintiffs' own expert testimony shows that the alleged flaws in the thought process

---

[8] Plaintiffs should not in any event be permitted to rely on the claimed "expert" testimony of Clawson to support their claims of breach of fiduciary duty because he clearly does not qualify as an expert on that subject under *Daubert* standards. *Odum v. Fuller*, 2001 U.S. Dist. LEXIS 156876 (N. D. Ill., Sept. 24, 2001). Amsted Defendants have not made a *Daubert* motion at this time since doing so would unnecessarily present an additional motion to the Court, but this Court should note that Clawson has never served as a trustee of an ESOP or any ERISA plan, and he has never been a fiduciary (Clawson Dep. 43). He has never studied, much less taught or done any original writing on ERISA fiduciary duties (Clawson Dep. 45 - 47). Tellingly, the only writing Clawson has ever done on ERISA fiduciaries is a letter to his clients which simply quotes the provisions of ERISA and its regulations (Clawson Dep. 45 - 46). He bases his claim of expertise solely on having observed trustees of plans for which he provides valuation services and his interactions with attorneys who represent those trustees (Clawson Dep. 50). That does

- 18 -

of Amsted defendants did not cause a transaction to occur which an objectively prudent fiduciary would have foregone. Thus, on undisputed record facts, Plaintiffs cannot meet their burden to establish that the Varlen acquisition and/or the Citibank loan caused any loss to the Plan.

In sum, only with the use of hindsight, which Plaintiffs' own expert Clawson admitted was completely inappropriate in a case such as this (Clawson Dep. 79, 112-13, 130-31), can Plaintiffs fashion any argument for questioning the wisdom or timing of this decision. Hindsight is always questionable but is particularly inappropriate in the period under examination. Nobody knew or could foresee in 1999 when Varlen was bought that the economy would experience significant reversals, that the stock market would tumble or that demand for the Company's products would decline significantly. Only Plaintiffs seek to take advantage of these unforeseen and unforeseeable changed circumstances to create a cause of action. The Court should not permit it.

### 2. The Repurchase Obligation

Undisputed record evidence also establishes that the Amsted Defendants satisfied or exceeded any duty of care in both forecasting its repurchase obligation and in responding to the unprecedented departure from historical redemption norms which occurred in the year 2000.

---

not an expert make. *Biondo v. City of Chicago*, 2002 U.S. Dist. LEXIS 9816 (N.D. Ill., May 30, 2002). Moreover, Clawson has never worked with a company or plan the size of Amsted's; and virtually all of his experience is working with plans which are individually trusteed, further undermining any possible asserted relevance of his observations of trustees and interactions with their attorneys (Clawson Dep. 52 - 53). Finally, and decisively demonstrating his lack of expertise, Clawson testified that all ERISA fiduciaries have exactly the same duties, which ignores the provisions of ERISA for allocation of fiduciary responsibility (Clawson Dep. 69-74) and is just plain wrong. See discussion *supra* p. 8. Clawson's testimony on fiduciary duty thus can lend no support to Plaintiffs' claims.

- 19 -

### a.    <u>Awareness of Risks</u>

Top level Amsted management was aware of the cash flow hazard inherent in the ESOP repurchase obligation from the outset. Management also understood that the ESOP's somewhat unusual design feature – which generously permitted any vested participant to cash out upon termination instead of being subject to a deferral – could exacerbate the inherent repurchase obligation risk. Militating against plan modification, however, were, first, that there was a consistent, thirteen year history of redemptions which correlated very nearly to those anticipated by the Amsted financial staff's forecasts and which had been paid without undue cash strain.[9] Secondly, Amsted executives recognized that a significant plan design change by, for example, implementing a deferral of cash payouts, might adversely effect participant expectations and morale. Third, the executives believed that a public offering might provide a viable source of funding the repurchase obligation if the need arose. Lastly, such a change would alter one of the underlying philosophies of the Amsted ESOP: that it should mirror as much as possible the flexibility inherent in owning stock in a publicly traded company which Amsted had been before 1986 (see Appendix Vol. II, Tab 6(K), at D&P0259-61).

For all these reasons, therefore, Amsted continued the ESOP as it had been until a crisis occurred that forced a re-examination of these assumptions.

### b.    <u>Repurchase Obligation Forecasting</u>

As Plaintiff's own expert, Wilson Ellis, testified, a repurchase study per se is not required by ERISA or any law or regulation, although prudent. Nevertheless, this record indisputably

---

[9] Even after the Varlen acquisition, the Company had ample liquidity, including over $200 million in unused borrowing capacity under the Citibank loan. If there had been any serious question concerning Amsted's liquidity, Citibank certainly would not have proceeded with the loan on an unsecured basis and Amsted's leverage ratio surely would not have been considered to be investment grade (Facts ¶¶ 76-77). See Heald Report p. 3.

shows that despite the absence of any legal mandate, Amsted assiduously and regularly predicted its potential repurchase liability in multiple ways. The Company's CFO and his staff quarterly and annually forecast (and revised as necessary) by operating division what probable redemptions would occur in a fiscal year. In doing so, they relied principally on historical and current data respecting participant turnover, a factor that both defendants' and Plaintiffs' experts agree is a, if not the, critical measurement of the repurchase obligation. The Company also evaluated other factors such as employee age, length of service, share value and the number of shares allocated to terminating employees. These are the key elements of any repurchase obligation study (Facts ¶34). From 1994 to 1999, the historical turnover rate was between 9 and 10%. Moreover, historically, as noted, forecast turnover generally proved to be what actually occurred. Accordingly, Amsted had every reason to believe in the validity of its forecasting methodology and no reason to doubt it.

In 1997 Amsted acquired a software program, PERLS, then on the cutting edge of repurchase forecasting, to estimate its repurchase obligation. The PERLS forecasting did not produce any different results than those forecast by Amsted's own methods; nor did it anticipate the extraordinary upsurge in redemptions that occurred in 2000.

If there were any room for doubt on this subject, it is eliminated by a review of Lawrence Levine's expert report. That report establishes through statistical analysis, that the repurchase obligation experience which occurred in 2000 was aberrant and could not have been foreseen. Exhibit 4 to his report (also attached to this brief at Tab B) also speaks volumes on this point. One has only to look at the chart to see that Citibank's projections of the repurchase obligation and of Amsted's excess cash flow were reasonable in light of past experience and, on the other hand, that the actual repurchase obligation incurred in 2000 was entirely unfathomable in

- 21 -

advance. In fact, based on history prior to September 30, 1999, there was far less than a 1% chance that the turnover observed in 2000 would actually take place (Levine Report at 14-15). Therefore, no inference of malfeasance can be found in this record with respect to the Amsted Defendants' treatment of, and planning for, the Company's repurchase obligation.

Finally, there is no evidence that an objectively prudent fiduciary would have followed a different process or obtained a different outcome with regard to repurchase obligation estimates. Here again, the testimony of Plaintiffs' supposed expert, Mr. Clawson, is revealing. At the outset, Clawson is not qualified as an expert on repurchase obligation estimates. He has never taken any courses in, much less taught or done any original writing on the subject of repurchase obligations (Clawson Dep. 247 - 48). He bases his claim of expertise solely on having reviewed repurchase obligation studies performed by his ESOP valuation clients or for those clients by others and the claim that he and his employees have performed three to five such studies (Clawson Dep. 14). He does not claim ever to have done a repurchase obligation study for a plan the size of Amsted's or one with generous redemption provisions, such as Amsted's had (Clawson Dep. 10 – 11, 20).[10] In short, the fact that Clawson has seen repurchase obligation studies performed by others and has done a few of them does not make him an expert. *Traharne v. Wayne Scott Fetzler Co.*, 156 F. Supp. 2d 717, 720 (N.D. Ill. 2001) (simply serving as president of a company does not make one an expert in cost estimate analysis without any specific training in the subject matter); *Terrell v. Childers*, Case No. 93 C 2460, 1996 U.S. Dist. LEXIS 9618 (N.D. Ill., June 27, 1996) (MBA with 9 years of teaching economics and 1 year

---

[10] Furthermore, he has not maintained an active membership in any ESOP industry trade groups; indeed at his deposition, he admitted that he did not keep up with and did not even know that he was no longer listed as a member of the ESOP Association, one of the two leading industry groups (Clawson Dep. 27-28, 138-39).

teaching finance at the college level could not be qualified as an investment management expert, where he had managed only one portfolio). For the same reasons discussed above with regard to Clawson's inability to serve as an expert on fiduciary duties, Plaintiffs cannot base their repurchase obligation claims on Clawson's testimony.

Even assuming that Clawson is an expert on repurchase obligation estimates, his testimony does not satisfy Plaintiffs' burden of showing that the Amsted Defendants breached their duties and that a prudent fiduciary would have achieved a better result. Although Clawson persistently criticizes Amsted's failure to perform "a complete and comprehensive repurchase obligation analysis" (Clawson Report at 8), when asked what should have been done, he testified only that a PERLS study should have been performed (Clawson Dep. 97). Of course, one was performed (*supra* at 21). Clawson testified that he did not know what the results of a proper repurchase obligation would have shown (Clawson Dep. 106). Thus, there is no evidence that even a PERLS study satisfactory to Plaintiffs – whatever that is – or any other kind of study would have yielded a different result from Amsted's studies. This is not surprising, since Clawson admitted that he did not know what turnover assumptions should have been used instead of what was done by the Amsted Defendants (Clawson Dep. 153). He admitted, moreover, that he does not know how the PERLS reports were used by Amsted and that he did not review the key depositions of Amsted Defendants Goetschel, Berg and Montgomery in any detail (Clawson Dep. 106-08, 110). Thus, even assuming arguendo that the Amsted Defendants somehow breached their duties by failing to perform "a complete and comprehensive repurchase obligation analysis," Plaintiffs have failed to meet their burden of establishing that such an analysis would have made any difference.

### c.   Response to the 2000 Redemption Crisis

No one really knows what caused the Amsted employee turnover rate, and concomitant redemptions, to jump from a yearly average of 9% or 10% to 17.4% for just the first three quarters of fiscal 2000 (Facts ¶¶ 33, 121). Clearly, individual participants made their own decisions based on a host of subjective and objective factors. What is known and undisputed is that a potential problem first became apparent shortly after the end of Amsted's first fiscal quarter (December 31, 1999). The actual cash payout in that quarter (for participants who elected a distribution by September 30, 1999) amounted to $55 million, only $1 million more than the Company's forecast (Facts ¶¶ 106-107). However, shortly after December 31, 1999, it became known that redemption requests submitted during the quarter ending on that date equaled approximately $64 million, which exceeded the Company's prior estimate by $29 million (Facts ¶¶ 106, 111-115).

Amsted Defendants promptly responded to this extraordinary turn of events which imperiled its loan covenants with Citibank and the Company's very existence. Beginning in January and continuing through July 2000, the following actions were taken or alternatives reviewed:

1.     SSB was retained again, this time to analyze the possibility of raising capital or debt in the public markets.

2.     Willamette, a leading ESOP consulting firm, was retained to re-examine the value of Amsted's stock in light of changed business circumstances.

3.     McDermott, Will and Emery (a nationally prominent ESOP law firm) and Houlihan Lokey, another leading ESOP consulting firm, were asked to provide and analyze alternatives with respect to the ESOP to see whether changes in plan design could curtail redemptions.

- 24 -

4.  Capital expenditures were reduced (Facts ¶ 118).

By the regularly scheduled April 18, 2000 directors' meeting, as redemption requests continued to escalate, it was clear that a public offering of Amsted shares was not possible. Nor were any other purely financial alternatives viable. A special directors' meeting was then held on April 25, 2000, at which the independent directors on the ESOP Committee unanimously voted to eliminate the Plan's most generous and unusual feature - - the option to immediately cash out.[11] Instead, a terminating participant would be required to sell his shares back to the Company in exchange for a promissory note payable in five installments over four years and paying interest at 6.33% per annum. This amendment was authorized by the Plan and was immediately communicated to participants.[12] Those who had filed distribution forms prior to the amendment's effective date still retained their right to a lump sum cash payment.

Nevertheless, even after the April amendments, redemptions continued at a high level. By the end of Amsted's third fiscal quarter (June 30, 2000), cash payments amounted to approximately $62 million for that quarter alone and the accrued repurchase obligation for the quarter (i.e. the total amount payable over four years under the installment notes) was an astonishing $150 million (Facts ¶ 121, 134). The total accrued repurchase obligation for

---

[11]  At the same time, the seldom used annuity option also was eliminated.

[12]  Section 11.2 of the ESOP states as follows:

> The Committee may also amend the plan, without the Trustee's consent after the effective date of this amendment and restatement, and the Trust, with the Trustee's consent (which shall not be unreasonably withheld), at any time and from time to time in any manner which it deems desirable, including but not by way of limitation to change any provision relating to the allocation of contributions, distribution or payment, or both, of any assets of the Trust Fund. The Committee in considering any amendment of the Plan and Trust shall not delegate its power or responsibility to the Plan Administrator (if other than the Committee).

- 25 -

participants redeeming shares in the one year period ending June 30, 2000 was over $330 million (Facts ¶ 142).

On July 18, 2000, faced with ongoing pressure from its lenders and the real possibility the Company would run out of cash, another special directors' meeting was held at which a further major overhaul of the ESOP plan design occurred. The changes, which did little more than align Amsted's Plan with many other ESOPs (Heald Report at 4), included:

- Quarterly instead of annual valuations.

- Eligibility for immediate distribution of shares was limited to terminating participants who were 65 years of age, disabled or 55 years old with 30 years of service.

- For all other vested terminating employees, distribution was deferred for five years from the date of termination (Facts ¶ 137).

In addition, the annual Company contribution was reduced from 25% to 10% of considered compensation. These amendments were again unanimously approved by all the independent directors on the ESOP Committee. Significantly, Plaintiffs' experts agreed that the April and July 2000 amendments were prudent and necessary, and were an "appropriate response" to the situation at hand (Ellis Dep. 253; Clawson Dep. 182-83).

Coupled with a decline in share value effective September 30, 2000, the extraordinary liquidity crisis brought on by these unparalleled redemptions ended.

Plaintiffs are expected to argue that, as the problem was developing and being addressed by the Amsted Defendants in 2000, they should have acted even more quickly and aggressively, presumably by amending the ESOP sooner to, among other things, declare a special valuation and cease distributions at the $184.41 share price. This theory suffers from the same flaws previously discussed which infect their entire case. First, Plaintiffs have not identified any specific "solution" to the problem that existed in 2000 other than plan amendments similar to

- 26 -

those actually made. However, as discussed previously at pages 8-9, plan amendments represent a settlor, not a fiduciary function. Accordingly, the failure to adopt plan amendments cannot form the basis of an ERISA claim for breach of fiduciary duty.

Second, the desirability of such a strategy is apparent, if at all, only with the gift of hindsight and does not consider either the vagaries of the real life, developing crisis faced by Amsted or the very substantial interest of all participants (and especially the departing participants) in avoiding such changes if at all possible. It is undisputed that the Amsted Defendants considered all options and, to the extent they did not adopt stronger measures at an earlier date, it was a reasonable exercise of judgment to conclude that such measures were unnecessary then, unfair to at least some participants, and ran the risk of adverse impact on employee morale. It follows that, even if reviewable as fiduciary conduct under the prudent person standard, there is no evidence to show that an objective prudent fiduciary would have acted differently.

In sum, the course of conduct by the Amsted Defendants in response to the unexpected and unforeseeable "run on the bank" and resulting liquidity crisis was fair, carefully measured and disinterested. The Company promptly examined viable alternatives to stem the outflow with help from outside expert advisers recognized in their respective fields. The voting directors on the ESOP Committee were guided by that advice and considered the interests of all participants. We are aware of no case law in which fiduciaries, confronted with and responding in similar circumstances, were held to be at fault. None can be found here.

- 27 -

**VII.    THE AMSTED DEFENDANTS CANNOT BE LIABLE UNDER ERISA WITH RESPECT TO THE 1999 SHARE VALUATION.**

### A.    The Amsted Defendants Were Not Fiduciaries With Respect to the 1999 Share Valuation

Under the Trust Agreement (§ 5.8), it was LaSalle's duty to value the shares, not the Amsted Defendants'.[13]    Pursuant to the Trust Agreement, LaSalle hired Duff & Phelps to conduct the valuation, and LaSalle reviewed and accepted it.  As discussed *supra* at page **8**, ERISA expressly permits such an allocation of fiduciary responsibilities.  Because the Amsted Defendants were not ERISA fiduciaries as to the 1999 share valuation, they cannot be directly liable for any alleged breach of fiduciary duty in connection with it.  See, e.g., *Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1325 (9th Cir. 1985) (employer that appointed plan administrator was not a fiduciary with respect to the plan administration).

### B.    The Amsted Defendants Cannot Be Liable As Co-Fiduciaries With Respect to the 1999 Share Valuation

Despite extensive fact and expert discovery in this case, Plaintiffs have adduced absolutely no record evidence to suggest that LaSalle breached its duty with respect to the 1999 share valuation.[14]  However, even assuming, arguendo, that LaSalle breached its duty in connection with the 1999 share valuation, no reasonable fact finder could conclude that the Amsted Defendants knew of LaSalle's breach.  Therefore, the Amsted Defendants cannot be liable with respect to the 1999 share valuation under a theory of co-fiduciary liability, either.

---

[13]  At the time of the 1999 valuation, Section 5.8 of the Trust Agreement provided, in relevant part, "As of each Valuation Date the Trustee shall determine for the period then ended the sum of the net earnings or losses of the Trust Fund . . . .  The Trustee may employ such investment bankers, appraisers, advisors or other agents as the Trustee, in its sole discretion, reasonably deems appropriate for valuing the Trust Fund, and pay their fees and expenses, which shall be deemed to be expenses of the Trust."

[14]  The Amsted Defendants will refrain from addressing this issue at length because LaSalle will doubtless do so competently on its own behalf.

CHICAGO/#1179788.8

ERISA requires actual knowledge of a breach in order for co-fiduciary liability to attach. It is required in the text of ERISA section 405(a) itself, 29 U.S.C. § 1105(a),[15] and applicable case law. See, e.g., *Donovan v. Cunningham*, 716 F.2d 1455, 1475 (5th Cir. 1983) (in order for co-fiduciary liability to attach, a party must know (1) that the other is a fiduciary; (2) that he participated in the act that constituted a breach; and (3) that it was a breach) (citing legislative history); *Keach v. U.S. Trust Co.*, 240 F. Supp. 2d 840, 844 (C.D. Ill. 2002); *Davidson v. Cook*, 567 F. Supp. 225, 233 (E.D. Va. 1983), *aff'd mem.*, 734 F.2d 10 (4th Cir. 1984), *cert. denied*, 469 U.S. 899 (1984).

Here, Plaintiffs cannot begin to show that the Amsted Defendants knew that the 1999 share valuation was erroneously high, if indeed it was. The belated criticisms made by Plaintiffs' experts regarding the valuation are highly technical and would not be noticeable to non-appraisers, including all the Amsted Defendants (See generally, Clawson Dep. 22, Rpt. at 20-26; Ellis Dep. 283, Rpt. at 17-20). For example, Plaintiffs' expert Kace Clawson stated that he believes the Duff & Phelps valuations violated certain provisions of Rules 9 and 10 of the Uniform Standards of Professional Appraisal Practice (USPAP) (Clawson Dep. 207-15, Rpt. at 22-26). Both Clawson and Plaintiffs' other expert, Wilson Ellis, also disagree with Duff &

---

[15] The full text of ERISA §405(a), 29 U.S.C. § 1105(a), states:

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

- 29 -

Phelps' decision not to include a discount for lack of marketability (Clawson Rpt. at 21; Ellis Rpt. at 194).[16]

Plaintiffs' expert opinions, which are, of course, contradicted by Defendants' experts, were not known to the Amsted fiduciaries at the relevant time, i.e. October 1999. More importantly, the Amsted Defendants are not professional appraisers and would not reasonably be aware of the supposed flaws identified by Plaintiffs' experts, nor would they need to be. The Amsted Defendants justifiably relied on LaSalle and Duff & Phelps, two acknowledged leaders in this specialized field, to perform and critique the valuation. Even Plaintiffs' own expert witness, Wilson Ellis, agreed that Duff & Phelps is, "in general, a quality organization" (Ellis Dep. 35); that, in his experience as an employee of Northern Trust, Duff & Phelps was one of the two firms with which he worked most frequently regarding valuations (*Id.* at 34); that in his experience he did not recall any instance in which a second opinion was required in connection with a Duff & Phelps valuation (*Id.* at 38); and that he is not aware of any Duff & Phelps valuation report that was ever rejected by Northern Trust as a trustee (*Id.* at 39).

Moreover, the valuation techniques were the same as those used in previous years, and the 31.9% increase in the share value in 1999 was consistent with the overall increases in the stock market, as indicated by the 31.8% increase in the Dow Jones average. Thus, the Amsted Defendants had no reason to question the share value determined, according to the terms of the Trust Agreement, by LaSalle and Duff & Phelps. In sum, even assuming that the 1999 share valuation was flawed, there is no record evidence whatsoever to suggest that the Amsted

---

[16]  Clawson testified that the use of a marketability discount is a subjective determination by the appraiser which he applies to 50% of his clients (Clawson Dep. 12).

Defendants knew that it was or knew that LaSalle breached any ERISA fiduciary duty with respect to the valuation, as required to establish co-fiduciary liability.

### C. Even If The 1999 Share Value Was Erroneously High, There Was No Loss To The Plan.

As this Court has recognized, under ERISA §409(a), 29 U.S.C. §1109(a) and ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), "[P]laintiffs may seek money damages only to the extent that they are paid to the plan to restore any money lost due to the alleged breach" (03/17/03 Opinion, p. 3; Docket # 122). Our research has revealed not a single reported case under ERISA where ESOP fiduciaries were held to be liable based on their payment of benefits to participants at an erroneously high share valuation, and it is not warranted here. To the extent that the 1999 valuation was too high, Plan participants were the only ones to benefit, i.e., some participants were enriched at the expense of others, but there was no loss to the Plan. Therefore, even if a breach occurred, which it did not, money damages are inappropriate under ERISA for this reason alone.

### VIII. AMSTED DEFENDANTS CANNOT BE HELD LIABLE WITH RESPECT TO THE PLAN AMENDMENTS ADOPTED IN APRIL 2000 AND/OR JULY 2000.

Plaintiffs allege in their First Amended Complaint (Amend. Compl. Ct. III, ¶¶ 175-178) that the amendments made to the ESOP in April 2000 and July 2000 are unlawful because they violate ERISA's anti-cutback rule. They also appear to allege in Count I that the Amsted Defendants therefore breached their fiduciary duties by unlawfully amending the ESOP. Although it seems that Plaintiffs have abandoned these claims (as even their own experts now agree that the 2000 Amendments were prudent and legal), there is in any event no merit to them, and Amsted Defendants are entitled to summary judgment as a matter of law.

ESOPs are specifically exempted from the anti-cutback rule. ERISA §204(g)(3) states that: "for purposes of this subsection, any... [ESOP] shall not be treated as failing to meet the

requirements of this subsection merely because it modifies distribution options in a non-discriminatory manner." 29 U.S.C. §1054(g)(3). See also Code §411(d)(6)(C) (identical provision); Treasury Regulation 26 C.F.R. §1.411(d)-4, Q&A-2(d)(1)(i); and *Lee v. Builder's Supply Co. Inc. ESOP*, Case No. 8:CV93-267, 1995 WL 795222 (D. Neb., Mar. 23, 1995).

Further, as previously shown (*supra* at 8-9), amendment of an ERISA plan is a settlor, not a fiduciary, function and thus, cannot form the basis of fiduciary liability under ERISA. This is especially true here where even Plaintiffs' own experts agree that the 2000 Amendments were prudent, necessary and appropriate actions taken to address the extraordinary acceleration of redemptions (Clawson Dep. 183; Ellis Dep. 246, 253, 288).[17]

For all of the above reasons, Amsted Defendants are entitled to summary judgment on Plaintiffs' Count III and breach of fiduciary duty claims regarding the April 2000 and July 2000 ESOP Amendments.

## IX. PLAINTIFFS' REMAINING THEORIES ALSO APPEAR TO HAVE BEEN ABANDONED AND, IN ANY EVENT, ARE MERITLESS

In addition to their main claims, disposed of above, Plaintiffs' Amended Complaint advances a number of other claims which appear to have been abandoned. But even if not abandoned, the Amsted Defendants are entitled to summary judgment on all of Plaintiffs' subsidiary claims because none have a legal or factual basis. If Plaintiffs' opposition papers

---

[17] To the extent that Amsted defendants are deemed to have acted as fiduciaries with respect to plan amendments made or not made in 2000, their conduct should be reviewed under the highly deferential arbitrary or capricious standard which is the appropriate standard for reviewing participant benefit claims involving exercises of discretion and claims which inherently require the balancing of interests of various groups of participants. This is the standard which has been applied by courts in regard to similar claims. *Hunter v. Caliber System, Inc.*, 220 F.3d 702, 710-12 (6th Cir. 2000) (holding that there was no violation of the anti-cutback rule or the plan sponsor's fiduciary duty when ESOP was amended to eliminate lump sum option); *Moench v. Robertson*, 62 F.3d 553, 563-66 (3d Cir. 1995). See, *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 208 (7th Cir. 1985) for often quoted description of the arbitrary and capricious standard ("...the least demanding form of judicial review...").

disclose any theory that is not addressed above and that they still rely upon, they will be addressed in reply.

## X. PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIMS MUST BE DISMISSED BECAUSE THE AMSTED DEFENDANTS ACTED IN GOOD FAITH RELIANCE ON EXPERT ADVICE

In *Morgan v. Independent Drivers Assn. Pension Plan*, 975 F.2d 1467, 1470-71 (10th Cir. 1992), the Tenth Circuit affirmed a decision in favor of fiduciaries who were alleged to have breached their duties, stating as follows:

> The case law indicates that in some circumstances good faith reliance on the advice of experts is not a defense to a breach of fiduciary duty claim. This is true of a breach of the duty of loyalty. [citations omitted] Those kinds of violations are not at issue here. Rather, we have before us a good faith but allegedly erroneous exercise of the trustees' powers under the plan agreement

> **\*\*\*\***

> ...[T]he trustees are not subject to strict liability for their mistake. Rather, they were required to act prudently under the circumstances before them. In response to an extraordinary event, the IDA's change in the plan's funding method, the trustees sought out the expert advice of counsel and an actuary, considered in good faith the three options presented to them, and implemented the option recommended by the experts. The district court after reconsideration correctly applied the prudent person standard and correctly determined that the trustees did not breach their fiduciary duties.

This same rule and result apply to the present case. It is undisputed that every step the Amsted Defendants took was in reliance on the advice of nationally prominent experts in their fields --- Salomon Smith Barney, Duff & Phelps, Houlihan Lokey and McDermott Will & Emery. There is no evidence that the Amsted Defendants acted contrary to the recommendations of their advisers and no evidence of any self-dealing or bad faith. For this reason alone, Plaintiffs' claims, based on the prudent person standard, should be summarily rejected.

## XI.  CONCLUSION

Plaintiffs' claims of ERISA violations have no more substance than the proverbial house of cards.  They fall to the law, undisputed facts and common sense.

There is in this record not a jot of evidence of self-dealing or self-enrichment by any of the defendants.  To the contrary, whether acting as businessmen, which the Amsted Defendants were doing most of the time, or as fiduciaries, the record facts incontestably show they consistently acted prudently and disinterestedly for the benefit of ESOP plan participants.  The Amsted Defendants did so when they made what they reasonably believed was a wise business investment in Varlen for the long-term benefit of their shareholders.  They did so when they accepted the valuation performed by Duff & Phelps and approved by LaSalle.  They did so again when, through the fog of unexpected, unforeseen and unforeseeable, increasing redemptions, it became evident that the Company's existence was at issue.

As repeatedly noted in this Memorandum, only the benefit of Plaintiffs' hindsight even raises the slightest doubt as to the soundness of defendants' conduct.  Such is not the basis for liability under ERISA or any other law.

Accordingly, Plaintiffs' Complaint should be dismissed in its entirety and summary judgment granted to Defendants.

- 34 -

Respectfully submitted,

AMSTED INDUSTRIES, INC., AMSTED
INDUSTRIES, INC. EMPLOYEES STOCK
OWNERSHIP PLAN, ARTHUR W.
GOETSCHEL, RAYMOND A. JEAN,
DAVID B. WHITEHURST, LEWIS
COLLENS, JOHN E. JONES, W. ROBERT
REUM, RICHARD E. TERRY, GORDON R.
LOHMAN, THOMAS C. BERG, O.J.
SOPRANOS, ROBERT A. CIAPPETTA AND
MATTHEW J. HOWER

By: _____
                One of Their Attorneys

Richard H. Schnadig
Charles B. Wolf
Michael G. Cleveland
Charis A. Runnels
Alison J. Maki
Vedder, Price, Kaufman & Kammholz, P.C.
222 North LaSalle Street, Suite 2600
Chicago, IL 60601-1003
Telephone: (312) 609-7500
Facsimile: (312) 609-5005
Dated: January 21, 2004

- 35 -

# SEE CASE FILE FOR EXHIBITS