## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JUAN ARMSTRONG, et al.,

        Plaintiffs,

v.

                                      No. 01 C 2963
                                      MDL No. 1417

AMSTED INDUSTRIES, INC., et al.,

                                      Judge James B. Moran

        Defendants.

### NOTICE OF FILING

To:    (See Attached Certificate of Service)

        PLEASE TAKE NOTICE that on the 9th day of April, 2004, the undersigned filed with the Clerk of the Court for the United States District Court, Northern District of Illinois, Eastern Division **LaSalle Bank's Reply Brief In Support Of Its Motion For Summary Judgment And In Opposition To Plaintiffs' Cross-Motion.**

_David Ackerman_
_____
Attorney for Defendant LaSalle Bank, N.A.

Theodore M. Becker
David Ackerman
Keith C. Hannigan
Jenkens & Gilchrist, P.C.
225 West Washington Street, Suite 2600
Chicago, Illinois 60606-3418
(312) 425-3900
COUNSEL FOR DEFENDANT LASALLE BANK, N.A.

FILED
APR 9 2004
MICHAEL W. [DOBBINS]
CLERK, U.S. DISTRICT COURT

201

## CERTIFICATE OF SERVICE

I, David Ackerman, an attorney, hereby certify that I caused a copy of **LaSalle Bank's Reply Brief In Support Of Its Motion For Summary Judgment And In Opposition To Plaintiffs' Cross-Motion,** to be served as indicated below upon:

**VIA FEDERAL EXPRESS**
Pamela B. Slate
Nicola A. Thompson
Slate Kennedy LLC
2001 Park Place North, Suite 450 (35203)
Post Office Box 370735
Birmingham, Alabama 35237-0735

**VIA MESSENGER**
Gary D. McCallister
Thomas A. Kelliher
Gary D. McCallister & Associates, Ltd.
29 South LaSalle Street, Suite 1210
Chicago, Illinois 60603

**VIA MESSENGER**
Richard H. Schnadig
Michael G. Cleveland
Charis Runnels
Vedder, Price, Kaufman & Kammholz
222 North LaSalle Street, Suite 2600
Chicago, Illinois 60601

on this 9th day of April, 2004.

David Ackerman

Theodore M. Becker
David Ackerman
Keith C. Hannigan
Jenkens & Gilchrist, P.C.
225 West Washington Street, Suite 2600
Chicago, Illinois 60606-3418
(312) 425-3900
COUNSEL FOR DEFENDANT LASALLE BANK, N.A.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JUAN ARMSTRONG, et al.,

        Plaintiffs,

        v.

AMSTED INDUSTRIES, INC., et al.,

        Defendants.

No. 01 C 2963
MDL No. 1417
Judge James B. Moran

DOCKETED
APR 1 2 2004

FILED

APR 9 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## LASALLE BANK'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION

Theodore M. Becker
David Ackerman
Keith C. Hannigan
Jenkens & Gilchrist, P.C.
225 West Washington Street, Suite 2600
Chicago, Illinois 60606-3418
(312) 425-3900

Dated: April 9, 2004

201

## TABLE OF CONTENTS

I.     STANDARD OF REVIEW ....................................................................................2

II.     LASALLE DID NOT BREACH ITS DUTY OF LOYALTY .......................................5

      A.     LaSalle had no Conflict of Interest ...........................................................5
      B.     LaSalle did not Engage in any Self-Dealing.............................................6

III.    THE VARLEN ACQUISITION ............................................................................7

      A.     LaSalle had no Duty to Conduct an Independent Investigation ................7
      B.     LaSalle Appropriately Monitored Amsted's Management .........................9

IV.    THE REPURCHASE OBLIGATION ...................................................................11

V.     VALUATION OF AMSTED'S SHARES ..............................................................12

      A.     LaSalle Reasonably Relied upon the Valuation Opinion of Duff & Phelps...........12
      B.     The Duff & Phelps Valuation Report was Properly Prepared ................14
      C.     The Case Law Cited by Plaintiffs does not Support Plaintiffs' Arguments on the Valuation Issue................................................................17

VI.    PLAINTIFFS' REMAINING CLAIMS.................................................................25

      A.     Co-Fiduciary Liability .............................................................................25
      B.     Plan Amendments ...................................................................................27
      C.     LaSalle did not Engage in any Prohibited Transactions .........................28

VII.   PLAINTIFFS FAIL TO PRESENT A TRIABLE ISSUE ON THE ELEMENT OF CAUSATION ...................................................................................................29

VIII.  CONCLUSION..................................................................................................33

## *TABLE OF AUTHORITIES*

## *Cases*

*Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir. 1982) ..................................................29

*Canale v. Yegen*, 782 F. Supp. 963, 967 (D.N.J. 1992)...................................................7, 8

*DeBruyne v. Equitable Life Assurance Society*, 920 F.2d 457, 465 (7th Cir. 1990)............12

*Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983) ...........................................16, 17, 20

*Ershick v. United Missouri Bank of Kansas City*, 948 F.2d 660, 666 (10th Cir. 1991).............2

*Eyler v. Commissioner of Internal Revenue*, 88 F.3d 445 (7th Cir. 1996) ...................3, 15, 17

*Grill v. U.S.*, 303 F.2d 922 (Ct. Cl. 1962) ...................................................................15

*Horn v. McQueen*, 215 F. Supp. 2d 867 (W.D. Ky. 2002) ..................................................3

*Howard v. Shay*, 100 F.3d 1484 (9th Cir. 1996)......................................................14, 17, 22

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 119 S.Ct. 755, 763 (1999) ................27

*In Re: The Two "S" Corp. v. Sun National Bank*, 875 F.2d 240, 244 (9th Cir. 1989) ...........15

*Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984).....................................................12

*Keach v. U.S. Trust Co., N.A.*, 2004 WL 324887 (C.D. Ill., Feb. 12, 2004)...............8, 26, 32

*Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995)..................................................2, 29

*Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984).............................................................30

*Martin v. Feilen*, 965 F.2d 660 (8th Cir. 1992) ......................................................7, 8, 31

*Moench v. Robertson*, 62 F.3d 553, 571 (3rd Cir. 1995)..................................................2

*Silverman v. Mutual Benefit Life Ins. Co.*, 138 F.3d 98, 105-106 (2d Cir. 1998)...............29

*Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) ................................9

*Young v. Standard Oil (Indiana)*, 849 F.2d 1039, 1045 (7th Cir. 1988)............................27

*Statutes and Regulations*

Department of Labor Regulations §2510.3-101(a)(2) ........................................................................7

Department of Labor Regulations §54.4975-7(b)(5) ........................................................................22

ERISA, Section 404, 29 U.S.C.A. §1104 ........................................................................................5

ERISA, Section 406, 29 U.S.C.A. §1104 ........................................................................................7

ERISA, Section 409(a), 29 U.S.C.A. § 1109(a) ..............................................................................29

I.R.C. § 4975(d)(13) ........................................................................................................................18

## LASALLE BANK'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION

Plaintiffs have failed to identify a genuine issue of material fact to prevent the entry of summary judgment in favor of LaSalle. Plaintiffs' "case" against LaSalle, which is now significantly different than what Plaintiffs alleged in their complaint, boils down to essentially three arguments: (1) that LaSalle breached a fiduciary duty in connection with Amsted's acquisition of Varlen; (2) that LaSalle breached a fiduciary duty in connection with Amsted's share repurchase obligation; and (3) that LaSalle breached a fiduciary duty in relying upon the valuation opinion of its independent financial advisor, Duff & Phelps. As a matter of law and undisputed fact, Plaintiffs have failed to identify a triable issue on any of their claims, and summary judgment should be entered in favor of LaSalle.

As a matter of law, Plaintiffs' claims relating to the Varlen transaction and to Amsted's share repurchase obligation fail against LaSalle. These were business matters within the province of Amsted's management. They did not involve the investment of the ESOP's assets and did not involve a fiduciary duty under ERISA on the part of LaSalle. To hold LaSalle liable for a breach of fiduciary duty in connection with either the Varlen acquisition or Amsted's repurchase liability would constitute a radical extension of the scope of an ESOP trustee's responsibilities, for which there is absolutely no support in the case law, and would violate both the plain language of the law and the policy underlying the law.

As for Plaintiffs' claim relating to the valuation of the Amsted shares held by the ESOP, the undisputed facts establish that it was reasonable and prudent for LaSalle to rely upon the opinion of its independent financial advisor in determining the value of Amsted's stock. While there is precedent for holding an ESOP trustee liable for improperly determining the value of employer securities, and even for improperly relying upon an independent valuation under certain circumstances, there is no precedent for holding an ESOP trustee liable for breach of fiduciary duty in connection with a valuation of employer securities where, as here, the undisputed facts establish that the appraiser was competent and independent, was granted access to all relevant information, and prepared a report in compliance with generally-accepted business valuation standards.

1

The cases Plaintiffs cite in their brief do not support Plaintiffs' argument that LaSalle should be held liable for a breach of duty in connection with the valuation. It is telling that Plaintiffs fail to discuss the facts of any of the cases they cite. The reason for this is that none of those cases are similar to this case. All of the cases upon which Plaintiffs rely involved ESOP trustees who labored under conflicts of interest and who engaged in related-party transactions involving plan assets. LaSalle is an independent and experienced ESOP trustee, with no interests in conflict with those of the participants in the Amsted ESOP. Unlike many of the fiduciaries in the cases relied upon by Plaintiffs, LaSalle has not engaged in any transactions with Amsted officers, directors, or other "insiders." None of the cases cited by Plaintiffs support a finding of a breach by LaSalle of its fiduciary duty. To the contrary, to hold LaSalle liable for breach of fiduciary responsibility in this case would require a radical departure from long-established standards.

## I.  STANDARD OF REVIEW

Plaintiffs agree that there are no disputed material facts in this case and that, therefore, the case is ripe for summary judgment. Where, as in this case, the trustee of an ESOP is independent and has substantial experience administering ESOPs, a court's review of the trustee's actions should be "highly deferential" and, as the Court of Appeals for the Tenth Circuit has held, the decisions of an independent fiduciary must be upheld by a court "unless they are arbitrary and capricious, not supported by substantial evidence or erroneous on a question of law." *Ershick v. United Missouri Bank of Kansas City*, 948 F.2d 660, 666 (10th Cir. 1991); *Accord, Kuper v. Iovenko*, 66 F.3d 1447, 1459-60 (6th Cir. 1995); and *Moench v. Robertson*, 62 F.3d 553, 571 (3rd Cir. 1995).

Plaintiffs seek to avoid the "arbitrary and capricious" standard of review established by the Third, Sixth, and Tenth Circuits by arguing that where the valuation of closely-held stock is the basis for a claim of breach of fiduciary responsibility, the standard to be applied is the "objective prudent man standard." (Plaintiffs' Brief at 8.) This argument confuses a standard of conduct with a standard of judicial review. The prudent-man standard is a standard of conduct by which the performance of a fiduciary of an employee benefit plan is to be measured. However, the standard of judicial review for determining whether a qualified independent

fiduciary has satisfied this standard of conduct is the "arbitrary and capricious" standard established by the courts.[1]

Plaintiffs rely upon the case of *Eyler v. Commissioner of Internal Revenue*, 88 F.3d 445 (7th Cir. 1996). The holding in *Eyler*, however, is not contrary to the holdings in the *Ershick, Kuper,* and *Moench* cases. The *Eyler* case did not even involve any allegations of breach of fiduciary duty. Rather, the *Eyler* case was a tax case involving an appeal from the imposition by the Tax Court of an excise tax upon the majority shareholder of a closely-held corporation in connection with a sale of shares to an ESOP at a price in excess of fair market value. One of the defenses raised by the taxpayer in the *Eyler* case was that even if the price he received from the ESOP for his shares exceeded their fair market value, no excise tax should be imposed because the ESOP fiduciaries acted in good faith in determining the purchase price. In analyzing and rejecting this argument, the Seventh Circuit in *Eyler* noted that the "prudent man" rule was the appropriate standard of <u>conduct</u>, but it did not discuss the appropriate standard of judicial review, because no claims of breach of fiduciary duty were presented to the court. Moreover, the ESOP trustee in the *Eyler* case was an officer of the plan sponsor and therefore was <u>not</u> independent. Thus, the *Eyler* case is inapposite.

Plaintiffs also argue that the "arbitrary and capricious" standard of judicial review should not apply in cases involving allegations of violation of the prohibited-transaction rules of Section 406 of ERISA (29 U.S.C.A. §1106). In support of this argument, Plaintiffs rely on the case of *Horn v. McQueen*, 215 F. Supp. 2d 867 (W.D. Ky. 2002). That case involved allegations against ESOP trustees both of breach of fiduciary duty and of engaging in a prohibited transaction by paying more than fair market value for employer securities. The ESOP trustees in that case were officers of the plan sponsor and were actively involved in the management of its business. In evaluating the standard of review applicable to the conduct of the ESOP trustees, the court in *Horn* distinguished the *Kuper* and *Moench* cases on the ground that those cases did not involve allegations that the ESOP trustees had breached their fiduciary duties by causing the ESOP to purchase employer securities for more than adequate consideration. Because the ESOP trustees

---

[1] The arbitrary and capricious standard was not applied by the courts in the cases relied upon by Plaintiffs, but this is because the fiduciaries in those cases were <u>not</u> independent. Rather, the fiduciaries in those cases all were officers and directors of the plan sponsors.

in the *Horn* case were <u>not</u> independent and because the trustees were alleged to have engaged in a prohibited transaction, the court in *Horn* declined to apply the arbitrary and capricious standard.

The ruling in *Horn* is not inconsistent with the applicability of the arbitrary and capricious standard in this case. Rather, what is established by the differing standards applied by the courts in the *Horn* case, on the one hand, and in the *Kuper, Moench,* and *Ershick* cases, on the other hand, is that the standard applied by courts in reviewing the conduct of an ERISA fiduciary is a function of two critical factors: (1) whether the fiduciary is independent or has a conflict of interest; and (2) whether the fiduciary has experience in connection with the administration of employee benefit plans and otherwise is qualified. In effect, the courts use a sliding scale in determining the standard of review to apply in evaluating the conduct of an ERISA fiduciary. What the *Kuper, Moench,* and *Ershick* cases establish is that judicial review of the actions of independent, experienced ESOP fiduciaries is highly deferential, and the arbitrary and capricious standard is applied. What the *Horn* case establishes is that where an ESOP fiduciary has a conflict of interest, courts will apply a higher standard in reviewing his or her conduct than in cases involving independent fiduciaries. Unlike the defendants in the *Horn* case, and like the defendants in the *Kuper, Moench,* and *Ershick* cases, LaSalle is an independent ESOP trustee.

Although Plaintiffs argue that purchases of Amsted stock by LaSalle from former employees of Amsted constituted prohibited transactions, Plaintiffs are simply wrong. The prohibited transaction rules of ERISA apply only to transactions with "parties-in-interest," and the former Amsted employees who received distributions from the Amsted ESOP were <u>not</u> "parties-in-interest" within the meaning of ERISA. *See* discussion below at p. 28.

Because LaSalle is an independent and well-qualified ESOP trustee, and because none of the actions taken by LaSalle can be characterized as "prohibited transactions" within the meaning of ERISA, this Court should not substitute its judgment for that of LaSalle. The "arbitrary and capricious" standard of review applicable to the conduct of independent, qualified ESOP trustees established by the Third, Sixth, and Tenth Circuits should be applied to LaSalle's conduct in this case. As discussed below, the undisputed facts establish that LaSalle's actions as trustee of the Amsted ESOP were neither arbitrary nor capricious. Rather, the undisputed facts show that

4

LaSalle acted carefully to protect the interests of the participants in the Amsted ESOP, in accordance with the standards and practices of prudent ESOP trustees. Therefore, summary judgment should be entered in favor of LaSalle.

**II.     LASALLE DID NOT BREACH ITS DUTY OF LOYALTY**

  **A.     LaSalle had no Conflict of Interest**

Apparently in an effort to avoid application of the "arbitrary and capricious" standard of review to LaSalle's conduct, Plaintiffs make a half-hearted attempt to construct an argument that LaSalle somehow breached its duty of loyalty to the participants in the Amsted ESOP under ERISA, Section 404, 29 U.S.C.A. §1104. Plaintiffs, however, fail to specify how LaSalle breached its duty of loyalty. Plaintiffs devote a grand total of one short paragraph in their 67-page brief to the assertion that LaSalle breached its duty of loyalty to the participants in the Amsted ESOP, and Plaintiffs fail to identify a single fact in support of this assertion.[2] Plaintiffs also assert that "at points proving critical for the Plan, only the interests of Amsted were considered." (Plaintiffs' Brief at 35.) This argument is based on the false premise that the interests of the participants in Amsted's ESOP somehow differed from the interests of Amsted itself. Because the ESOP owns all of the outstanding shares of Amsted, there can be no divergence between the interests of the ESOP and the interests of Amsted. The ESOP is the sole owner of Amsted, and therefore what is good for Amsted is good for the ESOP.

Plaintiffs posit three "critical points" where LaSalle supposedly considered only the interests of Amsted. First, Plaintiffs refer to "Amsted's interests in acquiring Varlen without interference by LaSalle no matter what the cost." (Plaintiffs' Brief at 35.) Plaintiffs do not explain what they mean by this statement; but whatever it means, it does not constitute a conflict of interest on the part of LaSalle. Plaintiffs, moreover, present no facts in support of their allegation that Amsted had an interest in acquiring Varlen without interference from LaSalle, and they do not even make the argument that LaSalle agreed not to interfere. As discussed below, LaSalle had no legal responsibility to independently investigate the proposed Varlen acquisition,

---

[2] Plaintiffs make the argument that because LaSalle is paid a fee for serving as ESOP Trustee, this somehow creates a conflict of interest. If this were the case, every independent institutional trustee that received a fee would have a conflict.

which was a matter of business judgment for the Company's management, not a matter for the trustee's independent evaluation. Nevertheless, LaSalle in fact did review the proposed transaction and the procedures implemented by management to authorize it.

The second "critical point" identified by Plaintiffs where LaSalle allegedly considered only the interests of Amsted is the so-called "appeasing" of Amsted's corporate interests in maintaining employee morale in the short-term and at the risk of the Plan. (Plaintiffs' Brief at 35.) Again, Plaintiffs fail to specify any facts which support their allegation of "appeasement" by LaSalle, and they fail to explain how acting to maintain employee morale would violate LaSalle's obligation to act in the best interests of the plan participants.

The third "critical point" asserted by Plaintiffs is that LaSalle "had no loyalty to the ESOP when it allowed [Duff & Phelps] to base its valuation on inaccurate and clearly unreliable information from Amsted's management." (Plaintiffs' Brief at 35.) As discussed below, Plaintiffs' assertion that LaSalle "allowed" Duff & Phelps to base its valuation on inaccurate information is false and is contradicted by the undisputed facts. In sum, none of the three "critical points" raised by the Plaintiffs involve any conflict of interest on the part of LaSalle.

**B.** **LaSalle did not Engage in any Self-Dealing**

Plaintiffs argue that LaSalle somehow was acting in its own interest by accepting an allegedly defective valuation prepared by Duff & Phelps and by failing to prevent the Varlen acquisition. There is no evidence to support these arguments. Plaintiffs fail to articulate how it is that they feel LaSalle was dealing with plan assets in its own interest or for its own account, as is required to state a claim under Section 406 of ERISA. Plaintiffs merely speculate that one possible reason for what Plaintiffs mischaracterize as LaSalle's "complacency and lackadaisical attitude" was that it did not want to jeopardize its annual fee. (Plaintiffs' Brief at 35.) Plaintiffs have failed to present a single shred of evidence in support of this characterization. In any event, neither "complacency" nor "lackadaisical attitude" can form the basis for a finding that a fiduciary has engaged in a prohibited transaction under Section 406 of ERISA. In effect, Plaintiffs argue that LaSalle engaged in a prohibited transaction by accepting a fee for its services. If the court accepts that argument, then no independent professional fiduciaries ever would agree to serve as trustees of ESOPs. Nothing could undermine the protections afforded by

6

ERISA for participants in employee benefit plans more than preventing experienced independent fiduciaries from serving.

## III.   THE VARLEN ACQUISITION

### A.   LaSalle had no Duty to Conduct an Independent Investigation

First and foremost, the Plaintiffs ignore the undisputed fact that the Varlen acquisition did not involve plan assets. The duties imposed upon fiduciaries of employee benefit plans by ERISA apply only to transactions that involve investing the assets of the plan and to activities that involve the administration of the plan. *Martin v. Feilen*, 965 F.2d 660, 666 (8th Cir. 1992). The assets of Amsted's ESOP were the shares of Amsted. The Department of Labor's regulations interpreting ERISA make clear that properties acquired and owned by Amsted were <u>not</u> plan assets. When an employee benefit plan, such as an ESOP, invests in an operating company, the plan's assets include its investment, but do not include any of the underlying assets of the operating company. Department of Labor Regulations §2510.3-101(a)(2). Therefore, the conduct and management of Amsted's business is not a matter of ERISA fiduciary responsibility.

The Varlen acquisition was a business transaction that did not involve any assets of the Amsted ESOP. The responsibility for determining whether to proceed with the Varlen acquisition resided with the officers and directors of Amsted, not with LaSalle. No shareholder vote was required to authorize the transaction, and LaSalle had no responsibility to "second guess" the business decisions of Amsted's management.

Plaintiffs concede these points, but they lamely assert that "Amsted <u>may as well have</u> used Plan assets to acquire Varlen." (Plaintiffs' Brief at 37.) As this statement tacitly admits, however, the undisputed fact is that Amsted did <u>not</u> use plan assets to acquire Varlen. Plaintiffs' claims regarding the Varlen transaction are claims of corporate mismanagement. This kind of claim does not state a cause of action under ERISA, even if the corporation's employee benefit plans have an interest in the corporation. *Canale v. Yegen*, 782 F. Supp. 963, 967 (D.N.J. 1992).

Plaintiffs alternatively ignore and attempt to obfuscate the differences between <u>corporate</u> fiduciary responsibilities and <u>ERISA</u> fiduciary responsibilities. The fact that the Varlen acquisition could impact the value of Amsted's stock, and therefore the benefits that the ESOP

participants ultimately would receive, simply is not sufficient to invoke the fiduciary rules of ERISA. As the Court of Appeals for the Eighth Circuit has recognized:

> "Virtually all of an employer's significant business decisions affect the value of its stock, and therefore the benefits that ESOP plan participants ultimately will receive. However, ERISA's fiduciary duties under §1104 attach only to transactions that involve investing the ESOP's assets or administering the plan. *Accord, Canale v. Yegen*, 782 F. Supp. 963, 967 (D.N.J. 1992). A broader rule would make ESOP fiduciaries virtual guarantors of the financial success of the plan . . . . We cannot reconcile such broad liability with the congressional intent to encourage the use of ESOPs as a 'technique of corporate finance.'"

*Martin v. Feilen*, 965 F.2d 660, 666 (8th Cir. 1992).

It would be impractical to require ESOP trustees to independently evaluate business transactions. Plaintiffs make light of the costs that would be imposed upon ESOP trustees if this court were to change the law in the manner proposed by Plaintiffs and impose upon ESOP trustees an obligation to independently investigate business transactions not involving plan assets. However, imposing these kinds of costs on ESOP trustees would undermine the Congressional policy of encouraging employee stock ownership. This point was noted and taken into account recently by the District Court for the Central District of Illinois in the case of *Keach v. U.S. Trust Co., N.A.*, 2004 WL 324887 (C.D. Ill., Feb. 12, 2004), which is discussed in more detail below. Among other things, the plaintiffs in *Keach* alleged that an ESOP trustee had failed to conduct a satisfactory investigation of a proposed stock purchase by the ESOP. The trustee retained independent legal and financial advisors and obtained a fairness opinion from its financial advisor, but the plaintiffs argued that this was not sufficient.

The plaintiffs' expert in *Keach* testified that the trustee's performance was deficient because the trustee failed to retain an independent accounting firm as part of the due-diligence team to review the plan sponsor's financial statements. The court rejected this position. The court noted that although hiring an independent CPA firm might be an advisable undertaking when considering a major stock purchase in a transaction on the open market not involving an ESOP, this was not <u>legally required</u> in an ESOP transaction. The court also observed that there was nothing in the record to establish that a review of independently-audited financial statements by an ESOP trustee's qualified financial advisor as part of its analysis would not be compliant with the standards and practices of prudent ESOP trustees. Finally, noting that the plaintiffs'

8

expert testified that his fees for reviewing the due-diligence performed in connection with the 1995 ESOP transaction were approximately $350,000, the court stated that "it would appear that the kind of expert assistance that [the plaintiffs' expert] recommended would be cost prohibitive in many ESOP transactions." *Id.* at 51.

This court should not expand the scope of ERISA in the manner advocated by Plaintiffs in this case. To do so would completely undermine the Congressional policy of encouraging employee ownership. No independent bank or trust company would be willing to serve as an ESOP trustee if that meant it would be obligated to independently investigate and second-guess business decisions of the plan sponsor's management not involving plan assets. For this reason, no court ever has held an independent trustee liable for failing to override a legitimate business decision made by officers or directors of the plan sponsor.

## B.    LaSalle Appropriately Monitored Amsted's Management

As set forth below and in LaSalle's opening brief in support of its motion for summary judgment, the undisputed evidence in this case shows that the officers and directors of Amsted were highly qualified to manage the business affairs of Amsted and to fulfill their corporate fiduciary responsibilities. Plaintiffs have not argued to the contrary, let alone identified any disputed facts on this issue. Rather, Plaintiffs assert that Amsted's management was not acting on behalf of the ESOP; but Plaintiffs are simply wrong about this. The officers and directors of a corporation are required to act in the best interests of the shareholders of the corporation. *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 955 (Del. 1985); *See also, Fletcher Cyclopedia Corporations, Permanent Addition,* Vol. 3, 11, §838, p. 194 ("the directors of a corporation are entrusted with the management of its business and property for the benefit of all the shareholders . . . ."). Since the ESOP was the sole shareholder of Amsted, Amsted's management in fact was acting on behalf of the ESOP – not as representatives of the ESOP or as fiduciaries of the ESOP, but as corporate fiduciaries acting in the best interest of the ESOP in its capacity as the sole shareholder of the Company.

Even though under the circumstances of this case it would have been reasonable for LaSalle to completely defer to the judgment of Amsted's management with respect to the Varlen transaction, LaSalle did not merely rely upon management's judgment. Rather, the undisputed

9

evidence shows that LaSalle reviewed the procedures undertaken by management in connection with the Varlen transaction. The information taken into account by LaSalle is set forth in paragraphs 53, 55-58, 62-64, 67, 69, 71, and 72 of Defendants' Joint Statement of Facts, and this information is described in summary fashion at pages 11-12 of LaSalle's opening brief. Plaintiffs do not dispute the information obtained and considered by LaSalle in connection with LaSalle's review of the Varlen transaction, but rather seek to demean its significance. For example, Plaintiffs seek to minimize the significance of the fairness opinion that management obtained from Salomon Smith Barney by noting that Salomon was acting solely on behalf of Amsted. Contrary to the Plaintiffs' misleading argument, however, since the ESOP was the sole owner of Amsted, there was no divergence between the interests of Amsted and of the ESOP.

Plaintiffs admit that LaSalle's primary representative for the Amsted ESOP Trust, Vaughn Gordy, attended a meeting of Amsted's officers at which Salomon made a presentation regarding the Varlen acquisition, and that LaSalle consulted with its financial and legal advisors regarding the Varlen acquisition. Plaintiffs assert that this was not sufficient but, as with all of their arguments in support of their claim that LaSalle somehow committed a breach of fiduciary duty in connection with the Varlen transaction, Plaintiffs fail to present any legal authority in support of their claim.

Plaintiffs also seek to minimize the significance of the fact that Mr. Gordy discussed the Varlen transaction with Tom Berg, Amsted's general counsel, prior to the closing of the transaction. Plaintiffs argue that LaSalle was not authorized to rely on information obtained from Mr. Berg because he was not a duly-authorized representative of the Committee under the Plan. The implication here is that LaSalle should not have obtained information about the Varlen transaction from any representatives of the Company other than members of the Plan Committee. However, if LaSalle had so limited its sources of information, Plaintiffs would probably be arguing that LaSalle did not conduct an appropriate investigation of management's conduct in connection with the proposed acquisition. Plaintiffs argue both ways: on the one hand, that LaSalle did not conduct an adequate investigation and, on the other hand, that LaSalle went too far in its investigation by seeking information from corporate officers who were not on the ESOP Plan Committee.

Contrary to Plaintiffs' assertions, LaSalle had no legal obligation to conduct an independent investigation of the Varlen acquisition. There is no legal authority that supports Plaintiffs' argument.[3] To expand the scope of ERISA in the manner advocated by Plaintiffs, and thereby impose upon ESOP trustees the responsibility to independently investigate the business decisions made by the officers and directors of an ESOP company, would make ESOP fiduciaries virtual guarantors of the financial success of their plans. This court should not expand the scope of ERISA in this manner, especially in this case where the undisputed facts establish that LaSalle carefully reviewed the procedures undertaken by Amsted's management in connection with the Varlen transaction.

What is more, as set forth by the Amsted Defendants in their summary judgment briefs, the decision by Amsted's management to acquire Varlen was a good decision on the merits and was a decision that was based on careful consideration of all appropriate factors. Even if the decision to acquire Varlen was a mistake, that is not sufficient to state a claim of breach of fiduciary duty against LaSalle. Plaintiffs' vague allegations that LaSalle should have done something more, without specifying what LaSalle should have done or, more importantly, what more an experienced ESOP trustee would have done, are not enough to merit a trial.

## IV.    THE REPURCHASE OBLIGATION

It is undisputed that LaSalle monitored Amsted's repurchase obligation. Plaintiffs do not deny this, but argue that LaSalle should have demanded that the Company develop more accurate information. Plaintiffs, however, present no authority in support of this argument. The fact is that repurchase liability <u>forecasts</u>, like any other business forecasts, are subject to wide variation and always are subject to change as unanticipated events unfold. The undisputed facts show that Amsted had an established track record of accurately forecasting its repurchase liability and that LaSalle was aware of this. (Facts ¶44.) Therefore, it was reasonable for

---

[3] Plaintiffs state that ERISA imposes the highest standard of conduct known to law on fiduciaries of employee benefit plans. However, as recently noted by the District Court for the Central District of Illinois, "this is not equivalent to a standard of absolute liability, as ERISA fiduciaries are only required to exercise prudence, not prescience or omniscience." *Keach v. U.S. Trust Company, N.A.*, 2004 WL 324887 at*43 (C.D. Ill., Feb. 12, 2004). Contrary to the approach taken by the court in the *Keach* case, plaintiffs here are attempting to persuade this court to impose a standard of absolute liability upon LaSalle.

LaSalle to rely upon the Company's forecast. Moreover, the undisputed facts show that LaSalle periodically spoke directly with Amsted's general counsel, Thomas Berg, regarding the repurchase obligation and that LaSalle was aware of the repurchase liability planning being undertaken by Amsted. (Facts ¶¶42-44.)

It is only with the benefit of hindsight that Plaintiffs now criticize the repurchase analyses conducted by Amsted, Duff & Phelps, and LaSalle, and this is inappropriate. It is well established that when evaluating an allegation that an ERISA fiduciary has breached its duty to act prudently, a court must examine the fiduciary's conduct "from the perspective of the time of the investment decision rather than from the vantage point of hindsight." *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) (citations omitted). As of September 1999, there was no basis for anticipating the unprecedented increase in employee retirements that occurred later in 1999 and early in 2000. (Belger Report, 6.) There is no evidence as to why, in fact, so many Amsted employees retired during this period of time, let alone any evidence that LaSalle could have anticipated these retirements. As the Seventh Circuit has stated, the fiduciary duty of care requires "prudence not prescience." *DeBruyne v. Equitable Life Assurance Society*, 920 F.2d 457, 465 (7th Cir. 1990).

The undisputed facts establish that Amsted, Duff & Phelps, and LaSalle all gave specific and detailed attention to the forecasting of Amsted's repurchase obligation. Plaintiffs' argument that LaSalle breached its fiduciary duty in connection with the Amsted repurchase obligation is nothing more than hindsight and, even with the benefit of hindsight, Plaintiffs have failed to show what would have done to more accurately predict the 2000 repurchase obligation.

## V.    VALUATION OF AMSTED'S SHARES

### A.    LaSalle Reasonably Relied upon the Valuation Opinion of Duff & Phelps

It is undisputed that Duff & Phelps is qualified and independent. For the fiscal year ending September 30, 1999, which is the relevant year for purposes of this lawsuit, LaSalle retained Duff & Phelps to assist it in determining the fair market value of Amsted's stock. (Facts ¶19.) In reaching its determination of the value of the Amsted stock as of September 30, 1999, LaSalle relied upon the opinion that it obtained from Duff & Phelps, together with the underlying valuation report prepared by Duff & Phelps. (Facts ¶91.) As LaSalle's expert, Colin Henderson,

12

stated in his report, knowledgeable independent institutional trustees with experience in ESOP transactions always retain their own independent financial advisors. (Henderson Report p. 19.) Plaintiffs do not dispute that it was prudent and appropriate for LaSalle to retain its own financial advisor in connection with its service as trustee of Amsted's ESOP. Rather, Plaintiffs assert that it was improper under the circumstances for LaSalle to rely upon the Duff & Phelps report.

Duff & Phelps was provided with complete and accurate information regarding Amsted. Although Plaintiffs assert in their brief, at page 45, that LaSalle did not insure that Duff & Phelps was working with accurate or up-to-date information, Plaintiffs fail to specify how the information about Amsted that was delivered to Duff & Phelps was incomplete or inaccurate in any way. The record establishes that, in fact, Duff & Phelps was granted full and free access to all information that it requested regarding the business and affairs of Amsted. (Facts ¶¶22, 23, 24, and 26.) The record also establishes that Duff & Phelps conducted a careful and thorough analysis of the business and operations of Amsted. Duff & Phelps reviewed numerous documents relating to Amsted's business operations, including financial statements, projections, and business plans (Facts ¶¶22-27, 79), and Duff & Phelps interviewed members of Amsted's management team regarding Amsted's operations. (Facts ¶23.)

The argument to which Plaintiffs devote the bulk of their attention in their brief is that LaSalle supposedly blindly relied on a valuation it cannot reasonably defend. (Plaintiffs' Brief at 44.) However, the undisputed facts clearly and conclusively contradict this assertion. LaSalle's reliance on the Duff & Phelps valuation report was neither "blind" nor unreasonable, and the valuation report itself presents a complete and thorough valuation analysis in accordance with generally-accepted valuation procedures.

The undisputed facts show that representatives of LaSalle reviewed the valuation report prepared by Duff & Phelps, understood it, and discussed it with representatives of Duff & Phelps. (Facts ¶81; Gordy Deposition 151:9-162:24.) On October 25, 1999, at a meeting of LaSalle's internal fiduciary committee, representatives of LaSalle discussed Duff & Phelps' valuation report with Elyse Bluth, the managing director of Duff & Phelps who had primary responsibility for preparation of the report. (Facts ¶81.) Prior to that meeting, copies of the valuation report were distributed to members of the fiduciary committee. (Facts ¶81.)

13

Applying the standards proposed by Plaintiffs for determining whether it was reasonable for LaSalle to rely upon the Duff & Phelps valuation report, which Plaintiffs derive from the case of *Howard v. Shay*, 100 F.3d 1484 (9th Cir. 1996), which is discussed in more detail below, the undisputed facts of this case establish that LaSalle fulfilled its fiduciary duty with respect to the valuation of the Amsted stock by taking the following actions: (1) hiring an independent appraiser, Duff & Phelps, and adequately investigating the appraiser's qualifications; (2) assuring that the appraiser was provided with complete and accurate information regarding Amsted; and (3) reviewing the valuation report prepared by Duff & Phelps. The undisputed facts establish that Plaintiffs' claim that LaSalle breached its fiduciary duty in connection with the valuation of the Amsted stock is without merit.

**B.  The Duff & Phelps Valuation Report was Properly Prepared**

In order for the court to conclude that LaSalle committed a breach of fiduciary duty by accepting the Duff & Phelps valuation report, the court must find both that the report was erroneous for the reasons alleged by Plaintiffs and that LaSalle should have known that the report was erroneous. There is no basis for either of these findings. As discussed above and in LaSalle's opening brief, the undisputed facts establish that Duff & Phelps prepared its valuation report carefully and in accordance with generally-accepted valuation standards, and that Duff & Phelps made carefully considered and reasonable judgments, in accordance with generally-accepted valuation standards. Even if a different appraiser might have reached different conclusions, the approach taken by Duff & Phelps was well within the realm of reasonable business valuation judgment and, therefore, it was appropriate for LaSalle to rely upon the opinion of Duff & Phelps.

1.  ***The Varlen Acquisition was Treated Appropriately***. Plaintiffs argue that the valuation of the Amsted stock as of September 30, 1999 was flawed because it was based on the assumption that the value of Amsted was not affected by the recent acquisition of Varlen. Plaintiffs assert that the assumption by Duff & Phelps that Amsted's value was exactly the same with or without the acquisition of Varlen was improper. (Plaintiffs' Brief at pp. 45-46.) Plaintiffs, however, fail to present any authority or evidence in support of this assertion. It is well established under generally-accepted valuation principles that the best indication of the

14

value of an asset which has been purchased and sold in an arm's-length transaction is the price paid for it. Henderson Rpt. pp. 23-24. *See, e.g., Eyler v. Commissioner of Internal Revenue*, 88 F.3d 445, 453 (7th Cir. 1996); *In Re: The Two "S" Corp. v. Sun National Bank*, 875 F.2d 240, 244 (9th Cir. 1989); and *Grill v. U.S.*, 303 F.2d 922, 927 (Ct. Cl. 1962). As shown by LaSalle in its opening brief, there was ample reason for Duff & Phelps to conclude that the price paid by Amsted for Varlen was equal to the fair market value of Varlen and that, therefore, the valuation of Amsted should not be affected by the Varlen transaction. Plaintiffs now concede that the acquisition may turn out to be a good investment (Plaintiffs' Brief at 36), but complain that Amsted borrowed the funds necessary to finance the transaction. Plaintiffs, however, overlook the fact that the liabilities incurred in connection with the financing of the acquisition were offset by the value of the business and assets obtained with the borrowed funds.

   2. ***Amsted's Repurchase Obligation was Properly Taken into Account***. Plaintiffs argue that the Duff & Phelps' valuation report was flawed because Duff & Phelps failed to adequately analyze Amsted's repurchase obligation. In "support" of their argument, Plaintiffs note that Elyse Bluth, the managing director of Duff & Phelps responsible for the Amsted valuation, testified that she did not recall seeing any computer spreadsheets relating to the repurchase obligation, and that Jeff Schiedemeyer, a Duff & Phelps associate who worked on the 1999 Amsted valuation, testified that he did not recall receiving any specific repurchase obligation forecast from the Amsted defendants.

   The mere fact that Ms. Bluth and Mr. Schiedemeyer do not now recall, more than four years later, whether they received computer-generated analyses of Amsted's repurchase obligation does not mean that they, *in fact*, did not receive either computer-generated or other analyses of Amsted's repurchase liability. Even if they did not receive any specific analyses of Amsted's repurchase obligation, the undisputed facts show that the financial statements and the financial projections which were received and analyzed by Duff & Phelps included the impact of the Company's repurchase obligation both upon its historical and its projected future financial performance. (Facts ¶43; Bluth Deposition 39:11-40:8; and Newman Deposition 53:24-54:12.)

   Moreover, the discounted cash flow valuation methodology used by Duff & Phelps included management's forecast of the Company's repurchase obligation as part of the projected future cash flows which Duff & Phelps valued. The record establishes that Duff & Phelps

obtained from Amsted documentation regarding the Company's repurchase obligation, and Duff & Phelps' internal work papers also show that Duff & Phelps considered the repurchase obligation in its valuation analysis. (Facts ¶43.)

3. *No Marketability Discount was Required*. Plaintiffs argue that it was improper for Duff & Phelps to value the Amsted stock on a marketable basis and that the acceptance by LaSalle of the valuation report from Duff & Phelps without a marketability discount constituted a breach of fiduciary duty. The question whether a marketability discount should be applied in valuing the shares of any particular company depends upon the facts and circumstances and is a matter within the judgment of the appraiser. Plaintiffs' own expert concedes that the determination of a marketability discount is essentially a subjective determination of the appraiser. (Clawson Deposition, p. 12.)

In order to properly rely upon the Duff & Phelps valuation report, LaSalle was obligated to assure that Duff & Phelps was independent and qualified, had accurate information about Amsted, and did not commit any obvious errors. LaSalle, however, was not required to second-guess the valuation methodologies employed by Duff & Phelps. To hold otherwise would require LaSalle to become a valuation expert itself, and this would be far beyond what the law requires. Even the cases cited by Plaintiffs recognize this. For example, in the case most heavily relied upon by Plaintiffs, the court stated that "ERISA fiduciaries need not become experts in the valuation of closely-held stock -- they are entitled to rely on the expertise of others." *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983).

It was entirely appropriate for Duff & Phelps to value the Amsted shares on a marketable basis. The reasons for this are set forth in LaSalle's opening brief and take into account the following undisputed facts: (1) unlike most ESOPs, the Amsted ESOP allowed terminated employees to receive their benefits almost immediately upon the termination of their employment (Facts ¶13); (2) throughout the 14-year history of Amsted's ESOP, the Company had paid benefits due to terminated participants in full and on a timely basis (Facts ¶13); and (3) for Duff & Phelps to have applied a discount for lack of marketability in the 1999 valuation would have been inconsistent with past practice and would have defeated the reasonable expectations of the participants in the plan who had relied upon the well-established valuation procedure. Another good reason why it was appropriate to value Amsted's shares on a

16

marketable basis is that Amsted is a much larger company than most ESOP companies. Amsted was formerly a public company and, unlike most other smaller ESOP companies, always had the option of going public again. Plaintiffs do not dispute these facts, and there is no basis for a finding that the Duff & Phelps valuation report was erroneous because the Amsted shares were valued on a marketable basis. Moreover, even if Duff & Phelps erred in not applying a marketability discount (and Plaintiffs have not established any error as a matter of fact), there certainly is no basis for finding that LaSalle should have known that the valuation methodology employed by Duff & Phelps, one of the country's leading and most experienced ESOP valuation firms, was flawed.

In sum, LaSalle acted reasonably in relying upon the 1999 Amsted valuation report prepared by Duff & Phelps. The undisputed evidence establishes that Duff & Phelps was independent and well-qualified to perform the appraisal, that the appraisal was based on accurate and complete information regarding Amsted, and that the report was prepared in compliance with generally-accepted business valuation principles.

### C.    The Case Law Cited by Plaintiffs does not Support Plaintiffs' Arguments on the Valuation Issue

Plaintiffs rely on three cases to support their argument that LaSalle breached its fiduciary responsibilities by relying upon the Duff & Phelps valuation report: *Eyler v. Commissioner of Internal Revenue*, 88 F.3d 445 (7th Cir. 1996); *Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983); and *Howard v. Shay*, 100 F.3d 1484 (9th Cir. 1996). As discussed below, the facts of those cases are far different from this case. Of particular importance is that each of the cases relied upon by Plaintiffs involved purchases or sales of employer securities by individual ESOP trustees who were neither independent nor experienced in ESOP transactions and who engaged in transactions with related parties. In addition, in each of these cases, the valuations were flawed in ways that should have been obvious to anyone who reviewed them. A careful review of these cases shows that none of them form any basis for imposing liability upon LaSalle in this case.

1.    *Eyler v. Commissioner of Internal Revenue*. The first case which the Plaintiffs discuss relating to the Amsted valuation issue is *Eyler v. Commissioner of Internal Revenue*, 88 F.3d 445 (7th Cir. 1996). Among the facts of that case which Plaintiffs fail to mention is that it

17

was an excise tax case on appeal from the Tax Court and did not involve any allegations of breach of fiduciary duty. The appellant in that case, Gary Eyler, was the former chief executive officer and majority shareholder of Continental Training Services, Inc. ("CTS"). In early 1986, Eyler decided to take CTS public through an initial public offering (an "IPO"). The underwriters retained by CTS determined an estimated price range of $13 to $16 per share within which the stock of CTS might possibly be offered to the public in the IPO. A preliminary prospectus was filed with the Securities and Exchange Commission on September 10, 1986. The underwriters then attempted to determine whether there was interest in purchasing CTS stock in the estimated price range. They found the "circle of interest" for CTS stock at $13 to $16 per share was only around $1 million, far less than Eyler was seeking. Eyler called off the IPO and, instead of selling stock in the public markets, sold approximately 14 percent of his CTS shares to a newly-formed ESOP for a price of $14.50 per share, or almost $10 million in the aggregate. The vice president of human resources for CTS acted as the trustee of the plan.

The Internal Revenue Service imposed an excise tax penalty on Eyler under the provisions of Section 4975 of the Internal Revenue Code (the "Code"). This section of the Code subjects the same kinds of transactions that are prohibited under Section 406 of ERISA to excise tax penalties. Among the transactions covered by Section 4975 of the Code are purchases and sales of property between employee benefit plans and related parties.[4] There is an exemption from the excise tax provided for purchases and sales of employer securities between related parties where the purchase or sale is for "adequate consideration," which is defined as fair market value. I.R.C. § 4975(d)(13).

Eyler sought to avoid imposition of the excise tax by arguing that the $14.50 price per share paid by the ESOP for his stock was fair market value, based on the estimated price range for the proposed IPO established by the underwriters. Both the Tax Court and the Seventh Circuit rejected this argument for several reasons. First, the courts noted that the "price range" did not purport to determine the fair market value of the CTS stock. Rather, the purpose of the range was to determine how investors might respond. Moreover, the price range was not binding and did not represent a firm commitment by the underwriters. In addition, the court found the

_____

[4] The Code uses the term "disqualified persons," which is defined in a manner similar to the term "parties in interest" under ERISA.

lack of public interest in CTS stock at the original price range to weigh heavily against Eyler's position. The court also noted that the $13 to $16 estimated price range for the IPO was based on certain assumptions which did not come to fruition at the time of the ESOP transaction, including that as a result of the IPO the shares of CTS would be publicly traded. The court noted that stocks which are not readily marketable generally are less valuable than those that can be freely traded.

Eyler argued that no discount for lack of marketability was necessary because of the existence of a put option for the participants in the ESOP. Plaintiffs make much of the fact that the Seventh Circuit rejected this argument. What Plaintiffs fail to state is that the Seventh Circuit, in fact, found this argument appealing, but concluded that it failed in that case because, as of the date of the ESOP transaction, CTS had no history of paying ESOP distributions in cash.[5] That finding should be contrasted with the facts of this case, where the Amsted ESOP had a 13-year history of promptly paying cash distributions to its terminated ESOP participants. Moreover, the purchase price for shares subject to the CTS put option could be paid out over five years, whereas retired employees of Amsted were entitled to immediate lump-sum payments.

Plaintiffs quote the Seventh Circuit opinion in *Eyler* as stating that it was questionable whether the *Eyler* fiduciaries had sufficient time to determine the value of the Company's stock before voting on the ESOP transaction. (Plaintiffs' Brief at 50.) Plaintiffs, however, falsely state that this comment was made "where the fiduciaries had *13 days* to consider the report of the appraiser hired to value the stock." (Plaintiffs' Brief at 50.) In fact, there was no valuation report presented to the fiduciaries in the *Eyler* case.[6] Plaintiffs have blatantly mischaracterized the holding of the Seventh Circuit in *Eyler* by suggesting that it ruled that 13 days was not a sufficient amount of time for fiduciaries to evaluate a valuation report.

In summary, *Eyler* is an egregious case involving facts that could hardly be more different from the facts of this case. It was not even a case involving allegations of breach of

---

[5] The Tax Court also acknowledged that the existence of a put option may preclude the need for a marketability discount, even though it held a marketability discount was required with respect to the shares of CTS.

[6] Plaintiffs mischaracterize a briefing of the Board of Directors by the company's financial consultant as a "valuation." In fact, no valuation report or opinion was prepared in connection with the ESOP transaction involved in the *Eyler* case.

fiduciary duty. It was an excise tax case that was tried in the Tax Court and then appealed to the Seventh Circuit. Moreover, no valuation report ever was prepared, either for the ESOP trustee or for anybody else. The taxpayer sought to justify the price that he received for the stock that he sold to the ESOP by reference to a failed public offering. The fact that an excise tax was imposed upon Mr. Eyler under the circumstances of that case in no way supports a finding that LaSalle committed a breach of its fiduciary duty in this case.

   2.   *Donovan v. Cunningham*. Plaintiffs place great reliance on the case of *Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir. 1983), which they describe as the "seminal case addressing whether more than adequate consideration has been paid to a party in interest for a company's stock in an ESOP transaction." (Plaintiffs' Brief at 51.) The first thing to note about this case is that, as Plaintiffs recognize, the question presented -- whether the ESOP fiduciaries had paid an excessive price for employer securities -- was quite different from the questions presented in this case. Like *Eyler*, and unlike this case, the *Cunningham* case involved self-dealing by the controlling shareholder of a corporation, who arranged for a sale of a portion of his shares to an ESOP at a price in excess of fair market value. It is easy for Plaintiffs to extract language from such cases regarding the high standards by which the actions of ESOP trustees are to be measured, but the facts of those cases provide no support for imposing liability upon LaSalle in this case.

   *Cunningham* was an action brought by the Secretary of Labor against individuals who served on the Board of Directors of Metropolitan Contract Services, Inc. ("MCS") and who also served as the members of the MCS ESOP administrative committee. One of the defendants, Kenneth R. Cunningham, was the Chairman of the Board, Chief Executive Officer, and sole shareholder of MCS. In August 1976, Cunningham sold 1,440 shares of MCS stock to the ESOP for a price of $200 per share, or $288,000 in the aggregate. In their capacities as directors of MCS, the defendants approved a $288,000 company contribution to the ESOP to fund this purchase, and they then approved the transaction in their capacities as members of the ESOP administrative committee. In February of 1977, Cunningham sold an additional 5,000 shares of MCS stock to the ESOP, also at a price of $200 per share, for a total purchase price of $1 million. This purchase was funded with a $1 million bank loan.

The Department of Labor alleged that the defendants breached their fiduciary responsibilities by paying more than "adequate consideration" for Cunningham's shares. The fiduciaries defended the transaction by stating that they had relied upon an independent appraisal of the company by an investment banking firm, updated by their personal assessments of the company's financial prospects. The parties agreed that the appraised value of the company, at $200 per share, was reasonable as of the valuation date. However, the two transactions took place 13 months and 20 months, respectively, after the effective date of the valuation, and the court held that it was imprudent for the fiduciaries to have relied on what the court found to be an outdated appraisal.

The *Cunningham* court also noted that the appraisal was based in part upon revenue and income projections and that the projections for the periods between the valuation date and the dates of the transactions had not been achieved. The court stated that the performance of MCS at levels consistently and significantly below those anticipated by the appraisal should have alerted the defendants that the appraisal was seriously out of date.

The court in *Cunningham* held that the fiduciaries had breached their fiduciary responsibilities by relying upon the outdated appraisal. This holding provides no basis for imposing liability upon LaSalle because the undisputed facts of this case establish that the appraisal upon which LaSalle relied was based upon information that was complete and up to date.[7]

Plaintiffs point out that the court in *Cunningham* mentioned in a footnote that a potential cash drain on the company would be occasioned by the operation of the ESOP when the company was required to repurchase shares distributed to participants upon termination of their employment and that the fiduciaries had failed to show that they had made any attempt to assess the effect of the repurchase liability. Contrary to Plaintiffs' characterization, however, the *Cunningham* court did not criticize the reliance on the ESOP participants' put right in assuming that no lack of marketability discount should have been applied in determining the value of the

---

[7] Plaintiffs make reference to the fact that the *Cunningham* court also noted that another change in circumstances from the date of the appraisal in that case was the establishment of the ESOP itself. This observation has no bearing on this case because Amsted's ESOP was adopted and in place long before the 1999 appraisal performed by Duff & Phelps which Plaintiffs criticize.

stock. Rather, the Fifth Circuit merely noted that the district court had relied in part upon the "put" right in holding that a discount for lack of marketability was inappropriate, but the Fifth Circuit did not criticize or overturn this ruling by the district court. What is more, the Fifth Circuit's observation lends no support to Plaintiffs' argument in this case because the undisputed facts in this case establish that the impact of Amsted's repurchase liability was built into the cash-flow projections upon which Duff & Phelps relied in preparing its appraisal.

The *Cunningham* case establishes that a prudent fiduciary should not rely upon an outdated appraisal in connection with purchases of employer securities from parties in interest. LaSalle has no quarrel with this holding; the holding simply does not pertain to this case. LaSalle did not purchase any employer securities from parties in interest but, rather, merely distributed benefits to which participants in the Amsted plan were entitled. The federal laws regulating ESOPs clearly and specifically authorize repurchases of employer securities from terminated ESOP participants at a price determined by reference to the most-recent annual appraised value of the shares. Department of Labor Regulations §54.4975-7(b)(5). The appraisal report upon which LaSalle relied in determining the fair market value of Amsted stock as of September 30, 1999 was current and was based on information that was complete and up to date.

3. *Howard v. Shay*. The final case upon which Plaintiffs rely in support of their argument that LaSalle breached its fiduciary duty by relying upon the Duff & Phelps valuation is *Howard v. Shay*, 100 F.3d 1484 (9th Cir. 1996). As is the case with Plaintiffs' descriptions of the *Eyler* and *Cunningham* cases, Plaintiffs quote various portions of the court's opinion in *Howard* out of context and conveniently fail to inform the court of the actual facts of that case because they are far different from the facts of this case. Like the *Eyler* and *Cunningham* cases, the *Howard* case involved a transaction between an ESOP and a party in interest (Edward Shay, who was the controlling shareholder of the plan sponsor). In the *Howard* case, the related party, rather than selling employer securities to the ESOP at an excessive price, was alleged to have purchased employer securities from the ESOP at a bargain price.

The transaction involved in the *Howard* case was a purchase by a trust created by Mr. Shay of shares of Pacific Architects and Engineers, Inc. ("PAE") from an ESOP sponsored by PAE. The ESOP administrative committee agreed to sell all of the PAE stock held by the ESOP

at a price set by an appraiser, even though the fiduciaries had not yet seen the valuation. Thus, the question presented was not whether the fiduciaries had adequately investigated the valuation report, because the record clearly established that they had conducted no investigation whatsoever. The court found that even a cursory review of the valuation would have revealed issues with respect to which a prudent fiduciary would have sought an explanation. For example, the court noted that the appraiser had discounted the value of PAE's 50-percent ownership interest in a real estate corporation by 60 percent, "thereby erasing more than $35 million of value (before the application of liquidity and minority discounts), without providing any empirical support for [the] discount." 100 F.3d at 1489. In addition, the appraiser applied minority-interest and liquidity discounts substantially higher than historical averages. The court found that a prudent fiduciary would have questioned these assumptions.

In reaching its holding that the fiduciaries had not fulfilled their ERISA duties, the court stated that in order to justifiably rely on an independent appraisal, a <u>conflicted</u> fiduciary must make "an honest, objective effort to read the valuation, understand it, and question the methods and assumptions that do not make sense." 100 F.3d at 1490. The court went on to conclude that "[c]onflicted fiduciaries do not fulfill ERISA's investigative requirements by merely hiring an expert." *Id.* (emphasis added). There is an obvious reason for distinguishing between conflicted and independent fiduciaries in setting standards of conduct. As the court in *Howard* noted:

> "A fiduciary determined to self-deal has ample opportunity to sway the final valuation that will set the transaction price. The fiduciary can do so either in selecting of the expert or by limiting the information conveyed to the expert."

100 F.3d at 1490.

In this regard, the court noted that one of the fiduciaries in the *Howard* case had discussed liquidity and minority interest discounts with prospective appraisers and that at least one appraisal firm had balked at the proposed conditions of retention. The court obviously was concerned about the possibility that the fiduciary was "shopping" for an appraiser who would minimize the price that his superior, Mr. Shay, would be required to pay for the shares held by the ESOP.

As this language from the *Howard* opinion shows, the holding in *Howard* is limited to situations involving ESOP fiduciaries with conflicts of interest and really does not apply to this

23

case since LaSalle is an independent ESOP trustee.  However, even if the same standards that the *Howard* court applied to the conflicted fiduciaries in that case are applied to LaSalle in this case, there is no basis for a finding of breach of fiduciary responsibility by LaSalle.  Unlike the fiduciaries in *Howard*, who conducted no investigation of the valuation report whatsoever and who agreed in advance to accept the price set in the report for a sale of employer securities, the undisputed facts of this case establish that members of LaSalle's internal fiduciary committee read the Duff & Phelps 1999 valuation report and reviewed it with representatives of Duff & Phelps before accepting it.  (Facts ¶81; Gordy Deposition 151:9-162:24.)  Unlike the fiduciaries in the *Howard* case, LaSalle did not commit itself in advance to accept the Duff & Phelps appraised value for purposes of any transactions, let alone any transactions with parties in interest.

      4.   ***Summary***.  In summary, none of the cases relied upon by Plaintiffs bear even a remote resemblance to the facts of this case (other than that they involved ESOPs).  The three cases upon which Plaintiffs most heavily rely all differ from this case in two critical respects.  First, the fiduciaries whose actions were challenged in those cases all were corporate insiders -- officers and directors of the corporations which sponsored the ESOPs and, in each case, the group of fiduciaries included the controlling shareholder of the plan sponsor who had either sold employer securities to the ESOP or purchased employer securities from the ESOP.  Second, each of the cases upon which Plaintiffs rely involved related-party transactions.  In *Eyler* and *Cunningham*, the controlling shareholders of corporations that sponsored ESOPs were found to have sold shares of their corporations to the ESOPs at prices in excess of fair market value.  In *Howard*, the controlling shareholder of a corporation was alleged to have purchased shares of his corporation from the ESOP at a price below fair market value.  Thus, each of the cases upon which Plaintiffs rely was focused on a related-party transaction involving plan assets.

      This case could not be more different than the *Eyler, Cunningham,* and *Howard* cases. No transactions involving plan assets are involved in this case.  LaSalle was independent and had no reason to attempt to influence the appraisal performed by its independent financial advisor. LaSalle determined the value of the Amsted shares as of September 30, 1999 in a careful and prudent manner, and it was reasonable for LaSalle to rely upon the Duff & Phelps appraisal.

Assuming that the standards set forth in *Howard* for determining whether a conflicted ESOP fiduciary may rely upon an appraisal also apply to independent fiduciaries, the undisputed facts of this case clearly establish that LaSalle satisfied these standards. LaSalle selected an independent and well-qualified business appraisal firm to perform the appraisal, LaSalle verified that Duff & Phelps had access to complete and up-to-date information regarding Amsted, and LaSalle carefully reviewed the valuation report before accepting it.

## VI. PLAINTIFFS' REMAINING CLAIMS

### A. Co-Fiduciary Liability

Plaintiffs argue that the Amsted Defendants committed breaches of their fiduciary responsibilities and that LaSalle can be held responsible for the acts of the Amsted Defendants under Section 405 of ERISA. Under this provision, a fiduciary of an employee benefit plan may be held responsible for a breach of fiduciary responsibility by another fiduciary with respect to the same plan if (i) the first fiduciary either participates in a breach of duty by the other fiduciary or knowingly undertakes to conceal a breach of duty by the other fiduciary, or (ii) if the first fiduciary has knowledge of a breach of duty by the other fiduciary, unless the first fiduciary makes reasonable efforts under the circumstances to remedy the breach. Co-fiduciary liability can be imposed upon LaSalle under ERISA only if one or more of the Amsted Defendants is found to have committed a breach of an <u>ERISA</u> fiduciary duty. LaSalle made this point in its opening brief, and Plaintiffs have failed to respond to it. It therefore appears that Plaintiffs are asserting against the Amsted Defendants' claims of breach of both corporate and ERISA fiduciary duty and are attempting to improperly apply the ERISA co-fiduciary liability rules to claims of breach of corporate fiduciary responsibility. The Court should not be misled by Plaintiffs' attempt at obfuscation.

Plaintiffs argue that LaSalle could have forced changes in Amsted's management or could have sought injunctive relief to remedy the alleged misconduct by the Amsted Defendants. Plaintiffs failed to explain how either of these actions, had they been taken by LaSalle, would have helped the ESOP participants. It is easy for the Plaintiffs now to Monday morning quarterback and suggest that LaSalle should have changed Amsted's management or brought a lawsuit against Amsted in 1999, but not even Plaintiffs' own expert would say that LaSalle

25

should have taken such drastic actions at that time. (Ellis Deposition p. 20.) Either a management change or a lawsuit in 1999, when things were going so well for Amsted, would have presented great costs and risks to the Company. Changing the Company's management at that time likely would have severely disrupted the conduct of the Company's business. The Company had experienced sustained growth and profitability over the immediately preceding eight years, and the value of the Company's stock had steadily increased over that period of time. It would have been the height of irresponsibility and recklessness for LaSalle to have intervened in the management of the Company when there was no apparent reason to do so.

Plaintiffs' suggestion that LaSalle should have taken action to change management or should have brought a shareholders' derivative action against the Amsted Defendants is similar to one of the arguments made by the plaintiffs in the recent case of *Keach v. U.S. Trust Co., N.A.*, 2004 WL 324887 (C.D. Ill., Feb. 12, 2004). The plaintiffs in that case alleged that the ESOP trustee should have pursued claims against the persons from whom it had purchased employer securities for alleged breaches of representations and warranties contained in the stock purchase agreement. The court found that there was no evidence establishing that any of the representations and warranties had been breached. Therefore, because any claims of the kind that the plaintiffs alleged that the trustee should have brought against the selling stockholders only would have caused the ESOP to expend substantial resources on unsuccessful litigation, the court rejected the plaintiffs' claim. For the same reason, this court should reject Plaintiffs' argument that LaSalle should have taken action against the Amsted Defendants. Plaintiffs have failed to identify a valid claim which LaSalle could have brought. Therefore, as with the situation presented to the ESOP trustee in the *Keach* case, for LaSalle to have brought an action against the Amsted Defendants only would have caused the Amsted ESOP to expend substantial resources on unsuccessful litigation.

LaSalle committed no breach of fiduciary responsibility by failing to change Amsted's management or by failing to bring a shareholders' derivative action in connection with the Varlen acquisition. Even now, with the benefit of hindsight, there is no basis for concluding that the Varlen acquisition was a mistake. Although Plaintiffs appear to question whether the Varlen acquisition was a good short-term investment for Amsted, they concede that it may prove to be a good long-term investment for Amsted. (Plaintiffs' Brief at 36.) The decision to proceed with

26

the Varlen acquisition was a good decision, based on a careful determination by Amsted's independent Board of Directors; and it was reasonable and appropriate for LaSalle to defer to their judgment as to whether the transaction was in the best interests of the shareholders. If LaSalle had taken action to prevent or restructure the Varlen acquisition, Plaintiffs now would probably be complaining that LaSalle had prevented the Company from taking advantage of an opportunity to expand and diversify and thereby enhance the value of its shares. Moreover, even if the decision to acquire Varlen was a mistake, that is not sufficient to state a claim of breach of fiduciary duty against LaSalle. Plaintiffs' vague allegations that LaSalle could have done something more, without specifying what LaSalle should have done or why the actions of LaSalle were insufficient, are not enough to merit a trial.

**B.**     **Plan Amendments**

Plaintiffs seek to impose co-fiduciary liability upon LaSalle in connection with the amendments to the Amsted ESOP that were adopted in the year 2000. Although Plaintiffs originally took the position that the amendments were improper and unlawful, their claim now is that the amendments should have been adopted even sooner. In either case, Plaintiffs' arguments fail against LaSalle for two reasons. First, it was not LaSalle's responsibility to make amendments to the plan; rather it was the ESOP Committee's responsibility. Second, even if the Company should have amended the plan sooner, there is no basis for imposing co-fiduciary liability upon LaSalle because the decision whether to amend an employee benefit plan is a settlor function, not a fiduciary function. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 119 S.Ct. 755, 763 (1999). *Accord, Young v. Standard Oil (Indiana)*, 849 F.2d 1039, 1045 (7th Cir. 1988).

Plaintiffs also seek to impose liability upon LaSalle by quoting a portion of the Trust Agreement out of context. Section 5.2 of the Trust Agreement provides that the trustee and the Committee shall manage and administer the trust and authorizes them to make determinations to amend the Plan or Trust. However, the ultimate authority to amend the Plan and the Trust remains vested in the Board of Directors of the Company. What is more, LaSalle was a "directed trustee," and in that capacity had authority to act only upon the direction of the Committee (except with respect to determining the value of the Company's stock).

27

As demonstrated by the Amsted Defendants in their Reply Brief, the 2000 Plan amendments were carefully considered by Amsted's management and thorough consideration was given to the appropriate effective dates for the amendments. The Amsted Defendants carefully considered the competing interests of the long-term ESOP participants and of the retiring participants who had relied upon the preexisting and long-standing benefit payout provisions. The terms and effective dates of the 2000 plan amendments were carefully determined by the Amsted Defendants in the reasonable exercise of their business judgment. They were not acting as ERISA fiduciaries in connection with the decision to adopt the plan amendments and, therefore, even if the Court should find that the amendments should have been adopted earlier, there is no basis for imposing liability upon LaSalle for failing to implement the amendments earlier.

**C.      LaSalle did not Engage in any Prohibited Transactions**

Plaintiffs argue that LaSalle engaged in prohibited transactions in violation of Section 406 of ERISA by using plan assets to purchase Amsted shares from "parties in interest" for more than adequate consideration. This argument misses the mark because LaSalle simply did not engage in any transactions with any "parties in interest," as that term is defined in ERISA. Plaintiffs argue that the persons from whom LaSalle purchased Amsted shares, whom Plaintiffs mistakenly identify as "employees of Amsted," were parties in interest. The undisputed facts, however, establish that LaSalle never purchased any shares of Amsted from employees of Amsted. Rather, it made distributions of benefits only to retired shareholders of Amsted who no longer were employed by Amsted. Section 102(14) of ERISA defines a "party in interest" to include employees of companies which sponsor employee benefit plans, but not former employees. Plaintiffs purposely mischaracterize the persons who received distributions from the Amsted ESOP as "employees" in an effort to bring within the scope of Section 406 transactions which were clearly not intended by Congress to be covered by that section. The share purchases by LaSalle were simply the mechanism by which benefits were paid to participants in the Amsted ESOP, not the kinds of self-dealing transactions regulated by Section 406 of ERISA. Therefore, Plaintiffs' argument that LaSalle engaged in prohibited transactions is without merit.

28

**VII.   PLAINTIFFS FAIL TO PRESENT A TRIABLE ISSUE ON THE ELEMENT OF CAUSATION**

Plaintiffs must prove that the alleged breaches of fiduciary duty by LaSalle caused loss to the Amsted ESOP.  Plaintiffs argue that if they can establish that LaSalle committed a breach of fiduciary duty and can establish a *prima facie* case of loss to the Amsted ESOP, the burden then is on LaSalle to prove that the loss was caused by something other than LaSalle's breach. (Plaintiffs' Brief at 4-6, 60.)  The applicable statutory provisions of ERISA, however, clearly place the burden on Plaintiffs to establish a causal connection between the alleged breach by LaSalle of its fiduciary responsibilities and the damages which Plaintiffs allege that the Amsted ESOP has suffered:

> "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan <u>resulting from</u> each such breach. . . ."

ERISA, Section 409(a), 29 U.S.C.A. § 1109(a) (emphasis added).

As the Seventh Circuit has held, the emphasized language "clearly indicates that a causal connection is required between the breach of fiduciary duty and the losses incurred by the plan." *Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir. 1982).  The Second and Sixth Circuits also have held that the plain meaning of the statute requires plaintiffs who allege a breach of an ERISA fiduciary responsibility to establish that the alleged breach caused the losses about which they complain.  *Silverman v. Mutual Benefit Life Ins. Co.*, 138 F.3d 98, 105-106 (2d Cir. 1998); *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995) (to establish the causation link between a breach of fiduciary duty and an alleged loss to a plan, "a plaintiff must demonstrate that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident").

Plaintiffs seek to avoid the plain language of Section 409 of ERISA by attempting to characterize their claim as one for violation of the ERISA "prohibited-transaction" rules and by quoting selective passages from a few court opinions out of context and in a misleading way. LaSalle acknowledges that a fiduciary who claims an exemption under Section 408(e) of ERISA from application of the prohibited-transaction rules of Section 406(a) of ERISA to a purchase or

29

sale of employer securities has the burden of proving that the employer securities were purchased or sold for no more than "adequate consideration" within the meaning of Section 3(18) of ERISA. For the reasons stated above, however, Plaintiffs' argument that LaSalle engaged in prohibited transactions in violation of Section 406 of ERISA fails because LaSalle did not engage in any transactions with any "parties in interest." Plaintiffs' mischaracterization of the persons who received distributions from the Amsted ESOP as "employees" simply is an improper attempt by Plaintiffs to shift the burden of proof and have the court misapply the standard applicable to self-dealing cases, notwithstanding the absence of any allegations of self-dealing by LaSalle, let alone any evidence of self-dealing.

Plaintiffs mischaracterize the case of *Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984), as holding that in determining whether ERISA fiduciaries have breached their duties, the focus is not on whether the plan suffered loss, but whether the fiduciaries' conduct placed plan assets at risk. 727 F.2d at 122. That is not what the court said. What the court actually said was that the nature of the breach of fiduciary duty <u>alleged</u> in that case was not the loss of plan assets, because the plan had suffered no loss, but rather was the risking of the plan's assets to aid management in connection with a corporate acquisition program. In other words, the court was merely characterizing the claims of the plaintiffs in that case, not setting forth either a rule of law or the approach that it was taking in evaluating the plaintiffs' claims. The actual legal standard set forth by the court in the *Leigh* case was as follows:

> "If ERISA fiduciaries breach their duties by risking trust assets <u>for</u> <u>their</u> <u>own</u> <u>purposes</u>, beneficiaries may recover the fiduciaries' profits made by misuse of the plan's assets."

727 F.2d at 122. (emphasis added)

This is consistent with the language of Section 409 of ERISA, which provides that a fiduciary who breaches its duties shall be personally liable to restore losses resulting from a breach and to restore any profits made by the fiduciary through use of plan assets. There is no allegation in this case, let alone any evidence, that LaSalle used plan assets improperly to benefit itself, and the language from the *Leigh* case upon which Plaintiffs rely relates to the remedy of disgorgement of profits which has no application in this case.

30

Plaintiffs compound their misplaced reliance upon the *Leigh* case by quoting the court's statement that doubts regarding which of the fiduciaries' profits were attributable to their improper actions should be resolved in favor of the plaintiffs. That statement has no application in this case because Plaintiffs make no allegations of improper profits by LaSalle. The fiduciaries in the *Leigh* case invested employee benefit funds in companies in which the defendants were seeking to obtain control or to earn substantial "control premiums." The defendants were officers and directors of the plan sponsor and included within their group the trustees of the employee benefit plan. At the same time that the plan invested 30 percent of its assets in three companies, other members of the defendant group were purchasing substantial amounts of stock in the same three companies. The court found that the defendants had breached their fiduciary responsibilities by using plan assets to further their personal investment interests. Therefore, the court held that the defendants should restore to the plan any profits that they obtained through the use of plan assets.

The plaintiffs in *Leigh* contended that they were entitled to all profits made by the defendants in their investments in the three companies in question. However, the court rejected this argument because it ignored the language of Section 409(a) of ERISA, which states that a fiduciary who breaches any of its responsibilities is personally liable to restore to the plan any profits "made through use of assets of the plan by the fiduciary". In language directly contradictory to the proposition for which Plaintiffs rely upon the *Leigh* holding, the court stated that this language of Section 409 permits recovery of the fiduciaries' profits "only where there is a causal connection between the use of the plan assets and the profits made by fiduciaries on the investment of their own assets."[8]

Plaintiffs also cite cases from other circuits in support of their argument that if they can prove a breach of fiduciary duty and a *prima facie* case of loss, then the burden of persuasion shifts to LaSalle to prove that the alleged loss was not caused by the alleged breach of duty. *See, e.g., Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992). However, in these cases the courts did

---

[8] The Seventh Circuit remanded the case to the District Court to determine the extent to which the defendants' profits from their investments in the three companies in which the trust fund had invested were attributable to the use of plan assets. It was in this regard that the court stated that doubts should be resolved in favor of the plaintiffs. This would serve to avoid depriving the plaintiffs of any recovery simply because the defendants had made it difficult to disengage commingled profits.

not engage in any analysis of the question whether the burden of proof should be shifted to the fiduciary. In any event, this court must follow the applicable Seventh Circuit precedents, which clearly establish that the plaintiff has the burden of providing a causal connection between the allegations of breach of fiduciary duty and allegations of loss to the ESOP.

The issue of causation in an ERISA breach of fiduciary duty case was carefully considered recently by the federal District Court for the Central District of Illinois. *Keach v. U.S. Trust Co., N.A.*, 2004 WL 324887 (C.D. Ill., Feb. 12, 2004). The plaintiffs in that case were participants in an ESOP sponsored by Foster & Gallagher Inc. ("F&G"). In 1995 the ESOP purchased shares of F&G stock for $70 million. By 2001, F&G had declared bankruptcy while the plaintiffs remained participants in the ESOP, and the plaintiffs therefore lost all of their benefits under the ESOP. The plaintiffs alleged that the ESOP trustee had breached its fiduciary duty by paying too high a price for the F&G stock and thereby causing the ESOP to enter into a prohibited transaction.

F&G operated through a number of subsidiaries. By 1995, its largest and most successful subsidiary was Michigan Bulb Company ("MBC"), which was in the business of direct-mail marketing of flower bulbs, plants, and seeds, primarily for home gardens. As part of its direct-mail marketing, MBC utilized a sweepstakes program. During the years 1992 through 1995 MBC received numerous complaints and inquiries from third parties, such as attorneys general of various states, Better Business Bureaus, and Action Lines, regarding its sweepstakes promotions. Inquiries about MBC's sweepstakes program continued after the 1995 ESOP transaction. In 1998, a number of news stories appeared concerning particular sweepstakes used by American Family Publishers and Publisher's Clearinghouse. This resulted in a public outcry and a dramatic change in the sweepstakes regulatory enforcement climate. MBC's revenues began a steep and steady decline, ultimately resulting in the bankruptcy of F&G in 2001.

The plaintiffs in *Keach* alleged that the trustee failed to adequately investigate the business and affairs of F&G and, in particular, failed to adequately investigate the complaints and inquiries regarding MBC's sweepstakes program. The court expressed dissatisfaction with the legal due-diligence investigation conducted by the trustee's legal advisor. In particular, the court faulted the trustee's legal counsel for failing to follow up upon its general inquiries into pending legal matters by asking for additional documents referred to in the materials that the

lawyers reviewed. For example, the court stated that the lawyers should have requested copies of the letters of inquiry that MBC had received from the states attorneys general regarding its sweepstakes promotions and also should have spoken with MBC's outside sweepstakes counsel.

Nevertheless, the court in *Keach* held that the trustee had not committed a breach of fiduciary duty because the risks associated with MBC's dependence upon sweepstakes in connection with its marketing were not material in 1995. The court found that if the trustee had investigated further into the sweepstakes inquiries, it would have discovered that none of the inquiries received prior to the closing of the ESOP transaction had resulted in any enforcement action or other negative consequence to the company and that the inquiries pending at that time were expected to be resolved in the normal course of business without any material adverse consequences. Accordingly, the court ruled that there was no basis for the plaintiffs' assertion that consideration of sweepstakes risks by a prudent investor would have reduced the value of F&G stock or caused a prudent investor not to proceed with the 1995 ESOP transaction.

Like the trial court in the *Keach* case, this court cannot hold LaSalle liable for breach of fiduciary duty in the absence of evidence that the alleged breaches caused losses to the Amsted ESOP. Because there is no evidence that establishes any causal connection between the acts or omissions of LaSalle and the decline in the value of Amsted's stock (which may well prove only to be temporary)[9], summary judgment should be entered in favor of LaSalle.

## VIII.  CONCLUSION

The undisputed facts establish that LaSalle acted in accordance with the standards and practices of prudent ESOP trustees. LaSalle was independent and highly qualified. LaSalle appropriately monitored the conduct of Amsted's officers and directors in connection with the Varlen acquisition, which even Plaintiffs now concede may prove to be a good long-term investment. Even if Plaintiffs somehow could establish that the Varlen acquisition was a mistake on the part of Amsted's independent and highly-qualified Board of Directors, this would not be sufficient to impose liability upon LaSalle, because LaSalle adequately reviewed the proposed

---

[9] It is important to keep in mind that the decline in the value of Amsted's stock took place in the context of a drastically declining stock market and rapid economic downturn that few economists predicted would occur in early 2000.

33

Varlen acquisition, as did highly-qualified professional advisors. Plaintiffs' vague allegations that LaSalle should have done more, without specifying what more LaSalle should have done, is insufficient to merit a trial.

LaSalle also adequately monitored the actions of Amsted's officers and directors in connection with the management of Amsted's share repurchase liability. LaSalle knew Amsted's officers and directors had been forecasting and planning for the Company's repurchase obligation on a regular and consistent basis for many years prior to the sudden increase in retirements during late 1999 and early 2000; and there is no basis in the record for faulting LaSalle or anyone else for failing to anticipate the sudden and dramatic increase in employee retirements at that time. To this day, there is no certain explanation for this phenomenon, even with the benefit of hindsight, and Plaintiffs provide no real explanation for the surge in retirements.

Finally, there is no basis in the record for a finding that LaSalle violated the standards and practices of prudent ESOP trustees by accepting and relying upon the 1999 valuation report that Duff & Phelps prepared. Duff & Phelps was independent and highly qualified and had access to complete and accurate information regarding Amsted. LaSalle reviewed the valuation report prepared by Duff & Phelps; and there is no basis in the record for finding that there were any errors in the valuation report, let alone any errors so obvious that LaSalle should have rejected the report. All Plaintiffs' argument really amounts to is that their expert might have done the valuation in a somewhat different way, but it is not unusual for appraisers to disagree on matters such as how to treat an ESOP company's repurchase liability -- a matter with respect to which there are no specific valuation guidelines. Indeed, seldom do two appraisers fully agree or come to the same valuation of a particular company. What is clear is that an ESOP trustee is entitled to rely upon an appraisal prepared by a well-recognized and highly-qualified firm like Duff & Phelps.

To hold LaSalle liable based on the undisputed facts of this case in effect would be to impose a standard of absolute liability upon LaSalle and make it a guarantor of the success of Amsted's business operations. This, of course, would be contrary both to the express language of the ERISA statute and to the policy underlying the laws promoting employee ownership. No court has ever held a trustee liable on facts even remotely resembling the facts of this case. No competent fiduciaries will serve as ESOP trustees if they can be held liable for refraining from

34

second-guessing business decisions made by independent and highly-qualified directors of plan sponsors in a proper exercise of their business judgment; or if the trustees are not able to rely upon valuation reports prepared in accordance with applicable valuation standards by independent and qualified appraisers who are given free access to the information required to perform an appraisal.

Plaintiffs have presented no real evidence that LaSalle's actions were inconsistent with the standards and practices of experienced, independent ESOP trustees. The unprecedented extension of the scope of an ESOP trustee's liability proposed by Plaintiffs cannot be supported either by the facts of this case or the law. Accordingly, summary judgment should be entered in favor of LaSalle.

Dated: April 9, 2004

Respectfully submitted,

LASALLE BANK, N.A.,

By: _____
Its Attorney

Theodore M. Becker
David Ackerman
Keith C. Hannigan
Jenkens & Gilchrist, P.C.
225 West Washington Street, Suite 2600
Chicago, Illinois 60606-3418
(312) 425-3900

35