IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEFFREY BRADLEY, et al., | |
| Plaintiff, | |
| v. | No. 01 C 2963 |
| | MDL Docket No. 1417 |
| AMSTED INDUSTRIES, INC., et al., | Judge Moran |
| Defendant. | |

## AMSTED DEFENDANTS' REPLY IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT AS TO BLANKENSHIP AND SPARKS

### I. INTRODUCTION

As Amsted Defendants ("Defendants") have shown by their response to Blankenship and Sparks' motion for Clarification or, in the Alternative, Modification of Class Certification Order, they are properly a part of the *Armstrong* class. Thus, the Court need consider Defendants' summary judgment motion as to the two of them only if it rules that they should be excluded from the *Armstrong* class. If the Court so rules, Defendants still are entitled to summary judgment as to both Blankenship and Sparks (sometimes referred to here as simply "Plaintiffs"), as shown below.

### II. FACTS

In their motion for summary judgment, Amsted Defendants adopted the Joint Local Rule 56.1 statement submitted in *Armstrong* along with their co-Defendant in that case, LaSalle Bank. Blankenship and Sparks have submitted what they call a response to that factual statement, but it is no such thing. It does not respond to any facts advanced by Defendants; and because they

have not responded to the facts asserted in Defendants' factual statement, all those facts are admitted.

Defendants have also filed a reply to Blankenship and Sparks' so called "Response" to Defendants' facts. The undisputed facts established with regard to Blankenship's and Sparks' claims are as follows.

### A. The ESOP

Amsted is wholly-employee owned through a "leveraged" ESOP established in 1986 (Joint Facts ¶8).[1] The ESOP was created by Amsted bank borrowings, the proceeds of which were lent to the ESOP which allowed it to purchase most of Amsted's outstanding shares. The named fiduciary of the ESOP is Amsted's "ESOP Committee", which was chaired by an independent outside director and composed equally of three independent and three management directors (Joint Facts ¶¶9, 10).

Annually until July 2000, Amsted made contributions to the ESOP, which in turn were used to repay the ESOP's debt to Amsted and the balance, if any, was used to repurchase terminating participants' shares. If the contributions are insufficient to cover the ESOP loan payment and stock repurchases, either a Company cash dividend is issued or the Company purchases the shares (Joint Facts ¶11).

Until the 2000 Amendments, eligible ESOP participants whose employment terminated, including those who terminated after attaining age 55 or 30 years of service, were entitled to receive an ESOP distribution for vested shares in a lump-sum cash payment. The value of the shares was determined on the basis of a valuation completed as of the end of Amsted's October 1

---

[1] References to "Joint Facts ¶____" are to paragraphs of the joint factual statement submitted by Amsted and co-Defendant LaSalle in *Armstrong* and adopted by Amsted for purposes of this motion. References to "D. Reply to P. Facts ¶____" are to paragraphs of Amsted Defendants' reply to the factual statement submitted by Blankenship and Sparks in response to Amsted Defendants' motion.

- 2 -

to September 30 fiscal year (Joint Facts ¶12). The Amsted plan was unusual in that it allowed departing employees to be paid in full almost immediately upon termination (Joint Facts ¶13). A terminating participant could elect to receive his distribution by completing and submitting a distribution request form sometime during the fiscal quarter in which the participant intended to terminate; payment was made after the end of that fiscal quarter (Joint Facts ¶14).

The requirement that Amsted pay participants their ESOP account balances creates what, in ESOP parlance, is known as a "repurchase obligation". Generally, the amount of the repurchase obligation depends on a number factors, principally the value of ESOP shares, turnover, and plan provisions relating the timing of redemptions (Joint Facts ¶34).

### B. Amendments to the ESOP

Amsted purchased Varlen Corporation in a transaction that closed on August 16, 1999 (Joint Facts ¶74). Varlen's acquisition was financed through the negotiation of a $1 billion unsecured loan with Citibank as lead syndicator (Joint Facts ¶76).

Within slightly more than a month after the Varlen purchase closed, Duff & Phelps, which was the adviser retained by LaSalle Bank, the ESOP Trustee, to perform the annual valuation of Amsted's stock, determined Amsted's stock price to be $184.41 per share as of September 30, 1999 (Joint Facts ¶¶18, 19, 79). Amsted subsequently revised its previously made repurchase obligation forecast upward several times in light of this and other developments (Joint Facts ¶¶105 – 108, 111 -114).

At a meeting on January 27, 2000, it was reported to the Company's directors that there was a $68 million difference between the most recent updated repurchase obligation forecast and the initial forecast built into Amsted's fiscal year 2000 business plan. Amsted's Chairman recommended that the Company begin considering financial and legal alternatives to protect the Company's deteriorating cash position. The options discussed included an initial public offering

of Company shares, a curtailment of capital expenditures and amending the ESOP to defer redemptions (Joint Facts ¶117).

Each of these and other alternatives were explored thereafter. Amsted, through its General Counsel, Thomas Berg, retained the services of outside consultants; and they, with the Company's ESOP legal counsel, McDermott, Will & Emery ("MW&E"), were directed to review all possible alternatives to curtail the amount of ESOP repurchases and the negative impact on the Company's cash position (Joint Facts ¶118).

Redemptions, however, continued to escalate. Estimates for redemptions to be paid out in May 2000 for the quarter ending March 31, 2000 were $28.1 million on February 2 (Joint Facts ¶119).

On March 14, 2000, MW&E presented Berg with a memorandum (revised on March 22) outlining various strategies for amending and modifying the ESOP's structure to stop or scale down the amount and timing of redemptions. Among the alternatives suggested were: (i) replacing annual share valuations with quarterly ones; (ii) imposing limitations on a participant's rights to immediate cash distributions; and (iii) deferring payments through tightened entitlement standards (Joint Facts ¶120). In its memo, MW&E advised that "it is uncertain what forms of distribution the company can and cannot eliminate under the ESOP" (D. Reply to P. Facts ¶5).

By early April 2000, the cash drain had accelerated. Payments scheduled to be made during the third quarter amounted to approximately $61.5 million. This raised the fiscal year total for the first three quarters to over $180 million (Joint Facts ¶121). The forecasted total fiscal year 2000 repurchase liability was adjusted in April 2000 to approximately $240 million (Joint Facts ¶123). At the same time, Amsted was advised that a public offering no longer was a

- 4 -

viable alternative for raising cash because capital markets had become much less receptive (Joint Facts ¶124).

By April 18, 2000, the date of a regularly scheduled Amsted directors meeting, it was apparent that the Company was in a liquidity crisis. Year end repurchases had recently been estimated at $240 million, and there was potential for repurchases to approach as much as $300 million (Joint Facts ¶126). Consequently, at the directors meeting, Amsted's Chairman and CEO recommended that there be a special director's meeting to consider structural changes to the ESOP (Joint Facts ¶127).

That meeting was subsequently held on April 25, 2000, and the independent directors considered and unanimously voted to amend the ESOP effective at midnight that day to eliminate the right of a terminating participant to receive a lump sum cash payment. Instead, he or she would be paid his or her account value in Company shares which would then be required immediately to be resold (or "put") to the Company in exchange for a four-year installment promissory note (bearing interest at a reasonable rate) of like amount secured by Company shares (Joint Facts ¶¶128, 129).

A majority of the independent directors voted to reject management recommendations that Amsted's stock be revalued as of June 2000 so that the new share price would apply to ESOP distribution requests received after the meeting date and that there be quarterly instead of annual valuations, concluding that those steps either were unnecessary then, unfair to at least some participants, or ran the risk of adverse impact on employee morale (Joint Facts ¶131).

The amendments were promptly communicated to participants (Joint Facts ¶132).

Notwithstanding the amendment, redemption requests submitted during the third quarter of fiscal year 2000 totaled approximately $150 million (Joint Facts ¶134). On July 18, 2000,

-5-

Amsted's Board of Directors and its ESOP Committee held a regularly scheduled joint meeting. As a result of the continued increase in redemption requests, and once again following the recommendations of MW&E, the Board and its ESOP Committee considered further amending the ESOP (Joint Facts ¶136).

On July 18, 2000, the independent directors on the ESOP Committee voted unanimously to amend the ESOP to require that, to be immediately eligible for any ESOP distribution, participants must be 55 years old and have 30 years service. If not so eligible, a participant became eligible five years after employment terminated or when the ESOP loan was repaid, whichever occurred last. Beginning with fiscal 2001, share valuations were changed to quarterly instead of annual (Joint Facts ¶137).

### C. Blankenship

Blankenship worked at Amsted's plant in Bessemer, Alabama. His date of birth is November 21, 1946. He was employed by Amsted from September 8, 1970 to September 30, 2000 (Blankenship Dep. 9, 11-12).[2]

By letter dated September 10, 1999, Blankenship gave notice of his intent to retire effective October 1, 2000. His letter states: "This notification is being given now so that I meet all the requirements necessary to receive a lump sum payment from the closed pension fund, the Prudential Annuity" (Blankenship Dep. 15-16, Ex. 1).

Prior to the April ESOP Amendment, he had not done anything to apply for ESOP benefits (Blankenship Dep. 29). He would not have expected to receive his ESOP distribution form before the ensuing July 30 under the Company's normal practice (Blankenship Dep. 53).

---

[2] Cited pages of the depositions and deposition exhibits of Blankenship, Goetschel, Gunn and Sparks are attached as Exhibits 1-4, respectively, to Amsted Defendants' Reply to Plaintiffs' "Response" to Defendants' Statement of Facts, filed herewith. All other cited portions of the record are included in the *Armstrong* Appendix filed 01/21/04.

- 6 -

The April Amendment caused him concern that the Company was not stable and its future uncertain (Blankenship Dep. 24). He was advised by his financial advisors after the April 2000 Amendments to retire one quarter earlier (*i.e.,* effective June 30, 2000) (Blankenship Dep. 46-47); he was aware of other employees who had accelerated their retirement dates after the April Amendment and so avoided the effect of the July Amendment (Blankenship Dep. 29-30); and it had occurred to him that maybe he should also retire early (Blankenship Dep. 30-31). He chose not to (Blankenship Dep. 30-31, 47).

### D. Sparks

Sparks also worked at the Bessemer plant. Her date of birth is August 11, 1945. She was employed by Amsted from November 1973 to September 2001 (Sparks Dep. 11-12).

In January 2000, Sparks gave notice of her intent to retire in February 2001. Like Blankenship, she gave one year's advance notice in order to receive a lump sum payment under the Amsted annuity plan (Sparks Dep. 18). Under Amsted's normal practice she would not have expected to receive ESOP distribution request forms until 60 to 90 days before her intended February 2001 retirement date (Sparks Dep. 65).

Sparks knew that the April Amendment affected her and on June 2, 2000 filed a claim letter under the ESOP's administrative procedures, asking that the Amendment not be applied to her (Sparks Dep. 44 - 45). She also knew that she could retire before age 55 and receive her ESOP benefits over a four year period but chose not to because she wanted to work to age 55 to get health insurance (Sparks Dep. 51 - 52). She was offered a transfer to Chicago, which might have enabled her to continue her employment until age 55, but turned it down (Sparks Dep. 70 - 71).

### III. ARGUMENT

Each of the multiple arguments offered by Blankenship and Sparks in an attempt to avoid summary judgment is in vain. None shows a breach of fiduciary duty by Defendants.

#### A. <u>Plaintiffs have not shown that they were denied any forms that prevented their retiring</u>

Plaintiffs first argue that their ERISA rights were violated because they were not provided the forms they needed to complete in order to receive a cash lump sum distribution, asserting that Gunn testified that "in the Spring of 2000, no valid distribution forms were available" (P. Br. 5). Plaintiffs have two intractable problems with this argument.

Plaintiffs' first problem is that Gunn did not testify to any such thing. She testified that there was a period of time when forms were unavailable but could not recall when that was. Gunn also testified that forms *were* available in the Spring of 2000. She testified that after the quarter ending March, 31, 2000 she stopped using forms dated June 1997; that she received a set of forms dated January 2000 before the April 2000 Amendments and, in fact, sent the January 2000 forms to at least one participant on April 20, 2000; and that she received another set of forms dated May 2000 sometime after the April 2000 Amendments (D. Reply to P. Facts ¶9). Because Plaintiffs have presented no evidence to support their argument that forms were unavailable when needed, that argument can furnish no basis for denying Amsted Defendants' motion.

Plaintiff's second, equally intractable problem is that they have offered no evidence at all that forms were not available when they "needed" them. Neither Blankenship nor Sparks testified that they sought forms during the Spring of 2000 (or any other time for that matter) and could not get them.

- 8 -

Further contradicting Plaintiffs' argument, Blankenship testified that he was in fact provided the ESOP distribution forms before the July Amendment by Gunn, who allegedly told him something was "fixing" and that he should submit his forms (Blankenship Dep. 61, 63). Thus, his testimony established that forms were available when needed.

### B. There was no fiduciary breach because Plaintiffs were not excepted from the amendments

Plaintiffs argue that they should have been excepted from the amendments, relying solely on the decision in *Aurwarter v. Donohue Paper Sales Corp.*, 802 F. Supp. 830 (E.D.N.Y 1992), where, they say, "the employer similarly amended its plan after it had notice of the plaintiff's [sic] intent to retire" (P. Br. 5). Not so. The plan in that case was not an ESOP but a defined benefit pension plan (802 F. Supp. at 833), making the special ESOP statutory provisions permitting amendments to eliminate optional benefit forms (clearly pertinent here, see Section C, below) inapplicable. Moreover, there were IRS regulations in place that allowed such amendments for defined benefit pension plans but the employer in *Aurwarter* had not acted within the strict time limits set by the regulations (802 F. Supp. at 839).

Additionally, the plaintiffs in that case had already terminated their employment and applied for a lump sum benefit when the employer *retroactively* amended the plan (after blowing the time limits established by the IRS regulations) to eliminate the benefit. 802 F. Supp. at 833, 841. Here, of course, Blankenship and Sparks were both still employed at the time of the amendments, neither of which were retroactive, and had not applied for their ESOP benefit. *Aurwarter* does nothing to support their claim.

### C. The anti-cutback rule does not save Plaintiffs' claim

Plaintiffs admit that an exception to the anti-cutback rule in Section 204 of ERISA allows ESOPs to eliminate an optional form of benefit (P. Br. 6). Then, pointing out that the exception

is limited to cases where the elimination of a form of benefit is consistent with the distribution and payment requirements applicable to such plans, they mistakenly argue that the exception does not permit the amendment to the Amsted ESOP because its Section 11.5 "stat[es] that no form of distribution would be eliminated" (P. Br. 6 – 7). But Section 11.5 says that no optional form of benefit will be eliminated *except as permitted by law*, language Plaintiffs misleadingly omit. The anti-cutback exception expressly permits the amendment made, and thus Section 11.5 does too.[3] Nothing in the anti-cutback rules saves Blankenship and Sparks from summary judgment.

### D. Plaintiffs' contract argument fails entirely

Barely averting to ERISA, Plaintiffs next argue that the amendments violated a contract which was formed by the Plan (P. Br. 7 – 8).[4] As shown, the ESOP reserved to Amsted the right to eliminate an optional benefit form. Further, Blankenship and Sparks were required to submit an application for ESOP benefits as a condition of receiving them (Joint Facts ¶14), and did not do so before either amendments. And they were required to terminate their employment in order to receive ESOP benefits, which neither did before the amendments (1995 ESOP Plan §§6.1, 7.1, 7.5, 7.7, 7.12). Their argument that they were entitled to a distribution of benefits under the terms of the Plan at the time of amendments fails and is in no way sufficient to defeat Amsted Defendants' motion.

### E. Plaintiffs' estoppel argument fails

Plaintiffs' claim of equitable estoppel relies on the federal common law, which was created to "plug gaps" in the ERISA. *Miller v. Taylor Insulation Co.*, 39 F.3d 755, 758 (7th Cir.

---

[3] Inconsistently with Blankenship and Sparks' position that the amendments violated ERISA, the plaintiffs in *Armstrong* take the position that it was an ERISA fiduciary duty violation that the amendments were not made sooner.

[4] If Plaintiffs mean to advance a state law claim, it is, of course, pre-empted.

1994). Claims of equitable estoppel are allowed only in "extreme circumstances" and have a "narrow scope" because they are largely obviated by ERISA's express provisions. *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 585 (7th Cir. 1999).

A claim of equitable estoppel requires that "one party has made an incorrect representation of fact, on which another reasonably relied to his detriment." *Frahm v. Equitable Life Assurance Soc'y of United States*, 137 F.3d 955, 961 (7th Cir.), *cert. denied*, 525 U.S. 817, 119 S. Ct. 55 (1998). Further, an ERISA estoppel claim is available only where a written misrepresentation is shown; alleged oral misrepresentations do not give rise to an estoppel claim. *Gallegos v. Mt. Sinai Medical Center*, 210 F.3d 803, 809 (7th Cir.), *cert. denied*, 531 U.S. 827, 121 S. Ct. 76 (2000) ("[W]e ... have determined that estoppel in the ERISA context only applies to written, and not to oral, misrepresentations."). Thus, Blankenship and Sparks must show that they reasonably relied on written statements that were false when made.

Here, Plaintiffs assert that Defendants – without identifying anyone in particular – made "misleading statements to the Plaintiffs that that they were not to apply for benefits under the old forms" (P. Br. 9). Plaintiffs do not assert that the supposed statements were written, so their claim fails on that ground alone. Even more tellingly, they have presented absolutely no evidence of even one such statement (even an oral one) in their Rule 56.1 Response. As a matter of fact, that Response totally lacks even an unsupported assertion, to match their brief, that *any* statements like that were made.[5] Their estoppel claim is utterly spurious.

Further, Blankenship has no estoppel claim because he admitted that he had become concerned about the Company's stability after the April amendments and was advised to retire

---

[5] Plaintiffs' brief asserts (at p. 10) that Defendants "admit[] many of the statements made the basis of Plaintiffs' estoppel claim." This is extraordinarily odd since Plaintiffs have not provided any evidence of any statements whatsoever – much less of statements admitted by Defendants.

between the April and July amendments by his own financial advisers. He thought about accelerating his retirement date and knew co-workers who had done just that; but he decided not to. Similarly, Sparks knew that she had been affected by the April Amendment but chose not to accelerate her retirement because she wanted health insurance which was available only if she worked until age 55. Even if there were evidence of any of the representations claimed – which there is not – neither can claim estoppel in such circumstances since they cannot establish the element of reasonable reliance which is an essentially part of any estoppel claim. *E.g., Gallegos, supra*, 210 F.3d at 810 -11.

### F. Plaintiffs' serious consideration claim fails

Plaintiffs' argument that they are due equitable relief if "Defendants prevented [them] retiring while giving serious consideration to Plan Amendments" (P. Br. 11) fails, first, because they have not shown that Defendants did anything to prevent them from retiring.[6] It also fails because the serious consideration cases on which they rely are simply inapposite.

As Plaintiffs note, the Seventh Circuit has not yet adopted the serious consideration test adopted by some other courts (P. Br. 11), but assuming it applies, each of the cases Plaintiffs cite require that the company, to be held liable, mislead employees regarding amendments it may be seriously considering. Plaintiffs attempt to fulfill that requirement by asserting "Defendants ... prevented employees from obtaining and/or lulled them into neither requesting not submitting" ESOP benefit request forms (P. Br. 12) and that "Defendants ... made (or ordered HR personnel

---

[6] Plaintiffs may merely intend their serious consideration argument as a variant of their equitable estoppel claim since in their argument heading (at pp. 10 – 11), they say: "Because the Amendments were under serious consideration at the time of Defendants' inequitable conduct, summary judgment must be denied regarding Plaintiffs' estoppel claim." If they do intend to conflate the two, they are wrong. As Plaintiffs' own cases make clear, equitable estoppel under ERISA is used to determine a claim for benefits; the serious consideration test arises from ERISA fiduciary duty.

to make) statements upon which Defendants knew Plaintiffs would act so as to because [sic, presumably Plaintiffs mean "become"] subject to the forthcoming amendments" (P. Br. 13). Conspicuously, Blankenship and Sparks cite no part of the record to support these claims in their brief and make no such claim in their factual Response. They have no evidence of any such alleged conduct or misleading statements, and there is none.[7]

Each of Plaintiffs' cases apply the serious consideration test in circumstances where the employer failed to convey information about new more beneficial retirement benefits that, if provided, might have caused the plaintiffs to defer retirement until the benefit became available.[8] None apply it as Plaintiffs would here – to argue that Amsted should have provided information that would allegedly have caused them to *accelerate* their retirements.

And critically, no case applies the serious consideration doctrine in a case like this, where amendments are necessary in the face of a run on the Plan that might potentially destroy it. Application here would mean that a fiduciary has a duty to announce to participants that it is considering taking steps to save a plan, when that very announcement would only exacerbate the

---

[7] Plaintiffs also argue that by preventing them from submitting forms to receive lump sum ESOP benefits "Defendants rendered inaccurate the Plan documents and their statements regarding same" (P. Br. 13). As noted, Plaintiffs have cited no evidence that Defendants "prevented" them from submitting their forms.

[8] Plaintiffs regularly misrepresent the cases they rely upon. For example, they quote at p. 14 at length from Magistrate Judge Levin's decision in *Neuma v. E.I. DuPont Nemours & Co.*, 133 F. Supp.2d 1082, 1085 (N.D. Ill. 2001), italicizing a sentence that allegedly reads: "Thus, when a fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey information which the beneficiary did not specifically inquire about or request." Plaintiffs, without ellipsis or any other indication that text is omitted, leave out of their quotation language that completely changes it by making plain that the duty of which the Magistrate Judge writes applies only where some information has been requested. The sentence actually in the opinion is as follows, with the material Plaintiffs omit shown in italics: "Thus, *when a beneficiary requests information from* a fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey material information which the beneficiary did not inquire about or request."

- 13 -

harm that the amendments are intended to prevent and ensure the plan's destruction. ERISA imposes no such fiduciary obligation.

On top of all that, even if the serious consideration doctrine applies (which it does not), the undisputed facts show that the April Amendments were not seriously considered until the meetings at which they were adopted. In late March, MW&E presented a memo to Amsted's General Counsel outlining possible amendments to remedy the growing liquidity crisis. On April 18, it was recommended that a Board meeting be held to address the situation and on April 25, some of the amendments MW&E suggested were adopted. Some were not. Likewise, in July, as the situation did not improve, amendments were adopted to address the situation. These facts preclude a finding that either amendment was actually seriously considered until its adoption.

## IV. CONCLUSION

For all these reasons, if considered separately, Defendants should be granted summary judgment on the claims of Plaintiffs Blankenship and Sparks.

Respectfully submitted,

AMSTED INDUSTRIES, INC., et al.

By: _____
One of Their Attorneys

- 14 -

CHICAGO/#1217119.2 4/8/04

Michael G. Cleveland
Richard H. Schnadig
Charles B. Wolf
Charis A. Runnels
Alison J. Maki
Vedder, Price, Kaufman & Kammholz, P.C.
222 North LaSalle Street, Suite 2600
Chicago, IL 60601-1003
Telephone: (312) 609-7500
Facsimile: (312) 609-5005
Dated: April 9, 2004

## CERTIFICATE OF SERVICE

The undersigned certifies that copies were served of the foregoing AMSTED DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AS TO BLANKENSHIP AND SPARKS on April 9, 2004 to the following:

Edgar C. Gentle, III
J. Paul Zimmerman
Gentle Pickens Eliason & Turner
Two North Twentieth Building
2 North 20th Street, Suite 1200
Birmingham, Alabama 35203
VIA U.S. MAIL

Mark D. DeBofsky
Daley DeBofsky & Bryant
1 North LaSalle Street, Suite 3800
Chicago, Illinois 60602
VIA U.S. MAIL

Susan E. Kennedy
3417 Southview Avenue
Montgomery, Alabama 36111
VIA FEDERAL EXPRESS
(SATURDAY DELIVERY)

Pamela B. Slate
Joel DiLorenzo
Slate Kennedy LLC
2001 Park Place North, Suite 450
Birmingham, Alabama 35203
VIA U.S. MAIL

Daniel "Dee" Miles
Clinton C. Carter
Beasley, Allen, Crow, Methvin,
Portis & Miles, P.C.
218 Commerce Street
P.O. Box 4160
Montgomery, Alabama 36104-4160
VIA U.S. MAIL

Gary D. McCallister
Thomas A. Kelliher
Gary D. McCallister & Associates, Ltd.
29 South LaSalle Street, Suite 1210
Chicago, Illinois 60603
VIA MESSENGER DELIVERY

Robert M. Foote
Peter J. Flowers
Foote, Meyers, Mielke & Flowers, LLC
416 South Second Street
Geneva, Illinois 60134
VIA U.S. MAIL

Gary D. McCallister
c/o Homestead Court Club
400 Homestead Drive
Edwards, Colorado 81632
VIA FEDERAL EXPRESS
(SATURDAY DELIVERY)

David Ackerman
Theodore M. Becker
Keith C. Hannigan
Jenkens & Gilchrist
225 W. Washington Street, Suite 2600
Chicago, Illinois 60606-3418
VIA MESSENGER DELIVERY

Michael G. Cleveland