# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2963 (MDL 1417) | **DATE** | 7/29/2004 |
| **CASE TITLE** | JUAN ARMSTRONG, et al vs. AMSTED INDUSTRIES, INC., et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

MEMORANDUM OPINION AND ORDER

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. The Amsted defendants' and LaSalle's motions for summary judgment are granted. Plaintiffs' motion for summary judgment is denied. Defendants Berg, Sopranos and Chiappetta's motion for summary judgment is moot, and is therefore denied. All pending motions and dates are now moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | **Document Number** |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | JUL 3 0 2004 | |
| | Notified counsel by telephone. | | | date docketed | 219 |
| ✓ | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | |
| | | | U.S. DISTRICT COURT CLERK | date mailed notice | |
| LG | courtroom deputy's initials | | 2004 JUL 30 AM 10:54 | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

JUL 3 0 2004

JUAN ARMSTRONG, et al.,    )
                       )
        Plaintiffs,    )
                       )
      vs.            )     No.  01 C 2963
                       )     MDL 1417
AMSTED INDUSTRIES, INC., et al.,  )
                       )
        Defendants.    )

## MEMORANDUM OPINION AND ORDER

Plaintiff class brought this action against Amsted Industries, Inc. (Amsted), the Amsted Employee Stock Ownership Plan (ESOP), Amsted ESOP committee members, Amsted plan administrators, two Amsted vice-presidents, and LaSalle Bank (LaSalle), for violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq., (ERISA). Plaintiffs; the Amsted defendants (all defendants except LaSalle); LaSalle; and defendants, Thomas Berg, O.J. Sopranos, and Robert Chiapetta, have all filed motions for summary judgment. The Amsted defendants' and LaSalle's motions for summary judgment are granted. Plaintiffs' motion is denied, and Berg, Sopranos and Chiapetta's motion is moot.

## BACKGROUND

This action arises from defendants' management of Amsted's Employee Stock Ownership Plan (ESOP). Complaints were filed separately, but then consolidated and transferred to this court by the multi-district litigation panel. We ordered plaintiffs to file two amended complaints: one for Amsted retirees and one for non-retirees. These motions for summary judgment relate to the claims of the non-retirees, whom we certified as a class (Armstrong class) on December 16, 2002. In re Amsted Industries, Inc. "ERISA" Litigation,

219

2002 WL 31818964 (N.D.Ill. 2002).

Amsted, a manufacturer of industrial products, was a publicly-traded company until 1986, when it became wholly employee-owned through an ESOP. The ESOP distributes shares of the corporation into Amsted employees' individual retirement accounts at the end of each fiscal year. The addition of new shares and changes in Amsted's stock price causes the value of the accounts to fluctuate. The ESOP's named fiduciary is Amsted's ESOP Committee, though the Committee may delegate authority to other individuals, plan administrators, who then also assume fiduciary responsibility. Plaintiffs' claims stem from three central concerns: Amsted's purchase of Varlen Corporation (Varlen), Amsted's obligation to repurchase ESOP stock from its retiring employees, and LaSalle's valuation of the ESOP stock.

In early 1999, Amsted's president, Arthur Goetchel, seriously began to consider acquiring the publicly-traded company, Varlen. After receiving advice from the investment banking firm, Salomon Smith Barney (Salomon), and meeting with its board of directors, Amsted attempted a friendly acquisition of Varlen. Amsted's initial offer of $33 per share was rejected, after which the company participated in an auction, purchasing the Varlen shares for $42 per share – 50 cents more than the next highest bidder. During this process, Amsted, its lenders, and Salomon, analyzed the effects of purchasing Varlen at various costs. Plaintiffs maintain that Amsted did not, however, sufficiently consider the effect on the ESOP. Specifically, plaintiffs allege that Amsted created a significant risk that it would not be able to meet its obligation to repurchase ESOP shares after taking on the debt of the Varlen purchase. Before Amsted's purchase of Varlen was finalized on August 16, 1999, Salomon issued a fairness opinion on the transaction which found that the price to be paid for the stock was fair. Amsted financed the purchase with a $1 billion unsecured loan from Citibank. Following the

purchase, Amsted had approximately $200 million in available credit.

About a month after Amsted purchased Varlen, the annual value of Amsted stock was determined. Under the then current terms of Amsted's ESOP plan document, the ESOP trustee was responsible for setting the fair market value of Amsted's stock annually on the last day of the fiscal year. LaSalle, the ESOP trustee, hired an independent investment banking firm to perform the valuation. For many years William Blair & Company valued the shares, but in 1998 LaSalle hired Duff & Phelps to perform the valuations. From the inception of the ESOP through 1998, the percentage change in annual stock value ranged from -11.7 per cent from 1989 to 1990, to 32.1 per cent from 1987 to 1988. To determine the value of Amsted's stock, Duff & Phelps performed due diligence review of the company by evaluating financial forecasts and cash flow projections, and meeting with executives in key operating divisions to discuss financial reporting and business plans. While defendants maintain that Duff & Phelps' workpapers reflect that their valuation took into account a forecast of Amsted's repurchase obligation, plaintiffs contend that Amsted never supplied Duff & Phelps with information on this obligation and the financial analysts never considered it in performing their valuation. Duff & Phelps did not conduct an independent analysis into the price paid for Varlen – its valuation assumes that fair market value was paid. Nor did the firm discount the valuation for lack of marketability – the inability to sell the stocks on the open market.

On October 25, 1999, Duff & Phelps presented its valuation of Amsted stock at $184.41 per share to LaSalle's ESOP fiduciary committee for review and approval. Duff & Phelps provided summaries that indicated the share price was the same regardless of whether or not the Varlen acquisition was considered. LaSalle approved the valuation, after which neither Amsted nor the ESOP committee could reject it. The stock value was set at $184.41 as of

September 30, 1999, reflecting a 32 per cent increase from its 1998 value. During the same time period, the Dow Jones average was up 31.8 per cent and the Standard & Poor 500 was up 26.1 per cent. Under the then current terms of the ESOP plan document, a participant terminating work at Amsted was entitled to a lump sum cash payment for his vested shares. The annual stock price established by LaSalle determined the value of a departing employee's redemption payout.

Following the announcement of the 1999 valuation, ESOP distribution requests began to surpass expectations. The parties dispute how much Amsted estimated it would pay in redemptions and how those estimates evolved as the redemption requests increased, but it is clear that by late January 2000, Amsted believed it would have to pay $68 million more than it forecast in its business plan for fiscal year 2000. At Amsted's directors meeting on January 27, 2000, the company began to consider ways in which to protect its cash reserves. Following the meeting Amsted explored different avenues for addressing its mounting repurchase liability, including decreasing expenditures for the expansion of a manufacturing plant, employing Salomon to investigate the possibility of an initial public offering, and retaining an ESOP consulting firm and Amsted's legal counsel to determine ways to decrease the amount of repurchases and its impact on the company's cash flow. On March 14, 2000, Amsted's legal counsel suggested that the plan administrators amend the ESOP plan document to allow for quarterly share valuations instead of annual valuations, limitations on participants' rights to lump sum cash payouts, and deferred payments for ESOP shares. By April 2000, Amsted was obligated to pay $180 million to repurchase ESOP shares for the first three quarters of the fiscal year. Its forecast for the whole year was adjusted to $240 million. At a special directors' meeting on April 25, 2000, Amsted's board unanimously voted to adopt two amendments to the

ESOP, eliminating the right to a lump sum cash payout and eliminating the joint and survivor annuity option. Amsted now bought terminating employees' company shares with promissory notes, which paid out in annual installments over four years. As the redemption rate continued to increase, Amsted's board of directors voted unanimously to further amend the ESOP plan document at its regularly scheduled meeting on July 18, 2000. Share valuations were now made quarterly, not annually. To become immediately eligible for an ESOP distribution, participants had to retire at age 65, be 55 with 30 years of service, or be permanently disabled Those not immediately eligible had to wait five years after terminating employment, or until the ESOP loan was repaid, whichever occurred last. Also, Amsted's contributions to participants' accounts were reduced.

### DISCUSSION

The function of the court in ruling on a motion for summary judgment is to determine if there is a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the evidence on file shows that no such issue exists and that the moving party is entitled to judgment as a matter of law, we will grant the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Bennett v. Roberts, 295 F.3d 687, 694 (7th Cir. 2002). A "metaphysical doubt as to the material facts" is not enough to create a genuine issue of fact for trial, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 (1986); the evidence must allow for a reasonable trier of fact to find for the non-movant. Buscaglia v. United States, 25 F.3d 530, 534 (7th Cir. 1994). When reviewing a motion for summary judgment we draw all inferences in the light most favorable to the non-movant. DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 811 F.2d 326, 329 (7th Cir. 1987). The court considers plaintiffs' and defendants' cross-motions independently – the failure of one party's motion for

summary judgment does not mandate the success of the other party's motion.

In over 200 pages of briefs the parties present their arguments for summary judgment on plaintiffs' claims for breach of fiduciary duty, which they allege resulted in a $167 million to $202 million loss for Amsted's ESOP. Plaintiffs' first amended complaint alleges five counts against defendants. Count I alleges defendants are liable for numerous breaches of fiduciary duty under 29 U.S.C. § 1109. In Count II, plaintiffs allege that defendants wrongfully denied their claims and benefits in violation of 29 U.S.C. § 1132. Plaintiffs argue that defendants made unlawful amendments to the ESOP in Count III. Counts IV and V, brought on behalf of a subclass for breach of contract and conversion, were dismissed as to all defendants. Count II was also dismissed against LaSalle. Both Counts II and III were dismissed for certain plaintiffs who filed their suits after the prescribed ESOP time limit for challenging the plan administrator's final decision.

Since plaintiffs filed their complaint their theories have undergone some transformation, causing them to drop their claim that defendants unlawfully amended the ESOP. Plaintiffs now maintain that the amendments were necessary (and in fact should have been enacted sooner), but only due to defendants' earlier breaches of duty resulting in significant losses to the ESOP assets. As plaintiffs' view of the amendments have changed, Count II, alleging wrongful denial of benefits, has apparently also been disregarded.

Plaintiffs do not contend that any defendant acted dishonestly or engaged in self-dealing or was guilty of disloyalty.[1] This is not a case about insiders acting for their own benefit or

---

[1] Plaintiffs do suggest that any analysis of the Varlen acquisition by Amsted is somehow tainted because it was not expressly for the ESOP participants. Who did what for whom may well affect the standard of judicial review, but undertakings for Amsted are undertakings for Amsted's stockholders and the Amsted stockholders are the ESOP participants. Further, plaintiffs seek to question the independence of the trustee and consultants because they were paid for their efforts. But so long as what they were paid is reasonable and customary, that cannot provide a basis for challenge – otherwise every trustee and expert has a conflict.

corrupt intent or greed. Plaintiffs also recognize that the financial or business advisors upon whom various defendants relied were independent, reputable, experienced and expert in the areas in which they were here involved. Even so, they contend that the defendants are liable for what was, indisputably, a precipitous decline in the value of the employees' ESOP shares. Plaintiffs focus on their theories of defendants' breach of fiduciary duties. They argue that defendants breached 29 U.S.C. § 1104, which establishes a fiduciary's general duties; § 1105, which establishes liability for the breach of a co-fiduciary; and § 1106, which prohibits certain transactions likely to injure a pension plan. We will address each parties' summary judgment motion in turn.

## Amsted Defendants' Motion for Summary Judgment

An ESOP is an ERISA plan allowed to invest primarily in "qualifying employer securities," typically shares of the employer's stock. 29 U.S.C. § 1107(d)(6)(A). Since the ESOP acts as both an employee retirement benefit plan and a method of corporate finance through employee ownership, it is not designed to guarantee retirement benefits. *See* Moench v. Robertson, 62 F.3d 553, 568 (3d Cir. 1995). By its nature, the ESOP puts its assets at greater risk than a typical diversified ERISA plan. Kuper v. Iovenko, 66 F.3d 1447, 1457 (6th Cir. 1995). While ERISA provisions cannot eliminate the risk inherent in an ESOP, they seek to ensure that ESOP fiduciaries properly manage a plan's assets for the benefit of its participants. Plaintiffs maintain that Amsted defendants violated ERISA provisions in the breach of their fiduciary duty, thus placing the ESOP's assets at risk.

Other than Berg, Chiappetta and Sopranos, who filed a separate motion of summary judgment which will be discussed later, the Amsted defendants agree that as the plan sponsor,

the ESOP committee members and the plan administrators, they were fiduciaries of the ESOP.[2]

Section 404 of ERISA, 29 U.S.C. § 1104, imposes duties upon fiduciaries managing plan assets.

It states, in part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
> (A) for the exclusive purpose of:
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan;
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

Due to the nature and purpose of the ESOP, a fiduciary does not violate the

diversification requirement or the prudence requirement (to the extent it requires

diversification) when an ESOP acquires or holds shares of the plan sponsor's stock. *See* 29

U.S.C. § 1104(2). Plaintiffs do not allege that the Amsted defendants failed to diversify; rather,

they allege defendants did not act for the exclusive benefit of the ESOP participants and that

they acted imprudently. Plaintiffs bring their claims pursuant to § 409 of ERISA, which

imposes liability on a plan's fiduciary for any losses to the plan resulting from the fiduciary's

breach of duties or obligations. 29 U.S.C. § 1109(a).

Under ERISA, a person may be a fiduciary for some purposes, but not for others. *See*

Plumb v. Fluid Pump Service, Inc., 124 F.3d 849, 854 (7th Cir. 1997). Section 1002(21)(A) states

that "[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any

---

[2] In their response to the motion by Berg, Chiappetta and Sopranos, plaintiffs agree to dismiss their complaint against Sopranos.

discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . ." 29 U.S.C. § 1002(21)(A). ERISA allows an individual to serve both as a fiduciary and an officer or representative of a plan sponsor, thus creating dual roles with different duties and responsibilities. *See* 29 U.S.C. § 1108(c)(3). The Supreme Court has found that a plan administrator is not acting as a fiduciary when adopting, amending, or terminating a benefit plan. Lockheed Corp. v. Spink, 517 U.S. 882, 890-91 (1996). Moreover, plan administrators who are also officers of the plan's sponsoring employer, assume fiduciary status only when and to the extent they act as plan administrators, not when they conduct business unregulated by ERISA. Canale v. Yegen, 782 F.Supp. 963, 967 (D.N.J. 1992)(quoting Payonk v. HMW Industries, Inc., 883 F.2d 221, 227 (3d Cir. 1989)); *see also* Martin v. Feilen, 965 F.2d 660, 666 (8th Cir. 1992)(Rejecting the Secretary of Labor's argument for a broad application of ERISA's fiduciary duty, the court stated that even though "[v]irtually all of an employer's significant business decisions affect the *value* of its stock, and therefore the benefits that ESOP plan participants will ultimately receive," ERISA fiduciary duties only attach when an individual invests the ESOP's assets or administers the plan). Even when a fiduciary/corporate representative undertakes day-*to*-day business operations that may have a collateral effect on employee benefits, ERISA does not require that he operate solely in the interest of plan participants. Hickman v. Tosco Corp., 840 F.2d 564, 566 (8th Cir. 1988)(quoting Phillips v. Amoco Oil Co., 614 F.Supp. 694, 718 (N.D. Ala. 1985), aff'd, 799 F.2d 1464 (11th Cir. 1986)). Thus, to find Amsted defendants liable for breach of fiduciary duty, we must first find that they were fiduciaries as to the activities at issue.

<u>Varlen Acquisition</u>

The Amsted defendants argue that their decision to purchase the Varlen Corporation and their forecasting of their repurchase obligation are business decisions and activities that do not trigger a fiduciary duty under ERISA. Plaintiffs recognize that the Varlen acquisition was not a fiduciary act ("Amsted Defendants argue they cannot be liable for participating in the decision to acquire Varlen. Plaintiffs do not claim that they are" (Class Plaintiffs' Brief 14)), but claim that the Amsted defendants still breached their duty in regards to this matter by "never put[ting] on their fiduciary hat."

Plaintiffs rely on <u>Reich v. Hall Holding Co.</u>, 990 F. Supp. 955 (N.D. Ohio 1998), *aff'd* 285 F.3d 415 (6th Cir. 2002), to support their contention that the Amsted defendants' purchase of Varlen, and analysis of its repurchase obligation, triggered fiduciary obligations that the defendants chose to ignore. In <u>Reich</u>, ESOP fiduciaries were sued for breach of duty after the ESOP purchased stock in the plan sponsor for $3.5 million, allegedly more than adequate consideration. The court rejected defendants' argument that the decision to purchase this stock was not a fiduciary decision because it was part of the establishment of the ESOP. The court distinguished the acquisition of these assets from the establishment of the ESOP and stated that ERISA fiduciary provisions apply in this case because "a person is a fiduciary to the extent . . . he exercises any authority or control respecting management or disposition of [a plan's] assets." *Id.* at 960 (quoting 29 U.S.C. § 1002(21)(A)). The court further noted that an ESOP's purchase of employer stocks requires the plan fiduciaries to investigate the fair market value of the stock to ensure that adequate compensation is paid. The circumstances in <u>Reich</u> are too distinct from those in this case to provide support for plaintiffs' argument. In <u>Reich</u>, fiduciaries used ESOP assets to purchase employer stock – clearly exercising control

over the plan's assets. Amsted did not use ESOP assets to purchase Varlen.

Reich reaffirms that an individual must be dealing with a plan's assets to be subject to ERISA's fiduciary duty. Though plaintiffs argue that there was a general failure on the part of defendants to assume their role as fiduciaries, they appear to recognize that the Amsted defendants only need to don their "fiduciary hat" when they are exercising authority or control over ESOP assets or administering the plan. Though the Amsted ESOP's assets are the shares of Amsted, properties acquired and owned by Amsted are not plan assets. Department of Labor Regulations, 29 C.F.R. § 2510.3-101(a)(2). Therefore, Amsted's acquisition of Varlen did not involve authority or control over plan assets.

## Repurchase Obligation

Plaintiffs also allege that the Amsted defendants violated their fiduciary duties with regard to forecasting their obligation to repurchase stock from retiring ESOP participants.[3] Amsted defendants respond that, as with the Varlen purchase, no fiduciary duty applies to the analysis of their repurchase obligation. However, these forecasts are not as easily classified as business decisions or transactions. If an employer sponsors an ESOP that distributes shares not traded on the open market, the Internal Revenue Code requires that the ESOP participants have the right to sell their shares to the employer for a fair price. 26 U.S.C. § 409(h)(1)(B). The ESOP participant's right to redemption is called a "put option" and the burden created for the employer/plan sponsor is its "repurchase obligation." Up until the Amsted ESOP was amended in 2000, participants had the right to a lump sum cash payment

---

[3] This allegation is entwined with the Varlen allegation, for plaintiffs are arguing in part that defendants' breach stems from their failure to recognize that the Varlen purchase created a significant risk that Amsted would not be able to meet its obligation to the ESOP participants. While recognizing the interplay between the allegations, they can be separated into distinct claims and should be for the sake of clarity.

when they exercised their "put option." As fiduciaries to the plan, the Amsted defendants could not ignore this obligation – imposed by law and the terms of plan – to the ESOP participants. Thus, they had a duty to prudently manage their repurchase obligation.

Under the prudent person standard, a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The prudence of a fiduciary's actions must be evaluated from the perspective of the time of his actions, not with the benefit of hindsight. Katsaros v. Cody, 744 F.2d 270, 279 (2d. Cir. 1984); Metzler v. Graham, 112 F.3d 207, 209 (5th Cir. 1997). As the Seventh Circuit has noted, "[F]iduciary duty of care requires prudence, not prescience." DeBruyne v. Equitable Life Assurance Society, 920 F.2d 457, 465 (7th Cir. 1990).

Plaintiffs argue the Amsted defendants were not making proper assumptions in their analysis of the repurchase obligation, nor monitoring important factors for the analysis, such as the age of ESOP participants, but rather were relying only on historical data. Plaintiffs' expert Kace Clawson testified that a repurchase obligation analysis focuses primarily on stock value, the company's turnover rate and the ESOP terms for repurchase of the stock, but it also involves "a complete survey of the company, its employees, their ages, estimates of turnover rates" (Clawson Dep. 18). Clawson affirmed that estimates of future turnover are subjective, based on historical turnover and the company's assessment of the attitude of its current employees (Clawson Dep. 19-20). Wilson Ellis, another plaintiffs' expert, testified that Amsted should have taken more information into account in forecasting its repurchase obligation, such as the increase in redemptions in the years immediately prior to 1999, the value of

participants' ESOP accounts, and the increase in the average age of the workforce (Ellis Dep. 244-45).

Plaintiffs also argue that Amsted's assumption of a 9 per cent turnover rate in forecasting its obligation was imprudent. Until 1995, the average annual turnover rate for shares of the ESOP[4] was 7.8 per cent. In 1996 it rose to 10.9 per cent (apparently impacted by the closing of a facility), and in 1997 and 1998 respectively, it was 9.0 per cent and 9.4 per cent. Ellis testified that the increased turnovers after 1995 should have alerted Amsted to re-examine its assumptions regarding share turnover (Ellis Dep. 244). Newman continued to use the 9 per cent turnover rate – a standard assumption that had been used for years – in his formulas for projecting the repurchase obligation.

Plaintiffs attack assumptions made in the use of PERLS software, as well. Amsted began using PERLS software in 1997 and reported some problems with its forecasts. Plaintiffs argue that Amsted's perception that the PERLS software was subject to big variations in its assumptions resulted from Amsted's failure to use realistic assumptions in its own forecasts. They further maintain defendants relied on unrealistic assumptions when using the PERLS software.

Defendants contend no reasonable factfinder could conclude that its repurchase obligation analysis was imprudent. They argue Amsted was well aware of the significance of the repurchase obligation and continually monitored the situation. They also maintain plaintiffs lack evidence that a hypothetical, objective, prudent fiduciary would have come to a different conclusion regarding Amsted's repurchase obligation, much less to the conclusion

---

[4]The share turnover rate is distinct from the employee turnover rate. Of course, the two rates are interrelated because shares are turned over by departing employees. The share turnover rate is the number of vested shares redeemed by departing employees divided by the total number of outstanding shares.

that share redemptions would increase to over 30 per cent between 1999 and 2000.

Despite the fact Amsted's repurchase obligation estimates were wrong, its treatment of this issue did not constitute imprudence. Indeed, plaintiffs' expert, Clawson, admits that the forecast of a prudent analysis may be followed by a higher turnover rate than predicted. The two primary factors Clawson identified, the historical share turnover rate and the assessment of employee attitudes toward the ESOP, would not have indicated that the Amsted defendants should have predicted a redemption rate of over 30 per cent in 2000. Ellis, another plaintiffs' expert, admits that "[i]t was not knowable in advance what the percentage increase would be or even with certainty that there would be an increase ..." (Ellis Dep. 244). Defendants' expert, Larry Levine, supports this assertion with his statistical survey, finding there was less than a one percent probability that the 2000 turnover rate would have occurred (Levine Report 14-15). After the Varlen purchase, Amsted had $200 million in unused credit from its unsecured Citibank loan. There is no indication from plaintiffs' or defendants' experts that the most prudent of fiduciaries would have determined that this cash cushion would not suffice to meet Amsted's repurchase obligation.

In support of their argument that Amsted abdicated its duty with regards to forecasts of its repurchase obligation, plaintiffs highlight a comment by Joseph Newman, former Amsted controller. During his deposition, Newman stated that an evaluation of the repurchase obligation is an "exercise in futility" (Newman Dep. 177-78). Despite plaintiffs' claim, this is not evidence of defendants' disregard of Amsted's obligation. Newman's deposition clearly illustrates that he was using "repurchase obligation" to mean not just Amsted's obligation to satisfy quarterly or annual redemptions, but the obligation it would have if all the outstanding shares were redeemed – an obligation that "is not going to come into being unless the entire

company – every employee inputs his shares"[5] (Newman Dep. 178). The "exercise in futility" is not forecasting what Amsted will have to pay in any given year for share redemptions, but determining what it would have to pay if every plan participant redeemed his shares.

Even if plaintiffs have evidenced that Amsted's assumptions and analysis regarding its repurchase obligation were too conservative, they have not evidenced that defendants' misjudgment caused harm to the ESOP. A causal connection between plan losses and the breach of fiduciary duty is necessary. Kuper v. Iovenko, 66 F.3d 1447, 1459-60 (6th Cir. 1995). In Kuper, participants in an ESOP brought an ERISA action for breach of fiduciary duty against the plan fiduciaries for failure to investigate and evaluate the appropriateness of the ESOP's assets after a substantial decline in the value of its primary holding. Id. at 1459. The court affirmed summary judgment for the defendant, explaining, "[T]o show that an investment decision breached a fiduciary's duty to act reasonably in an effort to hold the fiduciary liable for a loss attributable to this investment decision, a plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan." Id. (citing Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 279 (2d Cir. 1992)). The court determined that plaintiffs had failed to demonstrate this causal connection – there was no showing that "an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." Id. at 1460. Though plaintiffs do not allege a failure to investigate ESOP investments, their allegations are similar. They maintain that the defendants failed to properly investigate and forecast their repurchase obligation to ESOP participants. But, plaintiffs have not shown that an investigation, which conforms to their

---

[5] Earlier in his deposition Newman states, "A repurchase obligation is the total valuation of all shares that have not been tendered for distribution. The shares held by the – the value of the shares held by the participants who are still active in the plan" (Newman Dep. 55).

experts' standards and uses their assumptions, would have led Amsted to predict the redemption crisis and take proper precautions. The Amsted plan participants fail to provide sufficient evidence that a proper forecast, even with an increased turnover rate, would have caused a reasonable fiduciary to question whether Amsted's cash cushion was adequate.

## Plan Amendments

Though plaintiffs originally argued that Amsted's amendments to the ESOP plan document were breaches of fiduciary duty, they now argue that defendants' failure to take such action sooner was the breach. For plaintiffs to support this claim, they must evidence more than just defendants' failure to predict this cash flow crisis (which, as discussed above, is not a failure that constitutes a violation of the prudent person standard). Plaintiffs must show that the Amsted defendants sat by, ignoring ESOP participants' interests, as the higher than expected redemption rate caused a financial crisis. The evidence cannot support such a finding.

Defendants argue that plaintiffs cannot bring a breach of fiduciary duty claim for failure to amend the plan document because amending a plan is an administrator's settlor function, not a fiduciary function, and therefore not subject to claims of breach of duty. Amending a plan is a settlor function. *See* <u>Lockheed Corp. v. Spink</u>, 517 U.S. 882, 890-91 (1996). Nonetheless, plaintiff's contend that the ESOP plan and trust documents, relevant at the time of the ESOP's escalating redemption rates, imposed a fiduciary duty on defendants even when making amendments to the plan. Assuming that defendants had a fiduciary duty, stemming not from ERISA law but from the Amsted ESOP's plan document, there is no evidence that defendants breached this duty by ignoring remedial actions.

Plaintiffs maintain that once the liquidity crisis became clear to Amsted in late

December 1999 or early January 2000, they "did not take action until April 2000 – five months later ...." (Plfs' Reply 65). Besides adding at least a month to this alleged delay, plaintiffs ignore the undisputed fact that the Amsted defendants did take action. They began to research possible responses to the situation. While it is true that defendants did not amend the ESOP until three months after their January board meeting, when they first proposed responses to the increase in redemptions, this does not evidence the Amsted defendants' imprudence. To the contrary, hiring legal experts, ESOP consultants and financial advisors to investigate measured responses (as opposed to making rash decisions), evidences prudence on the part of Amsted. Nor does Amsted's decision not to make more drastic changes in April 2000, constitute evidence of imprudence. With the benefit of hindsight it is apparent that the April amendments did not slow the number of redemptions, thus necessitating more amendments in July 2000. Yet, our knowledge of what transpired after Amsted's decisions does not render its course of action at the time imprudent. Plaintiffs have not produced any evidence to show that the board of directors' decision to make only two amendments in April 2000 amounted to a breach of fiduciary duty.

Prohibited Transactions-29 U.S.C. § 1106(a)(1)(A) and (D)

Plaintiffs argue that both Amsted and LaSalle caused the ESOP to engage in prohibited transactions in violation of § 404(a)(1)(A) and (D) of ERISA, 29 U.S.C. § 1106(a)(1)(A) and (D). Section 1106(a) states, in part:

> Except as provided in section 1108 of this title:
> (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
> > (A) sale or exchange, or leasing, of any property between the plan and a party in interest; . . .
> > (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; . . . .

Section 1108 provides that these transactions are permitted as long as they are made for adequate consideration. 29 U.S.C. § 1108(e)(1). Defendants argue that this section does not apply to the benefits payments that were made to retired employees who opted for a cash payout on their ESOP holdings. We agree.

We need not address whether the retired employees were parties in interest because even if they are, § 1106 does not implicate these payouts. The Supreme Court has stated that the common thread among § 1106's prohibited transactions is that they "generally involve uses of plan assets that are potentially harmful to the plan." Lockheed Corp. v. Spink, 517 U.S. 882, 893 (1996). This assessment explains why the burden of proof shifts to the fiduciary to show that adequate compensation was provided, once it is established that a transaction falls under § 1106.

Not all payments by an ERISA plan are transactions under § 1106(a)(1). In Lockheed Corp., the Court held that the payment of benefits to a plan participant in accordance with the terms of a pension benefit plan did not violate § 406(a)(1)(D), prohibiting the transfer of plan assets to a party in interest. The Supreme Court explained, "[T]he payment of benefits in exchange for the performance of some condition by the employee is not a 'transaction' within the meaning of § 406(a)(1)." Lockheed Corp., 517 U.S. at 1792. As in Lockheed Corp., Amsted employees received benefits under the Amsted ESOP in exchange for their service to the company.

In an attempt to distinguish their prohibited transaction claim from the one in Lockheed Corp., plaintiffs present two different views of the elements of a § 1106 claim. First, plaintiffs maintain that to establish a § 1106 claim they need only show that a fiduciary used plan assets to purchase employer stock from a party in interest. Citing Keach v. U.S. Trust

Co. N.A., 235 F.Supp. 2d 886, 898-99 (C.D. Ill. 2002), plaintiffs argue the adequate consideration exemption allowed under § 1108(e) is an affirmative defense, for which defendants bear the burden. Yet, in emphasizing the harm of defendants' alleged prohibited transactions, plaintiffs focus not on the transaction – the payment of benefits to plan participants – but, rather, on the alleged overpayment resulting from LaSalle's faulty valuation. They argue that this overpayment was potentially harmful to the plan, like other prohibited transactions; was not pursuant to the terms of the plan; and was not sanctioned by ERISA, but rather, was in violation of 29 U.S.C. § 1104. While it is true that a fiduciary's imprudent valuation of company stock would be potentially harmful to an ESOP, would not be condoned by a benefits plan, and would be in violation of § 1104, that does not change the scope of prohibited transactions under § 1106.

In Lockheed Corp., the Supreme Court established that the payment of benefits to plan participants is outside the boundaries of § 1106(a)(1)(D), stating: "[W]hatever the precise boundaries of the prohibition in § 406(a)(1)(D), there is one use of plan assets that it cannot logically encompass: a *quid pro quo* between the employer and plan participants in which the plan pays out benefits to the participants pursuant to its terms." 517 U.S. 882, 895 (1996). Though plaintiffs assert that retired employees were paid too much as a result of an imprudent valuation, the payment to the ESOP participants was in accordance with the terms of the ESOP.

We also apply the Court's exclusion to transactions under § 1106(a)(1)(A). As highlighted above, the Court found payments to participants in accordance with plan terms not to be transactions within the meaning of § 1106(a)(1). Lockheed Corp., 517 U.S. at 1792. Excluding these types of transactions from the scope of this prohibition comports with the

section's general purpose, which is to "prevent plan fiduciaries from engaging in certain transactions that benefit third parties at the expense of plan participants and beneficiaries." Laborers' Pension Fund v. Arnold, 2001 WL 197634 at *8 (2001) (citing Marks v. Independence Blue Cross, 71 F.Supp.2d 432, 437 (E.D. Pa. 1999)). Amsted's purchase of plan participants' shares in accordance with the terms of the plan was not benefitting third parties at the expense of the participants.

## LaSalle's Motion for Summary Judgment

Plaintiffs allege that LaSalle, like the Amsted defendants, violated both 29 U.S.C. § 1104 and 29 U.S.C. § 1106. LaSalle's alleged breach stems from its failure to investigate Amsted's purchase of Varlen and analysis of its repurchase obligation; its imprudent valuation of Amsted's stock; and its inaction as the value of the ESOP's assets plummeted. LaSalle moves for summary judgment on all counts.

The parties begin by debating the proper standard that the court should apply in reviewing LaSalle's actions for breach of fiduciary duty. LaSalle argues that as an independent and experienced trustee its decisions are entitled to deference and the court should not substitute its judgment for that of the trustee. It relies on several cases in which courts reviewed a fiduciary's investment decisions under the arbitrary and capricious standard. Kuper v. Iovenko, 66 F.3d 1447, 1459 (6th Cir. 1995); Moench v. Robertson, 62 F.3d 553, 571 (3d Cir. 1995); Ershick v. United Missouri Bank of Kansas City, N.A., 948 F.2d 660, 666-67 (10th Cir. 1991). Plaintiffs counter that the Seventh Circuit demonstrated in Eyler v. Commissioner of Internal Revenue, 88 F.3d 445, 454-55 (7th Cir. 1996), that the prudent person standard is the proper standard to apply in this case. Though Eyler did not involve a claim for breach of fiduciary duty, the Seventh Circuit stated that courts employ the prudent person

standard in reviewing a fiduciary's determination of a fair market price for a prohibited transaction, such as the sale of the fiduciary's own stock to the ESOP. *Id.*

Plaintiffs also rely on Horn v. McQueen, 215 F.Supp. 2d 867 (W.D. Ky. 2002), to explain why a deferential standard was used in Kuper and Moench, but should not be used in LaSalle's case. In Horn, the court acknowledged the application of the arbitrary and capricious standard in the circuit court cases, but applied the prudent man standard because the allegations against the fiduciary did not involve investment decisions but, rather, involved overpayment for employer securities. *Id.* at 874-75.

Like in Horn, plaintiffs have attempted to fashion a §1106 claim for prohibited transactions against LaSalle. However, LaSalle's alleged breaches are more akin to those in Kuper and Moench than those in Eyler and Horn. LaSalle is an independent trustee accused of failing to rigorously and prudently review the valuation of Amsted's stock. It is not a fiduciary/employer representative accused of inflating the value of its own stock and then selling it to the ESOP, or buying stock from the ESOP at a discounted rate. Nor is there sufficient evidence for a reasonable factfinder to determine that LaSalle was engaged in self-dealing. According to plaintiffs, LaSalle's alleged failure to question Amsted's purchase of Varlen was motivated by a desire to preserve its annual trustee fee and ensure good corporate relations. Thus, plaintiffs argue, LaSalle's inaction amounts to "deal[ing] with the assets of the plan in [its] own interest or for [its] own account . . . ." *See* 29 U.S.C. § 1106(b). As we explained above, and will discuss further below, the Varlen purchase did not implicate fiduciary duties. Furthermore, even if there was a question of LaSalle's fulfillment of its duties as the ESOP trustee, plaintiffs provide no facts that create a question of self-dealing by LaSalle. The mere fact that LaSalle was compensated for its services as trustee does not raise

a triable issue regarding self-dealing.

Besides the fact that the claims against LaSalle are more akin to those in <u>Kuper</u> and <u>Moench</u> than <u>Horn</u>, there is another reason to apply a deferential standard to LaSalle's decisions in this case. We agree with LaSalle that the explanation for the standard applied in <u>Kuper</u> and <u>Moench,</u> on the one hand, and the standard applied in <u>Eyler</u> and <u>Horn,</u> on the other, relates to the independence of the fiduciary. The decisions of independent and experienced fiduciaries garner deferential review, while the decisions of fiduciaries with a conflict of interest or engaged in suspect transactions do not receive such deference. Before determining whether a defendant breached a fiduciary duty in <u>Steinman v. Hicks</u>, 252 F.Supp.2d 746, 760 (C.D.Ill. 2003), the court noted that its determination of whether the defendant acted as a "hypothetical prudent fiduciary" would have in the given circumstances, involves a "highly deferential" review of the fiduciary's acts. As in <u>Steinman</u>, our review of whether LaSalle met the prudent person standard will be deferential to the decisions it made as an independent trustee.

## Varlen Purchase and Repurchase Obligation

Plaintiffs maintain LaSalle breached its fiduciary duty with regards to Amsted's purchase of Varlen. They argue that LaSalle had an obligation to conduct an independent investigation of the purchase or to contract a firm to conduct an investigation. Plaintiffs further contend the steps that LaSalle did take to review the purchase were inadequate to meet its fiduciary obligation. As discussed above, Amsted's purchase of Varlen was not a fiduciary act to which ERISA applies. The Varlen purchase was a business decision and LaSalle cannot be held liable for breach of fiduciary duty to plaintiffs for failure to override an employer's business decision. <u>Kuper v. Ivenko</u>, 66 F.3d 1447, 1460 (6th Cir. 1995)(holding that fiduciaries

did not breach duty by failing to block plan sponsor's decision to transfer ESOP assets from one trust to another); <u>Martin v. Feilen</u>, 965 F.2d 660, 666 (8th Cir. 1992)(holding that though an employer's business decisions affect stock value and, therefore, pension benefits, an ESOP fiduciary does not become liable for these decisions).

As LaSalle points out, a requirement that ESOP trustees conduct independent investigations into employers' business transactions that do not involve ESOP assets would be unduly burdensome. *See* <u>Keach v. U.S. Trust Co., N.A.</u>, 313 F.Supp.2d 818, 870 (C.D. Ill. 2004)(finding no legal requirement that a trustee hire a CPA firm to review an ESOP transaction and noting that such expert assistance would be cost-prohibitive in many ESOP transactions). An independent investigation was especially unnecessary in this case, where the sole owners of Amsted were ESOP participants, and Amsted hired an independent firm, Salomon, Smith, Barney, to assess its purchase of Varlen.

The parties' factual disputes over LaSalle's review of the Varlen transaction are inconsequential, given that it had no fiduciary duty to review or approve this business decision. Nonetheless, the undisputed facts establish that LaSalle did monitor Amsted's purchase. Vaughn Gordy, the LaSalle trust officer principally in charge of the Amsted ESOP, attended an April 1999 Amsted board meeting during which Salomon presented its report on the Varlen purchase (Defs' Facts 60). Following this presentation, LaSalle consulted with Duff & Phelps, its financial advisor, and legal advisors, regarding the purchase (Defs' Facts 61). Gordy was updated on the Amsted transaction from the beginning of negotiations until the close of the deal. He discussed the transaction with Amsted's general counsel, Thomas Berg; reviewed Salomon's fairness report; and had Duff & Phelps review it. Thus, even though LaSalle did not have a fiduciary obligation with regard to Amsted's business decision, it took measures to

monitor the transaction.

Plaintiffs allege that LaSalle also breached its fiduciary duty with regard to Amsted's repurchase obligation by both failing to properly monitor and evaluate Amsted's projections, and failing to take the obligation into account in its valuation of Amsted's stock. Plaintiffs' maintain that LaSalle's alleged failure to monitor Amsted's repurchase obligation forecasts constitutes a breach of fiduciary duty. This claim fails for the same reason plaintiffs' repurchase obligation claim failed against the Amsted defendants – there is no evidence that, even if Amsted had used less conservative assumptions in its forecasts, it would have predicted an increase in redemptions that would threaten its cash flow.

## Amsted Stock Valuation

Plaintiffs' central complaint against LaSalle is its alleged breach of fiduciary duty in valuing Amsted's stock. Under the terms of the plan document, LaSalle, as trustee of the Amsted ESOP, was responsible for determining the fair market value of the company's stock. Plaintiffs argue that LaSalle breached this duty as trustee of the ESOP by (1) failing to ensure that Duff & Phelps (D&P), the valuation company it hired, had complete and correct information, and made proper assumptions for its valuation, especially regarding the Varlen acquisition and Amsted's repurchase obligation; and (2) failing to apply a marketability discount.

### Reliance on D&P Valuation

LaSalle maintains it is both appropriate and customary for a trustee to hire an independent expert, such as D&P, to value a plan sponsor's stock, and that LaSalle's reliance on D&P's finding was not imprudent. Plaintiffs recognize that securing an independent assessment of a stock valuation from a financial advisor or legal counsel is evidence of a

thorough investigation, but argue that it is not a complete defense to a claim of imprudence against a fiduciary responsible for the valuation. Citing Howard v. Shay, 100 F.3d 1484, 1489 (9th Cir. 1996), they argue the fiduciary must also (1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances. Shay involved a fiduciary accused of self-dealing who had the burden of proving that he fulfilled his fiduciary duties and that the ESOP received adequate consideration for its assets. Id. at 1488. As we have explained above, this is not a case of self-dealing – plaintiffs have not offered any evidence of self-dealing by Amsted or LaSalle,[6] nor does the ESOP's purchase of retiring participants' shares amount to prohibited transactions. LaSalle does not bear the burden of showing that adequate consideration was paid for the shares. Rather, plaintiffs must show that LaSalle's valuation was in some way imprudent, and thus a breach of fiduciary duty. Even if the standard developed in Howard applies to LaSalle, who was not involved in self-dealing or a prohibited transaction, a reasonable trier of fact could not find that this trustee violated it.

D&P's credentials as an expert in valuation are not at issue – plaintiffs did not dispute that D&P was "one of the premier ESOP valuation firms in the United States" (Defs' 19). Plaintiffs do dispute that LaSalle ensured that D&P had accurate information and made proper assumptions when performing its valuation. Plaintiffs argue that D&P did not have full access to documentation on Varlen or Amsted's acquisition of the company, nor did it

---

[6]This distinction between Shay and the Amsted case can be made with the other cases on which plaintiffs primarily rely, Donovan v. Cunningham, 716 F.2d 1455 (5th Cir. 1983), and Eyler v. Commissioner of Internal Revenue, 88 F.3d 445 (7th Cir. 1996). It is a significant distinction because the scrutiny of a fiduciary's decisions are justifiably stricter when it is involved in a transaction that provides personal benefit. The suspect nature of such transactions also explains why the burden of proof transfers to the fiduciary in such cases.

conduct an independent investigation into the acquisition. Therefore, plaintiffs argue that D&P's assumption that fair market value was paid for Varlen, and its conclusion that the purchase had a neutral effect on Amsted's stock price, was imprudent. While Elyse Bluth, the D&P manager in charge of the Amsted valuation, admits D&P did not conduct an independent investigation of the Varlen acquisition, this does not establish that their conclusion regarding its effect on the stock price was unreliable. In an arm's-length transaction, such as Amsted's purchase of Varlen at auction, the value of the asset is best determined by the purchase price. *See* In re: The Two S Corporation, 875 F.2d 240, 244 (9th Cir. 1989). Thus, D&P's assumption that fair market value was paid was not unsound. Upon review of the valuation, it was not imprudent for LaSalle to accept D&P's assessment that the acquisition of Varlen, offset by the debt Amsted incurred for the purchase, did not affect Amsted's stock price.

Plaintiffs also assert that D&P ignored Amsted's repurchase obligation in its valuation. They point to Bluth's testimony that she did not recall receiving any PERLS sheets (Bluth Dep. 55-56), and also highlight the testimony of Jeff Schiedemeyer, a D&P employee who worked on the Amsted valuation – that he did not recall receiving any "specific repurchase obligation forecast" from Amsted (Schiedemeyer Dep. 67). Though D&P may not have received separate reports dealing only with Amsted's repurchase obligation, the undisputed facts reveal that D&P was informed of the obligation through financial and cash flow statements that included information on the cost of shares repurchased from the ESOP (Bluth Dep. 39, 77-78). While the 1999 valuation report did not specifically address the repurchase obligation, it did take it into account as part of Amsted's projected future cash flows – flows that would be affected by the number of stock shares redeemed by terminating employees.

In their arguments that LaSalle was not vigilant enough in its review of D&P's valuation, plaintiffs rely heavily on <u>Donovan v. Cunningham</u>, 716 F.2d 1455 (5th Cir. 1983). As in <u>Eyler</u>, the defendant fiduciary in <u>Cunningham</u> sold shares of the sponsor company's stock to the ESOP. *Id.* at 1474. The sale price was found not to be adequate consideration but, rather, in excess of fair market value. *Id.* The fiduciaries in <u>Cunningham</u> argued that the sale price was taken from an investment firm's independent valuation of the stock. However, the transactions at issue took place over a year after the valuation. *Id.* at 1468-69. Not only was the valuation out of date, it was based on expectations of revenues that had clearly not materialized by the time of the stock sales. *Id.* LaSalle's reliance on D&P's valuation does not equate with the <u>Cunningham</u> fiduciaries' reliance on an out-of-date valuation that contained information which time had conclusively proven false. D&P's valuation contained assumptions that experts may have differed on, but that does not render LaSalle's reliance on the valuation a breach of fiduciary duty.

<u>Marketability Discount</u>

Plaintiffs rely on <u>Eyler</u> for the proposition that LaSalle's failure to apply a marketability discount was imprudent. In <u>Eyler</u>, the defendant appealed a tax court's holding that a marketability discount should have been applied to the price of his company's stock, shares of which were sold to the company ESOP. <u>Eyler v. Commissioner of Internal Revenue</u>, 88 F.3d 445, 453 (7th Cir. 1996). The Seventh Circuit rejected defendant's argument that no marketability discount should apply because ESOP participants had a "put option," allowing them to sell the shares to the company. *Id.* The court rejected this argument "for the fundamental reason that as of the date of the ESOP transaction, [the company] had no history of paying ESOP distributions in cash." *Id.* The court's fundamental reason for

requiring a marketability discount does not apply in LaSalle's case. Amsted did have a history of paying cash for ESOP participants' redeemed shares.

In his deposition, plaintiffs' expert, Kace Clawson, stated the application of a marketability discount is a "subjective determination by the valuation appraiser" (Clawson Dep. 12). D&P applied a zero per cent marketability discount to its October 1999 valuation of Amsted stock. Given Amsted's history of paying terminated participants their benefits quickly, and in full, its bylaws calling for the stock to be treated as if sold on the open market, and its precedent of not applying a marketability discount, no reasonable trier of fact could find that LaSalle breached its duty in accepting D&P's expert opinion.

## Plan Amendments

Plaintiffs also seek to impose co-fiduciary liability on LaSalle for failure to amend the ESOP plan document sooner. This fails both because amending the plan is a settlor function[7], for which the ESOP plan committee was responsible, and because, as explained above, the Amsted defendants did not violate the prudent person standard in reaching their decisions to amend the plan.

The Varlen acquisition resulted in a very sizable debt, but that was not the source of Amsted's cash flow problems. We are told that the business plan contemplated the servicing of that debt from the Varlen operations, and we are not directed to any evidence that they did not – or, more importantly, that it was imprudent to believe that those operations could service that debt. That acquisition still left about $200 million credit available for the repurchase of ESOP shares from its retiring employees, far more than historically had been necessary. We

---

[7]Even if the plan documents imposed fiduciary liability on the administrators when making plan amendments (as discussed in our analysis of the Amsted defendants' motion), that does not mean amendments are no longer a settlor function, only that the settlor is now subject to fiduciary responsibilities.

are told that the stock evaluation was too high, primarily because it did not take into account a presumed likelihood that a higher value would impact the repurchase obligation, although that "too high" is not quantified. But prior increased valuations, some of similar dimensions, had not triggered any significant change in stock or employee turnover. The cash crunch resulted from a turnover increase from 9 or 10 per cent to over 32 per cent, an extraordinary and wholly unexpected surge. When the dimensions of that cash crisis began to emerge, the measures taken to stem the hemorrhaging were not imprudent. We recognize that the changes in Amsted's fortunes had a far-reaching adverse impact on at least many in the class and bitterly disappointed their expectations, but that adverse impact is not, by itself, the predicate of legal liability.

<u>Other Issues and Motions</u>

Given that we have granted summary judgment on all claims discussed above for both the Amsted defendants and LaSalle, it follows that defendants are also granted summary judgment for plaintiffs' § 1105 claims seeking liability against defendants for their co-fiduciaries' violations. Plaintiffs' motion for summary judgment is denied and defendants Berg, Sopranos and Chiappetta's motion for summary judgment is moot.

## CONCLUSION

For the foregoing reasons, the Amsted defendants' and LaSalle's motions for summary judgment are granted. Plaintiffs' motion for summary judgment is denied. Defendants Berg, Sopranos and Chiappetta's motion for summary judgment is moot, and is therefore denied.

JAMES B. MORAN
Senior Judge, U. S. District Court

July 29 , 2004.