CERTIFIED COPY

# In the
# United States Court of Appeals
# For the Seventh Circuit

No. 05-3417

JUAN ARMSTRONG, et al., on behalf of themselves
and others similarly situated,

                        *Plaintiffs-Appellants,*

v.

LASALLE BANK NATIONAL ASSOCIATION,

                        *Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 2963—**James B. Moran,** *Judge.*

ARGUED JANUARY 17, 2006—DECIDED MAY 4, 2006

Before CUDAHY, POSNER, and WOOD, *Circuit Judges.*

POSNER, *Circuit Judge.* Amsted Industries, Inc., a manufacturer of railroad and other transportation equipment, has for many years been owned entirely by its employees (including retired employees) through an Employee Stock Ownership Plan (an ESOP), which is subject to ERISA. 29 U.S.C. §§ 1104(a)(2), 1107(b), (d)(6); *Steinman v. Hicks*, 352 F.3d 1101, 1102-03 (7th Cir. 2003); *In re Merrimac Paper Co.*, 420 F.3d 53, 63 (1st Cir. 2005). Employees begin receiving stock shortly after they join the company, and

Case: 1:01-cv-02963 Document #: 282 Filed: 05/26/06 Page 2 of 12 PageID #:3488

over the years the value of an employee's holding can grow to a considerable amount. When an employee leaves Amsted's employ, his stock is (or rather was until recent changes in the plan that have precipitated this litigation) redeemed in full and at once by the company for cash. The plaintiffs, representing a class consisting of all participants in the ESOP, charge that the ESOP's trustee, LaSalle National Bank, made an imprudent valuation of the company's stock, causing heavy losses to the class members. The district court granted summary judgment for LaSalle.

A critical stage in the administration of an ESOP of a company whose shares are not traded is establishing the price at which an employee who leaves the company can redeem his shares. If the price is set too low, employees who leave will feel short-changed. If it is set too high it may precipitate so many departures that it endangers the firm's solvency. Setting a price for redemptions is difficult because by definition there is no market valuation of stock that isn't traded.

The price of Amsted's stock was reset every year. Before the recent amendments to the ESOP, it was set on September 30 but an employee had until June 30 of the following year to decide whether by quitting the company to redeem his stock at the September 30 value. Thus a drop in the stock's value between September 30 and the following June 30 would increase the departure rate because employees who didn't expect the value to recover could truncate their loss by redeeming their stock at the higher September value.

In August 1999 Amsted bought Varlen Corporation, a manufacturer of trucking equipment, for some $800 million. This was a big acquisition for Amsted; Amsted's

value on the eve of the acquisition probably did not exceed the purchase price of Varlen. There is no contention that Amsted overpaid, however; it outbid the next highest bidder by only fifty cents a share.

Amsted financed the acquisition by taking out a $1 billion unsecured bank loan, which replaced its previous debt; so after completing the acquisition it had a $200 million unused line of credit ($1 billion minus $800 million). We do not know how much additional credit it could have obtained, and on what terms, but apparently not much, as we shall see. What is certain is that the acquisition increased Amsted's debt-equity ratio, and hence the risk to its employee-shareholders, assuming they could not offset it by altering their stock portfolios; presumably most of the employees had the bulk of their financial assets in the ESOP.

On September 30, 1999, a month after the acquisition, a consulting firm (Duff & Phelps) hired by LaSalle valued Amsted's stock at $184 a share. This was 32 percent higher than the previous year's valuation. The Dow Jones index of 30 industrials had increased by that amount, though we have no reason to think that Duff & Phelps was merely assuming that Amsted was about as good a performer as the average company in the index. (More on valuation later.) LaSalle accepted Duff & Phelps's valuation.

Given Amsted's limited unused credit line, it was important that its shares not be valued at a price that would precipitate so many employee departures, and therefore so many redemptions, as to create financial problems for the company. In recent years (1996 to 1999), the annual percentage of the workforce that had left the company, weighted by stock ownership, had, as shown

in the following chart, varied in a tight band between about 9 and 11 percent. But back in 1990 it had hit 13 percent, more than double the rate the year before.



If the percentage of redemptions in 2000 had turned out to be 10 percent, the average for the previous four years, the cost of redemptions would have been only about $100 million. Amsted could easily have financed that expense by borrowing against its unused line of bank credit, or alternatively out of its cash flow. Amsted had earned net income of $56 million in 1999; in addition it made annual cash contributions, equal to 10 percent of each employee's compensation, to the ESOP in lieu of contributing to a pension plan for its employees, though the record does not indicate the total amount of those annual contributions and diverting them to redemptions would hurt current employees.

The redemption rate in 2000 turned out to be not 10 percent but 32 percent. Redeeming cost the company $330 million, creating liquidity problems that caused Amsted to amend the ESOP to eliminate departing employees' right to a lump-sum distribution (their shares would henceforth be redeemed over four years), to defer

eligibility for distributions generally to five years after the employee left the company, and to make other changes in the plan—all adverse to the members of the plaintiff class. Amsted's shares were revalued that year at only $90 and the next year at $44.

The reason for the surge in departures and therefore redemptions is not entirely clear. But the Dow Jones Industrial average, although it actually rose by 2 percent between September 30, 1999, the date on which Amsted's stock was valued, and June 30, 2000, the date on which employees could by quitting redeem their shares at the price that had been set on September 30, fell 12 percent between January 1, 2000, and June 30, 2000. That may have made the employees skittish about continuing to own Amsted stock. Of course Amsted might do better than the companies in the Dow Jones index—but it might also do worse.

In addition, many workers were reaching an age at which they would want to retire, and many of them had accumulated substantial amounts of Amsted stock through the ESOP. Of Amsted's 3,000 employee-shareholders, 735 owned in the aggregate $560 million worth of Amsted stock at the $184 redemption price set in September of 1999. And the 800 employee-shareholders who were at least 55 years old or had more than 30 years of service with the company had amassed Amsted stock worth almost $300 million. The average annual number of redemptions in previous years had been 485, so it is easy to see how a surge in departures could quickly swallow up the $200 million unused line of credit plus other available cash; apparently Amsted was not able to cover the expense of the redemptions with additional borrowing.

Assuming that Amsted stock was the principal financial asset of most employees, they were underdiversified and

therefore at risk of experiencing a large decline in their overall wealth if the price of the stock fell. One cannot infer from the concentration of their wealth in the stock of one company that they *liked* risk and were therefore indifferent to the risk imposed on them by the lack of diversification. Remember that Amsted contributed an amount equal to 10 percent of the employee's salary to the purchase of stock in the ESOP; there is no suggestion that an employee could have persuaded Amsted to give the money to him instead so that he could purchase a diversified portfolio. Nor is it suggested that risk-averse workers shy away from working for companies that have ESOPs.

For the reasons just indicated, the Amsted ESOP was ripe for a "run" in 2000; and the more employees who left, redeeming their shares for cash at $184 a share, the more acute Amsted's liquidity problem would be and therefore the greater the incentive of other employees to leave before the house caved in. The question is whether LaSalle, as the ESOP's trustee, behaved imprudently in the face of this risk.

The duty of an ERISA trustee to behave prudently in managing the trust's assets, which in this case consisted of the assets of the ESOP, is fundamental. This is true even though, by the very nature of an ESOP, the trustee does not have a *general* duty to diversify, though such a duty can arise in special circumstances. *Steinman v. Hicks, supra*, 352 F.3d at 1106. The duty to diversify is an essential element of the ordinary trustee's duty of prudence, given the risk aversion of trust beneficiaries, but the absence of any general such duty from the ESOP setting does not eliminate the trustee's duty of prudence. If anything, it demands an even more watchful eye, diversifi-

Case: 1:01-cv-02963 Document #: 282 Filed: 05/26/06 Page 7 of 12 PageID #:3493

cation not being in the picture to buffer the risk to the beneficiaries should the company encounter adversity. There is a sense in which, because of risk aversion, an ESOP is imprudent per se, though legally authorized. This built-in "imprudence" (for which the trustee is of course not culpable) requires him to be especially careful to do nothing to increase the risk faced by the participants still further.

Before proceeding further we must consider whether our review of the trustee's decisions in administering an ESOP, particularly the choice of a redemption price, should be deferential or plenary.

In general, judicial review of the decisions of an ERISA trustee as of other trustees is deferential unless there is a conflict of interest, which there is not here. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-15 (1989); *Rud v. Liberty Life Assurance Co.*, 438 F.3d 772, 775-76 (7th Cir. 2006). And an ESOP trustee is an ERISA trustee. Yet in *Eyler v. Commissioner*, 88 F.3d 445, 454-56 (7th Cir. 1996), we conducted a plenary review of the performance of the decisions of an ESOP trustee (though without discussion of the standard of review), as did the Ninth and Fifth Circuits in *Howard v. Shay*, 100 F.3d 1484, 1488-89 (9th Cir. 1996), and *Donovan v. Cunningham*, 716 F.2d 1455, 1473-74 (5th Cir. 1983), respectively, though other courts have in similar cases applied the deferential standard of abuse of discretion. *Kuper v. Iovenko*, 66 F.3d 1447, 1458-60 (6th Cir. 1995); *Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir. 1995); *Ershick v. United Missouri Bank, N.A.*, 948 F.2d 660, 666-67 (10th Cir. 1991).

It may seem odd to speak of standards of judicial review in the present context. Such standards are usually meant to guide an appellate tribunal asked to overturn the

rulings or findings of a trial-level adjudicator, such as a judge or jury or administrative law judge, or (coming closer to home) an ERISA trustee asked to determine a beneficiary's entitlement under a welfare plan. LaSalle was doing nothing analogous to adjudication in fixing a $184 redemption price of Amsted shares in 1999. Still, there are rules as to how much deference a court should give nonadjudicators, a pertinent example being the business-judgment rule, which decrees a light hand for a court asked to invalidate a business decision. E.g., *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 927-28 (Del. 2003). Whether a valuation is prudent seems rather similar in character to whether a business decision is sensible. They are both judgmental.

But there is a difference. A trustee is not an entrepreneur. His services are more like those of a professional. He is supposed to be careful rather than bold. And care is something that courts are more comfortable in appraising than entrepreneurial panache, as when they decide that a driver was negligent because he failed to exercise due care and as a result injured a pedestrian. It is natural for a court to consider whether a trustee was prudent rather than whether he abused his discretion.

In arguing that LaSalle placed the ESOP's participants at unnecessary risk, the plaintiffs emphasize LaSalle's seeming failure to consider the effect on the liquidity of the ESOP's assets of Amsted's having taken on so much debt in order to buy Varlen. It was obvious that if redemptions exceeded $300 million, Amsted might encounter a serious liquidity problem that would force it to change the ESOP to the detriment of the remaining employees. There is no evidence that LaSalle thought about this possibility, let alone that it tried to reduce the risk by

lowering the redemption price, which by dampening the redemption rate would reduce the threat to liquidity. LaSalle appears to have been confident that the future would be just like the past. That may have been the best prediction, but it may have been incautious for LaSalle to act on it. The best prediction may be that one's house will not burn down, but that doesn't means that it's prudent to allow one's fire-insurance policy to lapse.

LaSalle had, it is true, a balancing act to perform. For if it slashed the redemption price, departing employees would have cause for complaint and LaSalle might find itself sued, just as it has been, only by another set of plaintiffs. We must not seat ESOP trustees on a razor's edge. We agree therefore with those courts that review the ESOP trustee's balancing decision deferentially. *Caterino v. Barry*, 8 F.3d 878, 883 (1st Cir. 1993); *Edwards v. Wilkes-Barre Publishing Co. Pension Trust*, 757 F.2d 52, 56-57 (3d Cir. 1985); *Foltz v. U.S. News & World Report, Inc.*, 865 F.2d 364, 374 (D.C. Cir. 1989); *Northeast Dept. ILGWU Health & Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund*, 764 F.2d 147, 162-63 (3d Cir. 1985); *Ganton Technologies, Inc. v. National Industrial Group Pension Plan*, 76 F.3d 462, 466-67 (2d Cir. 1996). Even if, as we assumed in *Eyler*, the *general* standard of review of an ESOP's decisions for prudence is plenary, a decision that involves a balancing of competing interests under conditions of uncertainty requires an exercise of discretion, and the standard of judicial review of discretionary judgments is abuse of discretion.

But a discretionary judgment cannot be upheld when discretion has not been exercised. *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005); *Miami Nation of Indians of Indiana, Inc. v. U.S. Dept. of Interior*, 255 F.3d

342, 350 (7th Cir. 2001). We cannot find in the record as now constituted (a significant qualification, since the case is before us as a result of a grant of summary judgment) any indication that LaSalle considered how best to balance the interests of the various participants in the ESOP in the novel circumstances created by Amsted's acquisition of Varlen. LaSalle acted as if nothing had changed, without (so far as appears) attempting to determine the consequences of the acquisition for the risk borne by the ESOP's participants. A trustee must discharge his duties "with the care, skill, prudence, and diligence *under the circumstances then prevailing* that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B) (emphasis added); see also *Moench v. Robertson, supra,* 62 F.3d at 572-73. A trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent. Whether that is an accurate characterization of LaSalle's conduct is a critical issue requiring exploration by the district court.

Should that issue be resolved in LaSalle's favor, the court will have to consider whether LaSalle, although exercising discretion, abused it. One way to pose the question—we do not say the only way—is to ask whether it was unreasonable for LaSalle, in the circumstances that confronted it, to fail to apply a "marketability discount" to the redemption price.

We do not know how Duff & Phelps arrived at the $184 figure for the value of Amsted stock on September 30, 1999. A likely possibility is that it computed the average price-earnings ratio of companies that are in businesses similar to Amsted's but the stock of which is publicly

traded, and that it then multiplied Amsted's earnings by that ratio and finally that it adjusted the ratio (and hence the valuation of Amsted's stock) on the basis of factors that distinguish Amsted from the average firm in the comparison group. See generally Daniel Bayston, "Valuation of Closely Held Companies," Duff & Phelps, LLC, http://www.duffandphelps.com/3_0_index.htm?3_3_1_content_arc, visited Apr. 7, 2006. One of those factors was the relative illiquidity of Amsted stock.

The less marketable a property is, the lower its market value; shares in closed-end mutual funds typically trade at prices lower than the prices of the stocks held by the funds because the mutual-fund investor cannot sell his share of the stocks in the mutual fund's portfolio other than by selling shares of the fund. A participant in an ESOP is in a parallel position: he can sell his shares of his employer's stock only by quitting his job. And the ESOP could always be changed by Amsted—ultimately it was—to limit redemptions in the event of a run, thus further reducing the liquidity of the participant's investment. The average person would therefore prefer to own shares in a publicly traded company than in Amsted (if they were priced the same) even if the two companies had identical cash flows and risk profiles. And so they wouldn't be priced the same. By increasing the probability of a run, the Varlen acquisition increased the probability that rights of redemption by Amsted's employee-shareholders would be further restricted, and so the acquisition created a further threat to liquidity.

There are techniques for calculating a marketability, or illiquidity, discount, see Z. Christopher Mercer, "A Primer on the Quantitative Marketability Discount Model," *CPA Journal*, July 2003, www.nysscpa.org/cpajournal/2003/

0703/dept/d076603.htm, visited Apr. 6, 2006, but we shall not speculate on what they might have yielded if applied to Amsted, or on how far a trustee can deviate from them before he can be adjudged imprudent. These are issues for exploration on remand if it is determined that LaSalle did not fail to exercise discretion.

REVERSED AND REMANDED.

A true Copy:

Teste:

*Clerk of the United States Court of Appeals for the Seventh Circuit*